

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff**

**v.**

**TODAYS GROWTH CONSULTANT INC.**
**(dba "The Income Store")**

**and**

**KENNETH D. COURTRIGHT, III,**

**Defendants.**

1:19-cv-08454
Judge Andrea R. Wood
Magistrate Judge Jeffrey Cummings

**JURY DEMANDED**

FILED

DEC 2 7 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against

Defendants Todays Growth Consultant Inc. and Kenneth D. Courtright, III, alleges as follows:

**SUMMARY**

1.      The SEC brings this action to stop a long-running Ponzi-like scheme and offering

fraud by Todays Growth Consultant Inc. ("TGC") and Kenneth D. Courtright, III, its founder,

co-owner, and current Chairman ("Courtright") (collectively, "Defendants").

2.      From at least January 2017 through October 2019, TGC and Courtright have

raised at least $75 million from more than 500 investors who executed "Consulting Performance

Agreements," in which TGC purports to provide investors with a minimum guaranteed rate of

return, in perpetuity, on revenues generated by websites that TGC acquires or builds for the

investor and then develops, maintains, and hosts.

1

3.     TGC's Consulting Performance Agreements, which are sold through unregistered offerings that TGC and Courtright advertise on websites and via radio ads, purport to guarantee high returns to investors.  In the agreements, TGC promises investors the larger of either 50% of their website revenues or a minimum annual guaranteed return (typically ranging from 13% to 20% of the initial investment amount) to be paid monthly, even if the investor's website revenue is insufficient to pay that return.  TGC backs it guarantee with various representations, including that it is in "satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties" and that it is "debt-free … with no accounts payable or loans outstanding."

4.     The reality is that TGC's business model has not been successful.  It is not in satisfactory financial condition.  It is not able to perform its contractual duties under Consulting Performance Agreements.  It is crumbling under its debt obligations.

5.     Collectively, from at least January 2017 through the present, investor websites have generated materially less revenue than the guaranteed amounts specified in TGC's Consulting Performance Agreements.  From January 1, 2017 through at least October 31, 2019, investor websites generated approximately $9 million in advertising and product sales revenue.  During the same period, TGC paid investors at least $30 million.

6.     TGC's financial statements and bank records show that, in classic Ponzi-like fashion, from at least January 2017 into at least May 2019, TGC funded the gap between website revenues and its guaranteed investor payouts primarily through the offer and sale of Consulting Performance Agreements to new or repeat investors.

7.     Although TGC appears to have added loans as a second source of funds beginning in May 2019, including several large loans from distressed lending companies, TGC has

2

continued to raise funds through the offer and sale of Consulting Performance Agreements and continued after May 2019 to operate in a Ponzi-like fashion. TGC has co-mingled investor funds with loan proceeds and used the co-mingled funds to both satisfy its guarantee obligations and begin to repay its loans.

8.  Throughout, TGC has also diverted millions in investor funds to pay Courtright's personal expenses, including his mortgage and private secondary school tuition, among numerous other personal expenses.

9.  Use of investor funds to satisfy TGC's payment obligations to other investors and for Courtright's personal expenses is an express violation of the use of funds provision in TGC's Consulting Performance Agreements. Such cash flows are also indicative of a Ponzi-like scheme.

10. TGC's scheme has become unsustainable. On Friday, December 13, 2019, TGC informed investors that it is putting a temporary moratorium on investor payouts due to cash flow problems. It is currently offering investors a variety of options, including, to buy back their investments in exchange for an interest-bearing promissory note. Investors are under pressure to make a choice now. TGC has told investors that, if they remain investors, it will resume investor payouts in April 2020. Upon information and belief, TGC continues to solicit potential investors; TGC's bank records indicate that TGC has raised new investor money as recently as November 2019, the last month for which the SEC has TGC bank records.

