**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil Action No. 1:19-CV-08454 |
| : | |
| TODAY'S GROWTH CONSULTANT, INC. : | |
| (dba THE INCOME STORE) : | |
| : | |
| and : | |
| : | |
| KENNETH D. COURTRIGHT, III, : | |
| : | |
| Defendants. : | |
| : | |

## RECEIVER'S INITIAL REPORT

Melanie E. Damian, the court-appointed receiver (**"Receiver"**) in the above-captioned enforcement action, submits her first status report setting forth her activities and efforts to fulfill her duties under this Court's Order Appointing Receiver pursuant to which she was appointed to act as receiver of Defendant Today's Growth Consultant, Inc. until further order of this Court.

## <u>TABLE OF CONTENTS</u>

I.    ENTRY OF TEMPORARY RESTRAINING ORDER, APPOINTMENT
OF RECEIVER, AND SUMMARY OF RECEIVER'S
ACTIVITIES TO DATE.....................................................................................4

    A.  Appointment and Duties of Receiver ............................................................4

    B.  Executive Summary .......................................................................................5

        1.  A Summary of Operations of the Receiver and Steps Taken to Implement
            TRO..........................................................................................................5
        2.  Summary of Cash on Hand and Accrued Administrative Expenses.........7
        3.  Receiver's Receipts and Disbursements ..................................................7
        4.  All Known Receivership Property ............................................................7
        5.  Liquidated and Unliquidated Claims .......................................................8
        6.  Known Investors and Creditors ...............................................................8
        7.  The Receiver is Evaluating Recommended Steps Moving Forward ........8

    C.  Overview of Receiver's Activities to Date ....................................................9

II.    A SUMMARY OF THE OPERATIONS OF THE RECEIVER
AND EFFORTS TO IMPLEMENT THE TERMS OF THE TRO .....................11

    A.  Receiver's Initial Efforts to Marshal and Preserve Assets
And Records and Employment of Professionals ...........................................11

    B.  Obtaining Information and Records from Defendants....................................14

    C.  Recovery of Defendants' Records and Assets from Third Parties ................16

    D.  Securing Real and Personal Property and Other Assets of the Defendants....18

    E.  Preliminary Analysis of Accounts and Business Cash Flow .........................19

        1.  Accounts at Financial Institutions..........................................................19
        2.  Digital Devices.......................................................................................19
        3.  Email, Cloud Computing and Third-Party Accounts,
            And Websites .........................................................................................19

    F.  Investigation of the Defendants' Business Operations and
Recommendations........................................................................................20

        1.  The SEC's Complaint.............................................................................20
        2.  TGC's Records Confirm the Allegations in the Complaint ...................21
        3.  Receiver's Recommendations ................................................................22

III.    CASH ON HAND AND ACCRUED EXPENSES OF THE ESTATE ...............23

IV.    RECEIPTS AND DISBURSEMENTS OF RECEIVERSHIP ESTATE .............24

V.    KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE.............................24

VI.    LIQUIDATED AND UNLIQUIDATED CLAIMS OF THE RECEIVERSHIP
       ESTATE...............................................................................................................25

VII.    KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE...........................26

VIII.    CONCLUSION..................................................................................................27

I.    **ENTRY OF TEMPORARY RESTRAINING ORDER, APPOINTMENT OF RECEIVER, OVERVIEW AND SUMMARY OF RECEIVER'S ACTIVITIES TO DATE**

A.    **Appointment and Duties of Receiver**

On December 30, 2019, the Court entered a Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief [ECF No. 20] (**"TRO"**) and an Order Appointing Receiver [ECF No. 19] (**"Appointment Order"**) in this Securities and Exchange Commission (**"SEC"**) enforcement action. The TRO ordered all of the Defendants' assets frozen to preserve the *status quo*. *See* ECF No. 20 at pp. 6-7. Further, the TRO ordered the preservation of all Defendants' documents, books and records concerning (1) the allegations of the Complaint, (2) any securities offered for sale by Defendant Today's Growth Consultant, Inc. (dba The Income Store) (**"TGC" or the "Receivership Defendant"**)[1], including, but not limited to Consulting Performance Agreements, (3) any communications with, between, or among either Defendant. *See* ECF No. 20 at pp. 7-8. Additionally, TGC and Kenneth D. Courtright, III (**"Courtright"**) were each ordered to provide a sworn accounting to the Court detailing, among other things, each Consulting Performance Agreement entered into by TGC, each loan or indebtedness entered into by TGC, all current assets and liabilities, and any transaction of $10,000 or more. *See* ECF No. 20 at pp. 8-11.

The Appointment Order appointed Melanie E. Damian, Esq. as Receiver, including for the purposes of marshalling and preserving the books and records and all assets of TGC, which operates primarily out of an office located in Lancaster, Pennsylvania.

The Receiver's mandate was to take all actions necessary to implement the terms of the TRO by, among other things, taking possession, custody and control of all of Defendants' assets,

---

[1] Capitalized terms herein not otherwise defined are given the definition ascribed to such terms in the Court's Orders.

establishing control of TGC's business, ensuring that Defendants' assets were frozen and preventing their withdrawal or misapplication, obtaining and preserving documents and records pertaining to Defendants' assets, transactions and business operations, and performing all acts necessary to protect and preserve the Receivership Estate. *See* ECF No. 19 at pp. 2-4.

