IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> TODAYS GROWTH CONSULTANT INC. (dba "The Income Store") <br><br> and <br><br> KENNETH D. COURTRIGHT, III, <br><br> Defendants. | No. 1:19-cv-08454 <br><br> The Honorable Andrea R. Wood <br><br> Magistrate Judge Jeffrey Cummings <br><br> **JURY DEMANDED** |

**DEFENDANT KENNETH D. COURTRIGHT'S COMBINED OBJECTION TO THE RECEIVER'S CLAIM ADMINISTRATION PROCESS, PARTIAL PLAN OF DISTRIBUTION AND RECEIVER'S FIRST INTERIM APPLICATION FOR AN ORDER APPROVING AND AUTHORIZING PAYMENT OF FEES AND EXPENSES OF RECEIVER AND HER PROFESSIONALS**

NOW COMES Defendant, Kenneth D. Courtright, III ("Mr. Courtright"), by and through his undersigned attorneys, and for his Combined Objection to the Receiver's Claim Administration Process, Partial Plan of Distribution and Receiver's First Interim Application for an Order Approving and Authorizing Payment of Fees and Expenses of Receiver and Her Professionals (hereinafter "Combined Objection"), states as follows:

**INTRODUCTION**

On December 30, 2019, based upon an *ex parte* motion by the SEC, Judge Norgle entered an order appointing Melanie Damian (the "Receiver") as the receiver in this matter. The Court did so based, in part, on the SEC's representation, which the Receiver presumably approved, that "she has extensive experience and qualifications to serve in a fiduciary capacity in matters involving

1

(i) taking control of, evaluating, and if necessary winding down companies involved in *web-based businesses…*" (emphasis added) ECF #13, p. 26. However, at the initial hearing in this matter on January 13, 2020, the Court, on its own, raised an issue and questioned how the Receiver, who is located in Miami, was selected. The SEC revealed that it had put this Receivership position out for bid. Four interested, potential receivers responded to the bid, and after two of the four potential receivers backed out, the Receiver was "low bidder." On that same day, Courtright raised his concerns that the Receiver was wasting the assets of the estate through her inaction.

Despite the SEC touting her qualifications, the Receiver's proposed administration process and distribution plan ("Plan") shows a fundamental misunderstanding of TGC's business. *See generally* ECF #53. The Receiver's Plan fails to recognize the value of TGC's assets and that of the Site Owners[1], and ascribes an overall de minimis value to the assets of the Receivership Estate. *Id.* The Receiver's failure to grasp the value of TGC's assets is evidenced by an investor group standing ready to take control of those same assets and others for as much as $22,000,000. Further evidencing her misunderstanding of TGC's business, the Receiver's Plan seeks to extract a release from each Site Owner in exchange for the website(s) they already own, lacks detail and substance as to who may file a claim, and shows a bias against the Defendants. As a result, Mr. Courtright objects to the Receiver's Plan and Fee Petition.

---

[1] The Receiver has blindly adopted the terminology of the SEC in her filings. The Consulting Performance Agreements which are the subject of this lawsuit are between TGC and "Site Owners."

**ARGUMENT**

I. **The Receiver Has Demonstrated a Fundamental Misunderstanding of TGC's Assets and Those of the Site Owners.**

   a. **The assets of TGC have significant value unrecognized by the Receiver's Plan.**

Despite the Receiver's apparent expertise in "taking control of, evaluating, and if necessary winding down companies involved in web-based businesses,"[2] her position that TGC is valueless begs a contrary conclusion.

In the simplest terms, TGC operates and manages over 1000 revenue generating websites. *See* January 16, 2020 letter to Receiver from Mr. Courtright's counsel, attached hereto as Exhibit A. Those websites generate revenue in different ways, but almost all depend on traffic from search engines. *Id.* Drastic drops in content pace (amount of posts published daily, weekly or monthly), in marketing (other websites that link to shared content), and in social signals (amount of times per week a piece of content is shared through social platforms) all effect TGC and its clients (i.e. Site Owners). *Id.*

The most glaring problem with the Receiver's Plan is that she intends to "assign" the websites to the Site Owners in return for a release. ECF #53, p. 7. Essentially, the Receiver's Plan ascribes a value of $0 to these sites. However, an independent investment group recognizing the value of what TGC has created, has offered to purchase and manage certain of these very assets for upwards of $22,000,000. *See* Copy of Expression of Interest dated March 17, 2020 attached hereto as Exhibit B.