11. Courtright has known, or recklessly disregarded, for years that TGC operates as a Ponzi-like scheme. For example, in September 2018, while applying to increase TGC's line of credit with its then-current bank, Courtright admitted to bank representatives that TGC had used, and would continue to use, incoming funds from new investors to cover the shortfall between

website revenues and investor payouts until advertising revenues increased or TGC developed an alternative revenue stream. Concerned that TGC funded payouts to existing investors with new investors' money, the bank closed TGC's accounts, and TGC moved to a new bank in September 2018.

12. Unless restrained from raising additional investor funds, TGC and Courtright are likely to continue doing so, and to continue using those funds to satisfy its payment obligations to other investors and to pay Courtright's personal expenses, until TGC collapses. Its recent letter to investors, of December 13, 2019, states that TGC expects to resume payments to investors in April 2020. TGC and Courtright should be enjoined now to preserve the status quo.

## VIOLATIONS

13. By virtue of the conduct alleged herein, TGC and Courtright, directly or indirectly, singly or in concert, have engaged in violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]. TGC, with the substantial assistance of Courtright, has also engaged in and continues to engage in transactions, acts, practices, and courses of business that constitute violations of the registration provisions of Securities Act Sections 5(a) and 5(c) [15 U.S.C. § 77e(a) and 77e(c)].

14. Unless TGC and Courtright are permanently restrained and enjoined, they will likely again engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object, especially in light of their plan to lift the moratorium on investor payouts in four months.

4

15.     The SEC, in the interest of protecting the public from any further unscrupulous and illegal activity, brings this action against TGC and Courtright, seeking temporary, preliminary and permanent injunctive relief, disgorgement of all illicit profits and benefits Defendants have received, plus accrued prejudgment interest, and civil monetary penalties. The SEC also seeks an asset freeze; an order appointing a receiver to take possession and control of TGC's assets and business, its customer funds, and the assets and funds of Courtright; and an order prohibiting the destruction of documents, accelerating discovery, and requiring an accounting.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to Securities Act Sections 20(b) and 22(a) [15 U.S.C. §§ 77t(b) and 77v(a)] and Exchange Act Sections 21(d), 21(e), and 27 [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

17.     In connection with the conduct alleged in this Complaint, each Defendant has, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange.

18.     Venue is proper in this District pursuant to Securities Act Section 22 [15 U.S.C. § 77v] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendant Courtright resides within this District, and Defendant TGC is headquartered in, and conducts fraudulent business out of Courtright's residence in, this District. Certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District.

## DEFENDANTS

19.     **Todays Growth Consultant Inc.** ("TGC"), is a private corporation, organized under the laws of the State of Illinois, and is co-owned by Defendant Courtright and his wife.

Courtright's residence serves as TGC's headquarters. TGC also does business through a division called The Income Store, which occupies premises in Lancaster, Pennsylvania. TGC has claimed at various times to have offices in Naples, Florida, and in Romania and recently announced it is growing and has plans to open offices in the Philippines and India.

20.     **Kenneth D. Courtright, III ("Courtright")**, age 49, resides in Minooka, Illinois, and is currently TGC's Chairman. From March 2009 through August 2019, Courtright was TGC's Chief Executive Officer and President. Together with his wife, who took over as President of TGC in or about August 2019, Courtright wholly owns TGC.

## FACTS

### Consulting Performance Agreements

21.     Since at least 2017, TGC has offered and sold unregistered investment contracts called Consulting Performance Agreements to investors across the United States and the world.

22.     The Consulting Performance Agreements require investors to pay a so-called "Upfront Fee" and to give TGC password access to the websites; TGC is required to use the Upfront Fee to acquire or build revenue-generating websites for the investor and then to develop, market and maintain the websites. The agreements, since at least 2017, have principally been structured in a manner that require no effort from the investor beyond payment of the initial investment amount, and investors are led to expect profits solely from TGC's expertise and efforts.