Further, the Appointment Order requires the Receiver to provide the Court with a written Report 30 days after the end of each calendar quarter. *See* ECF No. 19 at p. 21. Each such report is to include: (1) a summary of the operations of the Receiver; (2) a summary of cash on hand, accrued administrative expenses, and the amount of unencumbered funds in the estate; (3) a schedule of the Receiver's receipts and disbursements; (4) a description of all known Receivership Property; (5) a description of liquidated and unliquidated claims held by the Receivership Estate; (6) a list of all known creditors; (7) a status of Creditor Claims Proceedings (once commenced); and (8) the Receiver's recommendations for a continuation or discontinuation of the receivership. *See* ECF No. 19 at pp. 21-22.

**B.      Executive Summary**

Although the Receiver was appointed only a month ago, significant steps have been taken to implement the terms of the TRO, to preserve and secure the assets of Defendants, and to conduct an initial evaluation of the business, and the Receiver is prepared to make initial observations and recommendations to this Court.

**1.      A Summary of Operations of the Receiver and Steps Taken to Implement the TRO**

- On December 30, 2019, the Receiver obtained access to Courtright's residence, took control of the business assets that could be identified, and secured the home office therein.

- On December 30, 2019, the Receiver took control of the business operations of TGC, including having imaged, preserved, and secured exclusive access to TGC's physical and

electronic financial records, data, websites, accounts, domain names, computers, digital devices, email, messaging, and cloud-based accounts.

- The Receiver sent letters to all known financial institutions at which the Receiver has identified accounts. The Receiver took control of or currently has received confirmation that 9 different accounts of the Defendants located at PNC Bank are frozen. To date, The Receiver has effectuated the transfer of approximately $154,000 to the Receivership Estate (another approximately $146,000 of company funds which came in from website revenue this month is pending transfer, for a total of approximately $300,000 in funds from these accounts to the Receivership Estate). These amounts do not include Courtright's individual accounts which are frozen but not yet a part of the Receivership Estate.

- The Receiver analyzed the business operations, including projected and historic income and expenses and determined that without additional investor funds the operations were not sustainable even in the short term. Even with substantial infusion of investor funds, the TGC/Income Store records indicate a loss in 2018 of ($5.7m) and in 2019 of ($7.5m). Indeed, the payroll expense alone exceeded the website/e-commerce revenue. *See* Monthly Profit and Loss extracted from company files for 2017-2019, attached hereto as **Exhibit F**.[2] As a result, the Receiver terminated the employment of nearly all of TGC's workforce of approximately 110 employees, while retaining 6 information technology (IT) employees necessary to maintain and monetize investor websites as well as preserve the digital assets of TGC, in the short term.

- The Receiver's review of the books and records of the company confirm the SEC's allegations that new investor funds and loans were used to pay the investors/"website partners", not website revenue. For example, in 2018 website revenue was under $2m and website payout to investors was approximately $12.7m and likewise in 2019 website revenue was under $4m and website investor payout was $16.5m. In short, this was a Ponzi scheme.[3]

---

[2] These financial reports are directly from the books and records of the company and have not yet been audited or confirmed with bank records. The Receiver cites the last three years because those numbers appear to be the most reliable.

[3] In addition to using investor funds, more than $12m in loans were obtained to assist in paying investors.

- The Receiver created a website incomestorereceivership.com to provide investors and creditors pertinent information about this case and the Receiver's appointment.

- The Receiver is communicating with investors regarding their involvement with TGC, the Consulting Performance Agreements they entered into with TGC, and their interests, requests and expectations with respect to the websites.

2. **Summary of Cash on Hand and Accrued Administrative Expenses of the Receivership Estate**

- The Estate has $99,409.93 in cash on hand, plus $145,446.89 pending transfer from TGC accounts, for a total of $244,856.82.

- The fees and costs of the Receiver and her professionals for the work performed during this initial reporting period have not yet been finalized.

3. **Receiver's Receipts and Disbursements**

- The Receiver has recovered, or frozen pending transfer to the Receivership Estate, a total of $304,967.12.

- The Receiver has paid expenses totaling $60,110.30 for purposes of TGC's business operations and to otherwise preserve the value of the Receivership Estate.

- A full accounting of the Receivership Estate's receipts and disbursements is attached hereto as **Exhibit A**.

4. **All Known Receivership Property**

- Personal property located on TGC's office, including computer and related equipment, office equipment, and inventory for fulfillment of certain e-commerce websites. The Receiver is working on determining the value of such personal property. *See* Office Inventory at **Exhibit B.**

- Domain names owned by TGC, the value of which has not yet been fully determined. Preliminary figures reflect 3130 domains owned and operated by the Defendants. *See* Domain and

Website Summary and List, attached hereto as **Exhibit C.**[4]

- 2016 Chrysler Town and Country owned by TGC (valued at approximately $10,000-$13,000)

- Frozen but not yet part of the Receivership Estate is real property and personal property owned by Courtright, including the TGC building and Courtright's home and various luxury items in his home, various automobiles including a 2019 Mercedes GLE,), a 2009 Kawasaki Motorcycle, a 1972 Chevrolet Corvette, and a 2014 Moomba Outback speedboat. And, the assets in bank and investment accounts.