Further supporting significant value of these sites are the Consulting Performance Agreements ("CPA") between TGC and the Site Owners. *See* CPA, attached hereto as Exhibit C. Pursuant to the CPAs, TGC agreed to purchase and maintain a Revenue Generating eCommerce

---

[2] ECF #13, p. 26.

website and an Authority Web site for the Future Site Owners ("FSO"). Ex. C at p. 1, ¶ A. The CPAs specifically provide that: "All data, reports, documents and other information, as well as . . . website design and improvements . . . shall be FSO's sole property, and shall be subject to FSO's exclusive use, commercial development, commercial exploitation or otherwise." *Id.* at p. 5, ¶ J.

For its efforts, TGC is to receive three sources of compensation:

(1) An upfront fee (typically ranging from $50,000 - $250,000) (*Id.* at p. 2, ¶ E1);

(2) An ongoing fee of 50% of Ad Revenues, and Net Sales from any eCommerce based website (*Id.* at pp. 2, 3, ¶¶ E2 and G1); and

(3) In the event the FSO decides to sell one or all of its sites, 50% of the gross sales price above the original purchase price (*Id.* at p. 4, ¶ H).

Given the above three revenue streams realized by TGC under the CPAs, even if the Receiver chose to not engage any new Site Owners (eliminating revenue stream (1) above), TGC's contractual rights under streams (2) and (3) still have significant value. As explained in the January and February Letters sent to the Receiver, if properly operated and maintained by TGC, the websites should be able to generate substantial revenue for the Receivership Estate. *See* Ex. A; *see also* February 6, 2020 letter from Mr. Courtright's counsel to Receiver, attached hereto as Exhibit D. The Receiver's conclusion that the websites and TGC as a whole, are of minimal value, shows her fundamental misunderstanding of TGC's operations and is directly contradicted by the third party's recognition of at least $22,000,000 in value.

**b. The Site Owners have always maintained, and still maintain, full ownership of their respective website(s).**

Because the Site Owners were at all times, and still are, the owners of their respective website(s), seeking a release in exchange for "assigning" ownership of the websites back to the Site Owners creates an unenforceable contract as there is no consideration.

The CPAs state in pertinent part: "Hosting and all rights to content and Proprietary Rights appearing on the Sites or any Subsidiary Site are and shall be solely the property of F.S.O." Ex. C. The Receiver's proposal to allow Site Owners the option to have their website "assigned" to them in exchange for a release creates an unenforceable contract and further establishes the Receiver's misunderstanding of TGC's business. As made clear in the CPA, the Site Owners have always owned their website(s). There is nothing to assign. Any contract seeking to assign ownership of a website in exchange for a release creates an unenforceable contract as there is no consideration flowing to the site owner given that they already own what is purportedly being "assigned" to them.

    **c. The Receiver's definition of an "Allowed Claim" is overly restrictive and arbitrary.**

The Receiver's Plan proposes that only *eligible* claimants will be "entitled to receive turnover of the assigned Website(s) or a monetary distribution based on the investor's loss of principal investment…" ECF #53, p. 8. In defining who is an eligible claimant, the Receiver has explicitly excluded, without justification for same:

> (a) Defendant Kenneth D. Courtright, III, or any member of his family, including without limitation a spouse, child, parent, sibling or parent or sibling of Defendant Courtright's spouse, or any entity directly or indirectly controlled by them or a trust established for their benefit; (b) a person who was employed by or contracted to TGC or Defendant Courtright at any time from December 2009 through December 2019 (the "relevant period"); (c) a person or entity affiliated with TGC or Defendant Courtright during the relevant period, including without limitation Conklin Web Properties; and (d) a person or entity that promoted TGC or its investment contracts and was directly or indirectly compensated for such promotion.