23.     Investors are guaranteed a minimum return on their investment. Pursuant to the terms of the Consulting Performance Agreements, investors are entitled to receive, in perpetuity, a monthly payment equal to 50% of the revenues generated by their websites; but, if website revenues do not exceed an agreed-to threshold dollar amount specified in the agreement, TGC

promises to pay the investor the minimum return specified in their agreement. The threshold amounts vary from agreement to agreement but typically are a percentage of the investor's Upfront Fee, converted to a monthly dollar equivalent.

24. By way of example, INVESTOR 1's agreement, entered into in July 2017, entitles the investor to 18% of his $150,000 Upfront Fee, or $2,250 per month (18% of the investor's $150,000 Upfront Fee divided by 12), if the investor's website is not yet earning that amount in revenue each month. Payments are to commence as of a date certain, which is approximately 18 weeks after the date on which the Consulting Performance Agreement was executed, and are to continue monthly in perpetuity.

25. INVESTOR 2's agreement, entered into in July 2017 and executed by Courtright, guarantees the investor a minimum of $542 per month, which is the monthly equivalent of 13% of the investor's $50,000 Upfront Fee, if his website revenues do not exceed that amount. Payments are to commence as of a date certain, which is approximately 18 weeks after the date on which the Performance Agreement was executed, and are to continue monthly in perpetuity.

26. INVESTOR 3's agreement, entered into in August 2017 and executed by Courtright, provides the investor with a performance guarantee of $3,896 per month, which is the monthly equivalent of 17% of the investor's $275,000 Upfront Free. His payments are to commence as of a date certain, which is approximately 20 weeks after the date on which the Performance Agreement was executed, and are to continue for 60 years, a limit on duration that INVESTOR 3 requested and Courtright approved.

27. While INVESTOR 3 was making his investment decision, TGC provided him with a list of "contract minimum returns" that reflected the then-current guarantee rates that TGC offered to prospective investors, which were based on the amount of the Upfront Fee:

| Contract Minimum Returns | |
|---|---|
| $50k to 99k | 13% min. |
| $100k to 199k | 15% min. |
| $200k to 274k | 16% min. |
| $275k to 349k | 17% min. |
| $350k to 424k | 18% min. |
| $425k to 499k | 19% min. |
| $500k or more | 20% min. to start |

Some Consulting Performance Agreements have guarantee rates that fall outside of these ranges and provide investors an annual guaranteed return ranging from 12% of the investor's Upfront Fee to 30%.

28.     TGC's performance guarantee is accompanied by its express representation in the Consulting Performance Agreements that it "is in satisfactory financial condition, solvent, and able to pay its bills when due and financially able to perform its contractual duties hereunder." Its website also represents it is "debt free."

29.     TGC's Consulting Performance Agreements restrict TGC's use of investor funds. TGC agrees to "use the Upfront Fee exclusively" for purchasing or building, hosting, maintaining, and marketing of the investor's website(s).  Further, though TGC may use subcontractors who share in website revenue, the agreements make clear that TGC will pay subcontractors only from its 50% share of the website revenue.

30.     From at least January 1, 2017 through October 2019, TGC marketed its Consulting Performance Agreements through, among other ways, Sirius XM Satellite radio advertisements, online advertisements including on the website www.bizbuysell.com, and also through its own website www.todaysgrowthconsultant.com and that of its division, The Income Store, www.incomestore.com.

31.     Upon information and belief, during that period, TGC raised at least $75 million from more than 500 investors through the offer and sale of Consulting Performance Agreements.

Consistent with how it marketed the investment opportunity, investors who entered into Consulting Performance Agreements during this period are geographically dispersed throughout the U.S., and some are outside the U.S.

32.     Courtright reviewed and approved Consulting Performance Agreements before they were signed and sometimes signed the agreements on behalf of TGC. For example, when INVESTOR 3 asked to change the duration of his contract from "in perpetuity" to "60 years," and proposed other edits, TGC executives told him that Courtright had to approve the changes. Courtright is the executive who ultimately signed the agreement. Courtright, a public spokesperson for TGC, was familiar with the terms of the Consulting Performance Agreements, including the guaranteed returns, the restriction on TGC's use of funds and the representations about TGC's solvency and financial ability to satisfy its guarantee obligations.