## 5.     Liquidated and Unliquidated Claims

- The Receiver continues to investigate whether TGC and the Receivership Estate hold liquidated and unliquidated claims against third parties, affiliates, and insiders of the Defendants.

## 6.     Known Investors and Creditors

- Attached as **Exhibit D** is the list of Consulting Performance Agreements listed by number. The names of the individual investors are redacted to protect their identities. *See* Exhibit D. There are more than 700 contracts but fewer investors because some have multiple contracts.

## 7.     The Receiver is Evaluating Recommended Steps Moving forward.

- The Receiver is presently operating TGC's business with a minimal staff of IT personnel to preserve the websites and other digital assets. The Receiver will propose a hybrid claims process that permits investors to make a claim for the domain(s)/website(s) "assigned" to them in the Consulting Performance Agreement in exchange for releasing any claim against the Receivership Estate under certain parameters[5] and those investors who do not want their site could participate in a later distribution process from a pool of liquidated assets and recovered funds. The Receiver will make such proposal by

---

[4] 1596 sites are associated with investors, 1398 are not.

[5] The Receiver is aware that certain investors have already been repaid their full investment and are therefore "net winners". The Receiver would propose that those investors return any net winnings prior to the Receiver's transfer of their domains/websites.

separate motion on or before February 28, 2020. This expedited process will permit the Receiver to transfer and/or liquidate the remaining domains/websites in the next 90 to 120 days, preserving the Receivership assets required to maintain the domains and websites.

### C.    Overview of Receiver's Activities To Date

Since her appointment, the Receiver, with the assistance of her legal counsel, forensic accountants, computer forensic professionals, and with the cooperation of certain of TGC's employees, has worked diligently to identify, freeze, and marshal all known assets of Defendants, and to preserve all books and records of the Defendants in accordance with the TRO.

In particular, the Receiver froze all assets of individual Defendant Courtright including bank accounts located at the following financial institutions: PNC Bank, Heartland Bank and Trust, US Bank, Master Card, and American Express, among others.  Receiver's counsel also secured access to the office in Courtright's residence.

The Receiver's professionals also obtained, imaged or otherwise preserved TGC's financial records, account records and electronic data comprising files stored on TGC's computer hard drives, tablet devices, files stored with cloud storage providers, messaging and file sharing platforms, and other vendors, and emails sent and received through email service providers. Further, the Receiver has identified, marshalled and/or frozen funds held in bank accounts on behalf of the Defendants.  To date, the Receiver has secured the transfer of approximately $159,520.23[6] to the fiduciary account she opened for the Receivership Estate, with additional transfers of approximately $145,000 still pending.

With the assistance of her forensic accountants, the Receiver has performed a preliminary analysis of the financial information provided by the Defendants and reflected in the Defendants'

---

[6] *See* Exhibit A attached hereto.

financial records. The Receiver is working with her forensic accountants to identify the Defendants' additional accounts at financial institutions, determine whether the accounts were used in connection with the Defendants' businesses, and determine whether a more extensive forensic analysis is necessary to fulfill the Receiver's duties under the TRO.

Further, the Receiver has sought and obtained records and information from the Defendants, the SEC, and banks at which Defendants hold and held accounts, for purposes of investigating their operations and identifying assets to be marshaled for the benefit of the Receivership Estate.

The Receiver's forensic accountants are reviewing TGC's account and financial records and have made substantial progress analyzing the account activity and transactions. This will enable the Receiver to (i) identify and locate potential assets of the Defendants, (ii) investigate Defendants' business operations and dealings with investors, insiders, and affiliated persons and entities, (iii) determine the sources of funds transferred into the accounts for purposes of paying operational costs as well as identifying investors of the Defendants, among other things, (iv) identify transfers from those accounts to affiliates, insiders, and third parties and the accounts of such transferees for purposes of bringing actions to recover for the benefit of the Receivership Estate any improperly transferred funds, and (v) determining the appropriate disposition of TGC's assets, including its websites and domain names, and whether a claims process and distribution plan is appropriate given the nature of those assets and the investors' involvement with TGC's business, among other factors.

II.    **A SUMMARY OF THE OPERATIONS OF THE RECEIVER AND EFFORTS TO IMPLEMENT THE TERMS OF THE TRO**

      A.    **Receiver's Initial Efforts to Marshal and Preserve Assets and Records and Employment of Professionals**

Pursuant to the Appointment Order, the Receiver was directed to "assume and control the operation of Receivership Defendant and shall pursue and preserve all claims or interests of the Receivership Defendant. The Receiver may continue and conduct the business of the Receivership Defendant in such manner, to such extent and for such duration as the Receiver may deem to be necessary or appropriate, if at all." *See* ECF No. 19, at p. 3.

To this end, the Receiver was authorized by the Order as follows:

- To use reasonable efforts to determine the nature, location, and value of all property interests of the Receivership Defendant.

- To take custody, control and possession from third parties of all Receivership Assets and records relevant thereto from the Receivership Defendant.