*Id.* at p. 9. The Receiver's above exclusions (other than Mr. Courtright himself) are overly restrictive and unjustified. Without evidence that any such potential claimants are somehow financially linked to Mr. Courtright, the Receiver's Plan arbitrarily excludes them due to a tangential familial or business affiliation with Mr. Courtright. Excluding potential claimants dating

back to 2009 is extreme. It is unreasonable to exclude a potential claimant who, for example, may have briefly worked for TGC over a decade ago. Finally, the above exclusions contain various undefined and vague terms. The Receiver does not define terms such as "affiliated" or "promoted." *Id.* Without specifically defining these terms, the group of proposed excluded claimants is completely ambiguous.

If the Receiver is going to be allowed to exclude certain people and/or entities from submitting a claim, for the reasons stated above, such exclusions must be more narrowly tailored and the terms of same specifically delineated.

**II.     The Receiver Has Failed to Take Steps to Maintain the Assets of TGC and the Site Owners and Her Filings Reveal a Bias Against the Defendants.**

Immediately after her appointment, the Receiver's rush to wrestle control of TGC away from its management and ownership has resulted in waste of both TGC and Site Owner assets. Indeed, since the first court appearance on January 13, 2020, Mr. Courtright has continuously raised concerns regarding the Receiver's waste of TGC and Site Owner assets. To that end, on multiple occasions Mr. Courtright, through counsel, has written the Receiver with concerns regarding the maintenance of the Receivership Estate. *See* Ex. A and Ex. D. Through his correspondence, Mr. Courtright provided the Receiver with specific details of TGC's business operation and assets it and the Site Owners own, he has identified key members of the operation team to consult, and he has provided explicit instructions on what steps need to be taken in order to preserve the traffic to the Site Owners' websites. *Id.* Despite Mr. Courtright having the most knowledge pertaining to TGC's business, at no time has the Receiver taken up Mr. Courtright on his offer for assistance nor has she relayed that any of the proposed steps have been taken.

More troubling, however, is that from day one, the Receiver has approached her duties as if TGC is not a real business. Instead, she has adopted the SEC's theory that TGC was a fraud. As

6

an extension of the court, a receiver should be a neutral, impartial entity not otherwise interested in the main litigation as a party or creditor, and thus would not be considered adverse to either party. *In re Teknek, LLC,* 343 B.R. 850, 875 (Bankr. N.D. Ill. 2006). The receiver is a neutral overseer appointed as an agent of the court, subject only to the court's orders. *In re Teknek,* 343 B.R. at 875.

To date, the Receiver's actions demonstrate that she has not fulfilled her role as impartial fiduciary to the Receivership Estate and Site Owners. Indeed, the Receiver's filings and lack of action reveal a bias that has guided her, not in the best interest of the Receivership Estate, but in supporting the SEC's unproven allegations of fraud. Remarkably, after a month into her role, the Receiver was ready to conclude "[i]n short, this was a Ponzi scheme." ECF #45, p. 6; *see also* p. 21("…a classic Ponzi scheme"); p. 22 ("…in the vain (sic) of a Ponzi scheme."). In her most recent filing, she asserts without equivocation, that the business performed by TGC was a "fraud." ECF #53, p. 7, fn 7; p. 10. These conclusions are troubling for two reasons: (1) supporting the SEC's allegations is not part of her charge; and (2) it shows a clear misunderstanding of the value of the assets involved. *See supra* Section I. The Receiver is charged to fulfill the obligations and duties set out in the Order of Appointment (ECF #19), none of which include determining whether any of the SEC's allegations of a "ponzi-like" scheme hold water.

Further exhibiting her bias, in the Receiver's initial report (ECF #45), she asserts that "[a]ccording to the Company's own records more than $10.5 million of company funds were transferred to the benefit of Mr. Courtright whose assets are already subject to the Court's freeze order." At best, this statement is misleading, and at worst it is outright false. On January 30th, Mr. Courtright publicly filed his sworn accounting in this matter. *See* ECF #44. That accounting, coupled with TGC's books and records (both of which are available to the Receiver and the

7

forensic accountants that she hired) show that over $6.9 million of TGC's expenses were paid for on Mr. Courtright's personal credit cards. TGC then reimbursed or directly paid for those items, which benefitted TGC, not Mr. Courtright personally.