33.     From at least January 2017 through October 2019, investor websites, collectively, generated revenues that were materially below the threshold amounts guaranteed by TGC. TGC nonetheless paid investors their guaranteed returns, monthly, until December 2019, when it put a moratorium on investor payouts.

34.     According to TGC's financial statements, and upon information and belief, from at least January 2017 through October 2019, the websites underlying TGC's Consulting Performance Agreements generated approximately $9 million in advertising revenues and revenues from the sale of third-party products, as follows:

| Website Revenue | |
|---|---|
| **2017** | $2,784,507 |
| **2018** | $2,369,573 |
| **2019 (Jan.-Oct.)** | $3,847,948 |
| **TOTAL:** | **$9,002,028** |

35.     According to TGC's financial statements, and upon information and belief, during the same period, TGC made payments to investors of at least $30 million:

| Investor Payouts | |
|---|---|
| 2017 | $8,303,225 |
| 2018 | $10,654,449 |
| 2019 (Jan.-Oct.) | $12,190,089 |
| TOTAL: | $31,147,763 |

36.     TGC has been paying investors the amounts guaranteed in their Consulting Performance Agreements. For example, from December 2017 through November 2019, TGC paid INVESTOR 1 precisely $2,250 per month, which is his contractually guaranteed amount. From November 2017 through November 2019, TGC paid INVESTOR 2 precisely $542 per month and, from January 2018 through November 2019, it paid INVESTOR 3 precisely $3,896 per month, the amounts guaranteed in their respective Consulting Performance Agreements.

37.     TGC not only has paid investors their contractually guaranteed amounts, but also, in at least some cases, it paid investors their contractually guaranteed amounts even before TGC purchased websites for the investor. For example, INVESTOR 3 and Courtright (on TGC's behalf) executed a Consulting Performance Agreement effective August 30, 2017. INVESTOR 3 wired his Upfront Fee of $275,000 to TGC on September 7, 2017. On January 15, 2018, before TGC had purchased or built any websites for INVESTOR 3, INVESTOR 3 started to receive his monthly guaranteed payment of $3,896. In or about March 2018 the first website was purchased and in or about April 2019 the second website was purchased. INVESTOR 3 understands the first website has generated no revenues, ever, and the second website has generated insignificant revenues materially below the $3,896 payout he has received each month since January 2018, totaling $89,608. His requests for information concerning his website

revenues frequently went unanswered, but, for at least January to August 2019, and October 2019, he received confirmation from TGC that his websites had earned $0 or negative revenues.

38.     In order to pay investors their guaranteed returns, and in the absence of sufficient website revenues, TGC has had to turn to other funding sources to make up the more than $20 million shortfall between website revenue and its guarantee obligations:

| Investor Payouts vs. Website Revenue | | | |
|---|---|---|---|
| | *Investor Payouts* | *Website Revenue* | *Shortfall* |
| **2017** | $8,303,225 | $2,784,507 | $5,518,718 |
| **2018** | $10,654,449 | $2,369,573 | $8,284,876 |
| **2019 (Jan.-Oct.)** | $12,190,089 | $3,847,948 | $8,342,141 |
| **TOTAL:** | **$31,147,763** | **$9,002,132** | **$22,145,631** |

39.     Upon information and belief, TGC has made up the shortfall between website revenue and its guarantee obligations by raising new funds through the offer and sale of Consulting Performance Agreements and diverting a material portion of those funds to pay existing investors.