- To manage, control, operate and maintain the Receivership Estate and hold in her possession, custody and control of all Receivership Assets, pending further Order of this Court.

- To use Receivership Assets for the benefit of the Receivership Estate, making payments and disbursements, and incurring expenses as may be necessary or advisable in the ordinary course of business discharging her duties as Receiver.

- To engage and employ persons in her discretion to assist her in carrying out her duties and responsibilities hereunder, including, but not limited to accountants, attorneys, securities traders, registered representatives, financial or business advisors, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers.

*See* ECF No. 19, at p. 4.

Accordingly, the Receiver moved for authority to engage Damian & Valori, LLP as her legal counsel in Florida, Rachlis Duff & Peel, LLC as her legal counsel in Illinois, and Semanoff

Ormsby Greenberg & Torchia, LLC as her legal counsel in Pennsylvania (collectively "**legal counsel**"). This Court approved the Receiver's engagement of said counsel by Order dated January 13, 2020 [ECF No. 30]. Tomorrow, the Receiver will file a motion requesting approval of her engagement of Kapila Mukamal LLP (the "**forensic accountants**") as her forensic accountants.[7]

On the morning of December 30, 2019, the Receiver, with the assistance of legal counsel, forensic accountants, and computer forensic professionals orchestrated a simultaneous execution of this Court's TRO at the offices of TGC in Lancaster, Pennsylvania and the home of Courtright in Minooka, Illinois.

Upon arrival at the home of Courtright, the Receiver's Chicago-based counsel presented the TRO and Appointment Order to Courtright. Receiver's counsel also had a telephone conversation with Courtright's counsel because Courtright was asserting his Fifth Amendment rights against self-incrimination and would not be interviewed directly by the Receiver's counsel. With assistance from a local locksmith, Receiver's counsel changed all locks to the home and secured the home office located in the basement level, leaving Courtright with equal access to the home but no access to the home office. Counsel provided a set of the new house keys to Courtright but did not provide to Courtright a set of keys to the basement home office. Counsel secured all records that appeared to be related to TGC which included paper records in the home office as well as laptop computers and hard drives. The Receiver's team filled and removed 15 boxes with these paper records and devices. Certain items remain in the secured home office. The Receiver's team

---

[7] The forensic accountants were inadvertently omitted from the Receiver's prior Motion to approve the employment of counsel, and the Receiver respectfully requests the entry of an Order approving the Receiver's employment of the forensic accountants *nunc pro tunc* to December 30, 2019, when they commenced assisting the Receiver on this matter.

also photographed the interior of the house with the exception of the children's bedrooms. Receiver's counsel also obtained recent TGC mail that was on an office desk and sent that mail to the Receiver along with certain electronics and records.

Simultaneously, the Receiver executed the TRO at the offices of TGC in Lancaster, Pennsylvania. Upon entering the offices, the Receiver's counsel presented copies of the TRO and Appointment Order to the employees and independent contractors present in the offices and explained to them their obligations thereunder with respect to the assets, records and cooperation with the Receiver. The Receiver's counsel ordered all employees and contractors away from their desks, computers, and other digital devices to ensure that all physical and digital evidence maintained on or near the desks and stored on or accessible through computers and other digital devices would be preserved without modification or deletion. The Receiver's counsel interviewed all employees to obtain information regarding the Defendants' business operations as well as the position and duties of each employee while the computer forensics experts worked to catalogue, document, and image all critically important digital evidence on computers, online third-party instant messaging platforms, cloud-based servers, tablets, mobile storage devices, and other digital and online medium of storage.

Receiver's counsel arranged for the preservation of all personal property located on TGC's premises (including personal and Defendant-owned property) in order for the Receiver's counsel to take an account of such property and make a determination as to what was needed to be preserved to comply with the TRO and what could be returned to the individual employees.

Receiver's counsel also had the locks and security system at TGC's office location changed to restrict access to the premises during the initial term of the TRO, while arranging for Receiver's legal counsel to be present at the office location in Lancaster, Pennsylvania for purposes of the

Receiver's assessment, maintenance, preservation and/or wind down of various business operations, collection of mail and delivered packages and parcels, among other activities, and granting supervised access to certain of TGC's employees to the office and the Defendants' records (after they were imaged or otherwise preserved by the Receiver), while the Receiver worked to fulfill her duties under the TRO.

The Receiver also sent copies of the TRO and Appointment Order to financial institutions at which Defendants hold accounts based upon information provided by the SEC and the Receiver's professionals. The letters directed the financial institutions to freeze all access to and activity in the accounts of all Defendants pursuant to the TRO, to wire balances of the accounts of TGC to the Receiver's account, to arrange for the Receiver to be the sole signatory of all bank accounts of TGC, and to produce various account records.