Moreover, as the Receiver well knows by now, TGC is a subchapter S corporation that does not pay tax itself on its earnings. Rather, those earnings and profits flow through to Mr. Courtright for tax reporting purposes and then he pays taxes on them, even though the earnings are not, for the most part, distributed to him. In order to pay the taxes due on TGC's earnings, the company made distributions to Mr. Courtright that were either immediately sent by him, or in some cases sent by the company to either the IRS or the Illinois Department of Revenue. In fact, approximately $1.7 million was sent to the IRS and approximately $150,000 was sent in to the Illinois Department of Revenue between January 1, 2013 and December 31, 2019. The dollar figures may even be greater than that. As a result, less than $2 million could have personally benefitted Mr. Courtright, the bulk of which was salary that he earned by working for TGC from 2013-2019.

The above-mentioned information was all conveyed to the Receiver in an email from undersigned counsel on February 12, 2020 wherein it was requested that the Receiver amend her initial report to reflect the above-described accurate and non-biased information. A copy of this email is attached as Exhibit E.[3] The Receiver has failed to correct her unsupported assertions. Instead, she has left that damaging assertion uncorrected and displayed both in the court file and

---

[3] On February 10, 2020, Mr. Courtright's counsel also advised the Receiver that her Report to the Court was wrong in stating that TGC lost $5.7 million in 2018, and that was inconsistent with TGC's 2018 filed federal income tax return that reported taxable income of $6,937,140. The Receiver also refused to acknowledge or correct that error. *See* Exhibit F hereto.

8

on her website.[4] In his February 12, 2020 correspondence, Mr. Courtright (through counsel) requested, at the very minimum, the Receiver post his sworn accounting on her website so that Site Owners could make their own determination as to the sufficiency of her claims. She has refused to do so.

### III.     The Receiver Should Not Be Awarded $170,255.49 in Fees and Expenses.

Contrary to its title, the Receiver's "Unopposed First Interim Application for an Order Approving and Authorizing Payment of Fees and Expenses of Receiver and Her Professionals" ("Fee Application," ECF #60) is ***opposed***. Rather, as expressly stated in Section VII of the Fee Application, "Counsel for Defendant Courtright confirmed receipt of the draft Application and invoices but informed undersigned counsel that they were unable to review them with Defendant Courtright prior to the filing of the Application and, thus, reserved the right to object to or comment on the Application." ECF #60, p. 8. Accordingly, labeling the Fee Application as "unopposed" is grossly misleading.

District courts enjoy broad discretion in determining the amount of a receiver's fee award and may adjust the amount requested based on various factors including "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented." *Fed. Trade Comm'n v. A1 Janitorial Supply Corp.,* 2020 WL 887386, at *1 (N.D. Ill. Feb. 24, 2020) (citing *U.S. S.E.C. v. Wealth Mgmt. LLC*, 2011 WL 4479518, at *1 (E.D. Wis. Sept. 26, 2011).

Mr. Courtright objects to the Receiver's Fee Application. While the Fee Application shows extensive time put in by the Receiver and her agents, as shown above, those efforts have proceeded

---

[4] The Receiver created www.incomestorereceivership.com to "provide investors and creditors pertinent information about this case and the Receiver's appointment. ECF #45, p. 7.

under a biased and fundamentally wrong understanding of TGC's business and the value of the assets of TGC and its Site Owners. Bluntly, the Receiver has missed the boat.

Moreover, the $170,255.49 in fees that Receiver seeks for her and her agents is only for her first month's work. The Court needs to be advised about what additional charges the Receiver and her agents have run up since January 31, 2020 before it can judge the benefit to the Receiver's Estate and the quality and necessity of the work performed.

## CONCLUSION

WHEREFORE, for the reasons stated herein Defendant Kenneth D. Courtright, III respectfully requests that the Court reject the Receiver's claims administration process and distribution plan, deny the Receiver's request for fees and expenses, and grant such further relief as this Court deems just and proper.

Dated: March 19, 2020

Respectfully submitted,

*/s/ Leigh D. Roadman*
Leigh D. Roadman (ARDC No. 6193461)
lroadman@clarkhill.com
Mason N. Floyd (ARDC No. 6282874)
mfloyd@clarkhill.com
CLARK HILL PLC
130 East Randolph Street, Suite 3900
Chicago, Illinois 60601
Tel.: (312) 985-5900 | Fax: (312) 985-5999
*Attorneys for Defendant Kenneth D. Courtright, III*

J4351\398845\223587372.v3