40.     According to TGC's financial statements, and upon information and belief, from at least January 2017 through October 2019, TGC raised at least $75 million from investors through the offer and sale of Consulting Performance Agreements:

| Investor Funds Raised ("Upfront Fees") | |
|---|---|
| **2017** | $16,440,606 |
| **2018** | $42,265,241 |
| **2019  (Jan.-Oct.)** | $28,941,426 |
| **TOTAL:** | **$87,647,273** |

41.     Until May 2019, besides investor funds, TGC had no other source of revenue or funds that singly, or collectively with website revenues and other funds, were sufficient to cover the shortfall between website revenue and TGC's payment obligations to investors.

11

42.     Starting in May 2019, through at least October 2019, TGC appears to have added a second source of funds, but it has co-mingled funds from that second source, with funds from the offer and sale of Consulting Performance Agreements, and is using the co-mingled funds to make its guarantee payments to existing investors, and for purposes not consistent with the terms of the Consulting Performance Agreements.

43.     Specifically, from May through October 2019, based on credits that have appeared in TGC's bank statements during that period, it appears TGC entered into loans (some with lenders who specialize in distressed lending) and received loan proceeds of at least $11 million.  During the same period, upon information and belief, TGC raised more than $12 million from investors through the offer and sale of Consulting Performance Agreements.  TGC deposited the investor funds and loan proceeds into its principal commercial bank account where they became co-mingled.

44.     From May 2019 through October 2019, TGC used the co-mingled funds make approximately $8 million in investor payouts and approximately $3 million in payments to its lenders.  Accordingly, despite TGC having accessed another source of funding, TGC continued to engage in a Ponzi-like scheme from May through October 2019.  It continued to use funds raised from new investors to pay its guarantee obligations to existing investors, and for other purposes not allowed under the Consulting Performance Agreements, such as making loan repayments.

| Investor Payouts vs. Website Revenue, Net Loans, Upfront Fees | | | | |
|---|---|---|---|---|
| | *Website Revenue* | *Net Loans* | *"Upfront Fees"* | *Investor Payouts* |
| **2017** | $2,784,507 | - | $16,440,606 | $8,303,225 |
| **2018** | $2,369,573 | - | $42,265,241 | $10,654,449 |
| **2019 (Jan.-Apr.)** | 1,434,395 | - | $12,256,185 | $4,245,882 |
| **2019 (May-Oct.)** | $3,847,948 | $8,476,310 | $16,685,241 | $7,944,207 |
| **TOTAL:** | **$9,002,132** | **$8,476,310** | **$87,647,273** | **$31,147,763** |

**Courtright Diverted TGC Funds for His Personal Use**

45.     Since at least 2017, Courtright has transferred large sums of money from TGC's principal bank account (the account with co-mingled investor funds, website revenue, and loan proceeds) into his personal bank accounts and also transferred funds from TGC's principal bank accounts directly to third-parties to pay for personal expenditures.

46.     For example, from January 2017 through October 2019, TGC transferred more than $1.5 million in cash from its corporate accounts to Courtright's personal bank accounts, including accounts held jointly with his wife.

47.     Between January 2017 and October 2018, TGC transferred more than $323,000 in mortgage payments to the bank holding the mortgage on Courtright's personal residence.  The transfers were in amounts that exceeded Courtright's monthly mortgage obligation.  Specifically, as of September 2017, Courtright's mortgage loan required ***monthly*** principal and interest payments of $2,729, but, between January 2017 and October 2018, TGC generally made ***weekly*** payments of $3,000 to pay down Courtright's personal residential mortgage.

48.     In 2018, among other payments made for Courtright's personal expenses, TGC paid more than $12,000 in tuition to a private secondary school; and, in 2019, it paid more than $24,000 to the same school.  Upon information and belief, members of Courtright's family attended the school at that time.

**TGC and Courtright Acted with the Requisite Scienter**

49.     From at least January 2017 through the present, TGC and Courtright have knowingly or recklessly engaged, and, upon information and belief, are currently engaged, in a scheme to defraud investors and to obtain money by means of materially false and misleading statements to investors.