### B. Obtaining Information and Records from Defendants

Paragraphs 11-13 of the Appointment Order requires Defendants to turn over certain financial and other information regarding Defendants' assets and operations to the Receiver and the SEC. *See* ECF No. 19 at pp. 6-8. Courtright's counsel explained to the Receiver that Courtright required one of the laptop computers and one of the hard drives that the Receiver seized from Courtright's house on December 30, 2019 to gather and provide to the SEC and the Receiver the documents he is required to produce under the Court's Orders. Accordingly, Courtright sent to the Receiver's counsel a document requests seeking the production of images of the laptop computers and hard drives that the Receiver seized from Courtright's house. And counsel for the SEC served similar document requests on the Receiver's counsel. Subsequently, counsel for the SEC, the Receiver and Courtright reached an agreement regarding the preservation and imaging of the electronically-stored information ("ESI") on the laptop computers and hard drives seized

14

from Courtright's house, the production of the images to the SEC, the production to Courtright's counsel of one laptop computer and one hard drive (subject to return to the Receiver upon request) and the images of the other devices, and the measures to be taken to preserve certain rights and privileges of Courtright in connection with the SEC's searches of the ESI on the images. The parties submitted to the Court by motion a "Stipulation and [Proposed] Protective Order Regarding Electronic Data and Preservation of Privilege" (the "Protective Order"), and the Court entered the Protective Order on January 27, 2020 [ECF No. 40]. The Receiver imaged the laptop computers and hard drives seized from Courtright and, pursuant to the Protective Order, produced copies of the images to the SEC's forensic lab and to Courtright's counsel, and produced to Courtright's counsel one laptop computer and one hard drive to enable him to gather and produce to the SEC and the Receiver the information he was required to produce in the Court's Orders.[8] The Receiver awaits Courtright's production of the required financial information.

TGC's employees worked closely with the Receiver and Receiver's counsel since the implementation of the TRO to assist in providing details regarding the business operations and the finances of the Defendants. The TGC employees have (i) provided to the Receiver information and records regarding assets and accounts of TGC, (ii) facilitated the Receiver's online access to bank, credit card, email, cloud computing, online cloud-based instant messaging platform, and vendor accounts by, among other things, providing usernames and passwords so the Receiver and her computer forensic experts could access and capture forensic images of accounts and all data stored therein, and (iii) granted access to company laptop computers, tablet devices, storage devices, filing cabinets, servers, data capture software, and provided passwords so the Receiver

---

[8] Pursuant to the Stipulation and Protective Order, Courtright's counsel is required to maintain possession, custody and control of the laptop computer and hard drive and to return them to the Receiver upon request even over any objection or assertion of right or privilege by Courtright.

could have her computer forensic experts capture forensic images of those items.

For email, cloud-based accounts, online third-party instant messaging platforms, online data storage software, and vendor accounts, the Receiver has been able to access and take control of, and her computer forensic experts have successfully imaged and changed passwords to, all such known accounts. The Receiver continues to work with TGC employees to gain access to other accounts as they are identified in the course of the Receiver's investigation and to otherwise fulfill her duties under the TRO.

The extensive interviews conducted by Receiver's counsel provided the information necessary to identify and image a number of personal computers, cloud-based storage, and online accounts for preservation. The acquisition and aggregation of the employee credentials has been instrumental in gaining access to the Defendants' digital devices as well as all online/cloud-based accounts in order for the computer forensic experts to image and preserve all evidence. Further, through the interviews with the TGC employees, the Receiver also has made progress in gaining a thorough and detailed understanding of the Defendants' assets, liabilities, business operations and relationships, and dealings with investors.

Regarding the operations of TGC, the Receiver immediately began evaluating the operations of the business and its workforce, and within days determined it was necessary to terminate the employment of nearly all of TGC's workforce of approximately 110 employees because the operating business did not generate sufficient income to fund the payroll or overhead expenses. The Receiver has continued the employment of 6 IT employees necessary to maintain and monetize TGC's websites and otherwise preserve the digital assets of TGC.

### C.      Recovery of Defendants' Records and Assets from Third Parties

Following her appointment, the Receiver and her professionals swiftly took action to

review all available documents associated with the Defendants for the purpose of identifying and investigating their assets and business operations. Immediately thereafter, the Receiver issued demand letters to numerous financial institutions and other service providers with which the Defendants have had dealings during the time period relevant to the SEC's Complaint, requesting the freezing and turnover of accounts and the production of records. To date, the Receiver has sent letters to all known financial institutions providing each with a copy of the TRO and Appointment Order and demanding (i) the freezing of all accounts and assets of all Defendants, (ii) the turnover of the control and ownership to the Receiver of all accounts of the entity Defendants, (iii) exclusive access to the accounts and account records including online access, (iv) detailed information concerning the history, nature and value (where applicable) of each account as required by the TRO, (v) direction of future correspondence regarding the accounts to the Receiver, and (vi) records concerning each account including, without limitation, account statements, communications between the Defendants and the recipient of the letters, asset transfer records, and account opening documents.

With respect to the Defendants' bank and credit card accounts, the Receiver has been able to gain online access to those accounts using the usernames and passwords provided by TGC employees to confirm the balances and freezing of the accounts and download recent account statements. Further, the Receiver has received written responses from several of the institutions (i) confirming the receipt of the letters and the freezing and/or turnover of control of 24 accounts to the Receiver, (ii) providing the balances in the accounts, (iii) indicating whether the accounts remain open, (iv) producing the requested account records, and/or (v) requesting additional information. In particular, PNC Bank informed the Receiver that the Defendants' accounts are frozen, transferred the funds therein to the Receiver's account, and produced at least some of the

requested records. The Receiver also received responses from 3 financial institutions, indicating that the Defendants' may not have accounts at these institutions. The Receiver is continuing to communicate with the remaining financial institutions to confirm that the accounts are frozen and to effectuate transfer of the funds in TGC's accounts to the Receivership account and the production of the requested account records.