50.     Courtright knew or recklessly did not know that TGC used Upfront Fees from new investors to pay the guaranteed returns to existing investors.  He signed Consulting Performance Agreements and knew those agreements, consistent with TGC's offer to prospective investors, provided a minimum guaranteed return on their investment without regard to the performance of their websites.  He had signature authority on TGC's bank accounts and access to the accounts.

51.     Courtright admitted knowledge of the scheme in September 2018, when he told representatives of TGC's former bank that TGC had and would continue to pay the guaranteed returns to existing investors by using incoming funds from new investors, until either advertising revenue increased or an alternative revenue stream was adopted.

52.     Other TGC executives knew, or recklessly did not know, that TGC was using investor money to pay existing investors.  In August 2018, in response to questions from TGC's bank, TGC's Controller stated to bank representatives that when website revenue is insufficient to make guaranteed investor payouts, TGC uses incoming money from new investors.

53.     Despite this knowledge, TGC and Courtright nonetheless continued to engage in the unregistered offer and sale of investment contracts and to use the proceeds to pay existing investors.

**TGC's Recent Moratorium on Investor Payouts**

54.     On Friday, December 13, 2019, TGC emailed investors a notice that it is experiencing cash flow problems and is therefore placing a moratorium on investor payouts "for the next four months."

55.     The notice asks investors to make an immediate choice among four options. Investors may:  (i) terminate their Consulting Performance Agreement and transfer to another

service provider, (ii) sell the websites underlying their Consulting Performance Agreements with TGC's assistance, and TGC will waive its commission, (iii) sell their Consulting Performance Agreements back to TGC for a price equal to their Upfront Fee less payments received to date, in exchange for a promissory note from TGC with interest, or (iv) remain as investors, agree to a temporary modification of their Consulting Performance Agreements to provide investors with 8% interest on an annual basis until April 20, 2020, after which time the moratorium will lapse and investor payments will continue according to the original terms of Consulting Performance Agreements.

56.     Although TGC has put a moratorium on investor payouts, it has not put a moratorium on its efforts to raise funds from new investors and, upon information and belief, it continues to solicit new investors.

57.     Upon information and belief, TGC raised approximately $2 million in new investor money in November 2019, and it made payments to lenders of more than $2.5 million. Further, at least one of TGC's websites (incomestore.com) remains active, and TGC continues to promote investment opportunities through that site.  On that website, TGC continues to make false statements about its investment opportunity.  For example, a graphic that appears on the site at least as of December 18, 2019, claims that 100% of its websites are "succeeding financially." The site also represents that "TGC is a debt-free privately held company with no accounts payable or loans outstanding."

## COUNT I
### Violations of Section 10(b) of the Exchange Act and
### Rules 10b-5(a), (b), and (c) Thereunder

58.     The SEC realleges and incorporates by reference Paragraphs 1 through 57.

59.     Defendants, directly or indirectly, in connection with the purchase and sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, knowingly or recklessly employed devices, schemes, or artifices to defraud.

60.     Defendants, directly or indirectly, in connection with the purchase and sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, knowingly or recklessly engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon another person.

61.     Defendants, directly or indirectly, in connection with the purchase and sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, knowingly or recklessly made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

62.     By reason of the foregoing, Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), (c)].

## COUNT II
### Violations of Section 17(a)(1) of the Securities Act

63.     The SEC realleges and incorporates by reference Paragraphs 1 through 57.

64.     Defendants, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails,

directly or indirectly, knowingly or recklessly, employed devices, schemes, or artifices to defraud.