**D.     Securing Real and Personal Property and Other Assets of the Defendants**

The Receiver secured the real and personal property of Courtright. Specifically, the Receiver secured 3 laptops and 3 hard drives from Courtright's personal residence and a cell phone from Courtright's counsel. Also, as detailed above, the Receiver changed the locks to the basement office and maintained exclusive possession of the keys, thus securing the home office.

As it relates to TGC, the Receiver has taken possession of the offices, office equipment and furnishings, and all other known assets. Specifically, in addition to the 3 laptop computers and 3 hard drives seized from Courtright's house, the Receiver has obtained 6 laptop computers from employees or contractors of TGC who worked remotely and has secured 113 computers, office furniture and equipment, televisions and other electronics, TGC's 2016 Chrysler Town and Country automobile which was held at the business and various other assets located at the Defendant's office in Lancaster, Pennsylvania. The Receiver is working with an auction/liquidation company to determine the market and liquidation values of these items. The bulk of the valuable assets of the Receivership Estate, however, consists of the domain names and websites that were or could become income producing or sold in whole or in parts. The Receiver continues to search for assets of TGC, including by reviewing Defendants' account records and transactions, and will review Courtright's financial disclosures if and when he provides them, and will take possession of any additional assets that are discovered.

### E.     Preliminary Analysis of Accounts and Business Cash Flow

### 1.     Accounts at Financial Institutions

While the Receiver has control of and access to some of the 24 bank accounts spread across 10 different financial institutions at which the Defendants held or hold accounts, and the Receiver can obtain recent account statements for many of those accounts, she is still waiting to receive a comprehensive production of account records for the relevant time period under the SEC's Complaint for most of those accounts so she and her forensic accountants can confirm the financial records of the Defendants and investigate various transactions from those accounts for purposes of marshaling and preserving assets of the Estate.  The Receiver will continue to seek the transfer of all funds in TGC's accounts that have not yet been transferred to the Receivership account. The Receiver will provide updates to the Court as appropriate and consistent with her duties set forth in the TRO, the Appointment Order, and any subsequent orders.

### 2.     Digital Devices

As explained above, as part of the execution of the TRO, the Receiver's computer forensic experts have successfully imaged all vital TGC company and personal computers, external hard drives and other digital devices.  The Receiver will review the forensic images for purposes of investigating the Defendants' business operations and dealings with investors related to the subject of the SEC's Complaint, identifying and locating assets of the Defendants, and otherwise fulfilling her obligations under the TRO and the Appointment Order.

### 3.     Email, Cloud Computing, and Third-Party Accounts, and Websites

Additionally, the Receiver's computer forensic professionals have accessed and secured images of or otherwise preserved TGC's employee email and online/cloud-based accounts, g-suite, third-party online instant messaging platforms, data capture software, vendor accounts, domain

name accounts, and websites. As necessary, the Receiver and her professionals will review the images to identify and locate assets of the Defendants, investigate the Defendants' business operations and dealings with investors related to the subject of the SEC's Complaint, and otherwise fulfill the Receiver's obligations under the TRO and the Appointment Order.

### F. Investigation of the Defendants' Business Operations and Recommendations

#### 1. The SEC's Complaint

In its Complaint, the SEC alleges that from at least 2017 through October 2019, TGC and Courtright raised at least $75 million from more than 500 investors who entered into "Consulting Performance Agreements" with TGC (the "Agreements") pursuant to which the investors would provide up-front payments and ongoing payments in the form of advertising and eCommerce revenues to TGC and TGC promised to pay investors a minimum guaranteed rate of return, in perpetuity, on revenues generated by websites that TGC acquires or builds for the investors and then develops, maintains and hosts. *See* ECF No. 1 at p. 1; *see also* Consulting Performance Agreement attached hereto as **Exhibit E**. The Agreement touts TGC's experience and expertise, informing investors that TGC's "growth formulas" with a foundation in page one Google placement as well as a tailored eCommerce strategy would build a bridge to an array of revenue streams for the investor sites. *See id*. In particular, under the Agreements, each investor was entitled to a minimum annual guaranteed return (ranging from 13% to 20%), to be paid monthly, even if the website did not generate sufficient revenue to pay the promised monthly payment. *See* ECF No. 1 at p. 2. And, TGC represented to the investors that it is in "satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties" and that it is "debt-free . . . with no accounts payable or loans outstanding." *See id.* According to the Complaint, however, these representations were untrue and, since at least January

2017, the websites generated approximately $9 million in advertising and product sales revenue but TGC paid at least $30 million to investors, pursuant to the Agreements. *See id.* The SEC also alleged that TGC was able to cover this significant shortfall primarily by using the up-front payments it received from new or repeat investors who entered into Consulting Performance Agreements with TGC, making the business a classic Ponzi scheme. *See id.* TGC also obtained loans from distressed lending companies and commingled the loan proceeds with the up-front payments it received from investors, and then used the commingled funds to pay the monthly payments it guaranteed to investors under the Agreements and to repay the loans. *See id.*