65.     By reason of the foregoing, Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III
### Violations of Section 17(a)(2) of the Securities Act

66.     The SEC realleges and incorporates by reference Paragraphs 1 through 57.

67.     Defendants, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact and by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

68.     By reason of the foregoing, Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT IV
### Violations of Section 17(a)(3) of the Securities Act

69.     The SEC realleges and incorporates by reference Paragraphs 1 through 57.

70.     Defendants, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly, recklessly, or negligently engaged in transactions, practices,

and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

71. By reason of the foregoing, Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT V
### Violations of Sections 5(a) and 5(c) of the Securities Act

72. The SEC realleges and incorporates by reference Paragraphs 1 through 57.

73. Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect, or carried or caused to be carried such security for the purpose of sale or for delivery after sale.

74. Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed.

75. By reason of the foregoing, Defendants violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), (c)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court grant the following relief:

## I.

Enter, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure ("FRCP"), an Order that temporarily, preliminarily, and permanently restrains and enjoins Defendants and their agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business in violation of Sections 5(a), 5(c), 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(2), and 77q(a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## II.

Enter, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure ("FRCP"), an Order that temporarily, preliminarily, and permanently restrains and enjoins Defendants and their officers, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with any of them, who receive actual notice of the Order from directly or indirectly soliciting or accepting funds from prospective or current investors, including by offering, selling, entering into, or buying back Consulting Performance Agreements.

## III.

Enter, in a form consistent with FRCP Rule 65(d), an Order immediately freezing the assets of Defendants, including any assets held by or for the benefit of any Defendant, or in which any Defendant has a controlling interest, and directing that all financial or depository institutions who receive actual notice of the Order comply with the Order.

**IV.**

Enter, in a form consistent with FRCP Rule 65(d), an Order that temporarily, preliminarily, and permanently restrains and enjoins Defendants and their officers, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them who receive actual notice of this Order from destroying, mutilating, concealing, transferring, altering, or otherwise disposing of, in any manner, any document pertaining to the conduct or transactions alleged in this Complaint, including Defendants' books, records, ledgers, accounts, financial transaction statements, contracts, agreements, obligations, electronic files, computers, including e-mail, whether stored electronically or in hard copy, memoranda, brochures, or any other documents of any kind that pertain in any manner to the business of Defendants, until further Order of this Court.

**V.**

Enter, in a form consistent with FRCP Rule 65(d), an Order instructing Defendants to file with the Court and serve upon Plaintiff, a verified written accounting, signed under penalty of perjury by Defendant Courtright or, in the case of Defendant TGC, by an authorized officer or employee of the entity with knowledge of TGC's books, records, and financial condition, detailing, among other things, the cash flows associated with all Consulting Performance Agreements as reflected on Defendant TGC's books and records since January 1, 2013; the cash flows associated with all loans and statements of indebtedness as reflected on TGC's books and records since January 1, 2013; all of their current assets and liabilities, any transfers of assets between TGC and Courtright from January 1, 2013 to the represent; any transfers of assets over $10,000 from January 1, 2019 to the present; and an identification of all financial accounts held since January 1, 2013.

## VI.

Enter, consistent with Rules 26, 30, 33, 34, 36 and 45, and 65 of the Federal Rules of Civil Procedure, an Order expediting discovery

## VII.

Enter a Final Judgment directing each Defendant to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

## VIII.

Enter a Final Judgment directing each Defendant to pay civil monetary penalties pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or entertain any suitable application or motion for additional relief within the Court's jurisdiction.

## X.

Order such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The SEC hereby demands a trial by jury, pursuant to Rule 38 of the Federal Rules of Civil

Procedure, on all issues and claims so triable.

Dated:  December 27, 2019                    Respectfully submitted,

SECURITIES AND
EXCHANGE COMMISSION

Robert M. Moye
U.S. Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Ste. 1450
Chicago, IL 60604
Tel:

-and-

Suzanne J. Romajas (*pro hac motion pending*)
Antonia Chion
Kevin Guerrero (*pro hac motion pending*)
Patrick L. Feeney
Michael Brennan (*pro hac motion pending*)
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC  20549-5971
Email:  RomajasS@sec.gov
Tel: 202-551-4473 (Romajas)

Attorneys for Plaintiff