### 2. TGC's Records Confirm the Allegations in the Complaint.

The Receiver's investigation of TGC's business operations, financial records and dealings with investors has revealed that the foregoing allegations in the Complaint relatively accurately described the actual operations of TGC. Indeed, the Receiver has been able to confirm that the revenue that was generated from all of the websites each month was significantly less than the monthly payment obligations to the investors and certainly was not sufficient to cover both those monthly payments and TGC's monthly overhead expenses. Specifically, TGC's solicitation of investments from investors makes up the largest segment of its "revenue". Pursuant to the Profit and Losses accounting from the company's records, in 2019 alone TGC generated "revenue" from investors of approximately $41.5 million and website income of $3,724,809.00. *See* Monthly Profit and Loss attached as Exhibit F. During that same time period, TGC paid out $16.5 million to investors and operating expenses in the amount of $34,653,706, resulting in a net loss of $7,520,873 for 2019. Prior years reflect a similar discrepancy in revenues generated from investors in comparison with the amounts paid to investors based upon their investments. *See id.* Therefore, TGC's business depended on the use of new investors' up-front payments (and perhaps loan

proceeds) to cover its obligations to earlier investors much in the vain of a Ponzi scheme. As such, the Receiver believes that TGC's business was not sustainable. Likewise, the representations contained in the Consulting Performance Agreements entered into by TGC and the investors relating to TGC's financial condition and the use of the investor's funds at paragraph "O" of the Agreement was not supported by TGC's own records. *See* example of the Consulting Performance Agreement at Exhibit E. Specifically, the investor's upfront fee was not used "exclusively for the purchase, hosting, maintenance and marketing of the revenue generating website…" and TGC for at least the past three years was not solvent or financially able to pay its bills when due (without the improper use of new investor funds) to meet its contractual obligations. *See* Monthly Profit and Loss for 2017-2019 at Exhibit F**.** In addition, despite representations to the contrary, the websites and domains with minor exceptions were in the name of TGC and not the individual investors.[9]

### 3. Receiver's Recommendations

The Receiver is presently maintaining TGC's websites and domains and a portion of its business with a minimal staff of IT personnel to preserve these and other digital assets. The monthly operating cost to maintain the websites, domain renewals and other digital assets is between $60,000 and $80,000. Although some income is expected to offset those costs, the Receiver has determined that the long-term carry of the websites is not in the best interest of the Receivership Estate. In addition, the Receiver has heard from many of the investors and while all express anger and surprise, some investors have expressed a strong desire to have the websites "assigned" to them actually transferred to them while others do not and would prefer a monetary

---

[9] There is more than one version of the Consulting Performance Agreement but the pertinent portions are the same. There are more than 700 contracts for which investors provided more than $141 million. *See* Exhibit D.

recovery. After analysis of the equities, expenses and likely recovery to the Estate, the Receiver intends on proposing a hybrid claims process that permits investors to make a claim for the website(s) "assigned" to them in the Consulting Performance Agreement in exchange for releasing any claim against the Receivership Estate under certain parameters[10] and for the investors who do not want their purportedly assigned website(s) or if such promised websites were not developed for them, those investors could participate in a later pool of recovered funds, the distribution of which will be subject to subsequent Court approval. The Receiver will make such proposal by separate motion on or before February 28, 2020. This expedited process will permit the Receiver to transfer and/or liquidate the remaining sites in the next 90 to 120 days preserving Receivership assets required to maintain the sites.

## III.   CASH ON HAND AND ACCRUED EXPENSES OF ESTATE

The Receiver presently holds a total of $99,409.93 in cash on hand, which she recovered from the TGC and deposited in her fiduciary account for the Receivership Estate at City National Bank in Miami, Florida, earning interest at 1.25% (APR). An additional $145,000 is pending transfer to the Receivership Estate.

During the time period covered by this Report, the Receivership Estate has incurred administrative expenses in the form of fees and costs of the Receiver and her professionals for the work they performed in connection with fulfilling the Receiver's duties under the Court's Orders. Pursuant to the Appointment Order, the Receiver will file an application seeking approval and

---

[10] The Receiver is aware that certain investors have already been repaid their full investment and are therefore "net winners". The Receiver would propose that those investors return any net winnings prior to transfer of their website/domain. In addition, because it is believed that historically misinformation was provided to investors as to the value and/or income of their websites, the Receiver will provide investors with actual data relating to the websites upon request prior to the investor making any such election of remedy.

payment of those fees and costs from the funds the Receiver has marshalled and deposited into her fiduciary account since she was appointed.

## IV.    RECEIPTS AND DISBURSEMENTS OF RECEIVERSHIP ESTATE

Since the inception of the Receivership, the Receiver has made disbursements (totaling $60,110.30) from the Receivership account for necessary expenses to preserve and administer the Estate as well as to keep the Defendants' business operational minimally to preserve the digital assets and their value until such time that the Court makes a determination as to a claims and potentially bifurcated distribution process.  Such expenses included payroll to the IT professionals who continue to assist the Receiver to operate the business in a limited capacity, utilities, data expense, domain hosting, maintenance fees, fees for certified copies of certain Court Orders, and fees for bank account services and maintenance.  Attached hereto as Exhibit A is a detailed statement of the Estate's Receipts and Disbursements during this initial reporting period.

## V.    KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE

The Receiver is in possession, custody or control of the following assets of the Receivership Estate:

$99,409.93 in cash on hand in the Receivership account.

$145,446.89 pending transfer from TGC's accounts.

Domain Names and revenues generated by operational websites (value currently unknown).  A summary and list of TGC's domain names and websites is attached hereto as Exhibit C.

Office furnishings and equipment including computers and other electronics (value currently unknown)

2016 Chrysler Town and Country Minivan (valued at approximately $10,000-$13,000).

24

## VI.     LIQUIDATED AND UNLIQUIDATED CLAIMS OF THE RECEIVERSHIP ESTATE

During the first month of the Receivership, much of the Receiver's and her professionals' efforts were spent identifying, securing and marshalling the Defendants' funds and other assets that were readily identifiable and recoverable, preserving, accessing and analyzing the Defendants' records, and investigating and operating the Defendants' business.  Throughout this brief reporting period, the Receiver's professionals, including her forensic accountants, began to analyze potential sources from which the Receivership Estate could recover additional funds or other assets belonging to or improperly transferred from the Defendants, including affiliates, investors, relatives and third parties who are in possession of or received funds or other assets traceable to the Defendants' business or investors.[11]

The Receiver and her professionals will continue to analyze these potential sources of recovery and gather evidence for purposes of developing and pursuing claims the Estate may have to recover funds or other assets belonging to or improperly transferred from the Defendants, including without limitation turnover and fraudulent transfer actions against affiliates, investors, relatives and third parties, as is appropriate and authorized by the Court.  Further, the Receiver will investigate the Estate's potential claims against professionals and institutions that may have facilitated the alleged misconduct of the Defendants or otherwise contributed to the damages alleged to have been sustained by the Defendants' investors.

In the event the Court extends the Receivership at or after the Preliminary Injunction hearing and authorizes the Receiver to bring clams against affiliates, insiders, relatives or third

---

[11] According to the Company's own records more than $10.5 million of company funds were transferred to the benefit of Mr. Courtright whose assets are already subject to the Court's freeze order.

parties on behalf of the Estate, the Receiver will complete her investigation of those claims, and after consultation with the SEC, pursue those claims she believes are meritorious and likely to result in a significant recovery for the Receivership Estate.

The Receiver is not aware of any liquidated claims of the Estate at this time.

## VII.  KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE

The Receiver has identified more than 700 contracts which resulted in $141,518,356.00[12] in up-front payments to TGC pursuant to the Consulting Performance Agreements and may be creditors of the Receivership Estate.  Because some investors have more than one contract there are slightly fewer investors.  A list of the known investors of TGC can be provided to the Court and the parties upon request but to protect their identity (and avoid predatory solicitation) will not be filed in the public record.   The Receiver has sent emails to all known investors, informing them of the commencement of the enforcement action and the receivership, providing general information regarding the case, and inviting them to contact the Receiver at the dedicated telephone number and email address that the Receiver provided and visit the website the Receiver created for the receivership (incomestorereceivership.com), on which the Receiver has provided a summary of the action, posted important court filings and dates, and included several frequently asked questions and the Receiver's answers thereto.  The Receiver's professionals have received and responded to hundreds of telephone calls and emails from investors, providing various requested information and referring them to the receivership website for further information.

Further, the Receiver has been contacted by one company claiming that TGC owes it several million dollars.  The Receiver has not yet investigated this purported indebtedness.

---

[12] TGC's internal records reflect that $43,569,806 was paid to investors between 2013 and 2019. Again, the TGC's accounting records have not been audited or verified at this point.

## VIII. CONCLUSION

The Receiver and her professionals appreciate the opportunity to assist the Court in this matter. If so ordered, the Receiver and her professionals will continue their efforts, as discussed herein, to fulfill the Receiver's duties under the Court's Orders, with the focus on affording the most cost-effective approach to preserving the assets, maximizing the ultimate recovery by the Receivership Estate, and carrying out the directives of this Court.

Respectfully submitted this 30th day of January 2020.

DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
Email: kmurena@dvllp.com

By: */s/Kenneth Dante Murena*
        Kenneth Dante Murena, Esq.
        Florida Bar No. 147486

        *Counsel for Melanie E. Damian,*
        *Court-Appointed Receiver*

        *Admitted Pro Hac Vice*

RACHLIS DUFF & PEEL, LLC
542 S. Dearborn Street, Suite 900
Chicago, Illinois 60605
Telephone: (312) 733-3390
Facsimile: (312) 733-3952
Email: kduff@rdaplaw.net

By:_____*/s/ Kevin B. Duff*_____
        Kevin B. Duff, Esq.
        ARDC No. 6210491

        *Counsel for Melanie E. Damian,*
        *Court-Appointed Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on January 30, 2020 on all counsel or parties who have appeared in the above-styled action.

/s/Kenneth Dante Murena
Kenneth Dante Murena,
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*