**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil Action No. 1:19-cv-08454 |
| : | |
| TODAY'S GROWTH CONSULTANT, INC. : | |
| (dba THE INCOME STORE) : | |
| : | |
| and : | |
| : | |
| KENNETH D. COURTRIGHT, III, : | |
| : | |
| Defendants. : | |

**RECEIVER'S SUPPLEMENT TO STATUS REPORT [ECF NO. 69]**
**AND OMNIBUS REPLY TO DEFENDANT KENNETH D. COURTRIGHT'S**
**COMBINED OBJECTION [ECF NO. 68] TO THE RECEIVER'S CLAIMS**
**ADMINISTRATION PROCESS AND PARTIAL PLAN OF DISTRIBUTION**
**[ECF NO. 53] AND THE RECEIVER'S FIRST INTERIM APPLICATION**
**FOR AN ORDER APPROVING AND AUTHORIZING PAYMENT OF FEES**
**AND EXPENSES OF RECEIVER AND HER PROFESSIONALS [ECF NO. 60]**

Melanie E. Damian, the court-appointed receiver ("Receiver") in the above-captioned

enforcement action, hereby files this Supplement to Status Report [ECF No. 69] and Omnibus

Reply to Defendant Kenneth D. Courtright's Combined Objection [ECF No. 68] (the "Objection")

to the Receiver's Claims Administration Process and Partial Plan of Distribution [ECF No. 53]

and the Receiver's First Interim Application for an Order Approving and Authorizing Payment

Fees and Expenses of Receiver and Her Professionals [ECF No. 60], and states as follows:

## I.      INTRODUCTION

The Objection expresses a more general objection and frustration with the instant litigation

initiated by the U.S. Securities and Exchange Commission ("SEC") against Today's Growth

Consultant, Inc. d/b/a The Income Store ("TGC") and with this Court's appointment of a Receiver rather than specific objections to the Receiver's Motion to Approve (a) Noticing and Claims Administration Process and (b) Partial Plan of Distribution [ECF Nos. 53, 62].[1] *See generally* ECF No. 68. It is the actions of Defendant Kenneth D. Courtright ("Courtright"), however, and not those of the Receiver since her appointment, that gave rise to his current predicament. Defendant Courtright dedicates a significant portion of the Objection to insinuating that the Receiver is unqualified to perform her duties and obligations under this Court's Order Appointing Receiver [ECF No. 19] ("Appointment Order"). Of course, having never served as a Court-appointed receiver and having run TGC as a Ponzi scheme,[2] Defendant Courtright's assessment of the Receiver's qualifications to serve as TGC's receiver should hold little if any weight. Defendant Courtright mischaracterizes and overlooks key provisions of the Receiver's proposed claims process and partial distribution plan that effectively counter each of Courtright's objections, warranting an Order from this Court overruling the Objection in its entirety.

## II.    RESPONSES TO COURTRIGHT'S OBJECTIONS

### A.    *The Receiver Has a Detailed and Fundamental Understanding of TGC's Business Developed from the Significant Time and Resources that She and Her Professionals Devoted to this Receivership.*

Section I of Courtright's objection, in a nutshell, is that the Receiver does not understand TGC's business and thus sees the assets of the Receivership Estate as "valueless". This objection misstates the Receiver's initial report and ignores portions of the proposed claims process and partial distribution plan. Based upon her understanding of TGC's business, as set forth in several

---

[1] On March 10, 2020, the Receiver filed an amendment to the Motion, described *infra*. *See* ECF No. 62.

[2] As the Receiver explained in her initial report, TGC's own records demonstrate that investors were paid, not from website operating profits (which were millions of dollars insufficient) but from new investor funds.

2

Court filings [*see, e.g.,* ECF Nos. 45 and 53], the Receiver proposes a two-phase claims process and partial distribution plan that attempts to give the allegedly defrauded investors the benefit of their bargains with TGC by providing them with two options for maximizing their recoveries from the Estate in the first phase, while reducing the number of claims for monetary recovery against the Estate in the second phase.

      *i.*   *The Receiver Has Placed Significant Value on the Receivership Estate Assets Evidenced by the Two-Step Claims Process and Distribution Plan.*

Defendant Courtright asserts that, by proposing to allow investors to take possession of their assigned website(s) and in exchange release any claim they have against the Receivership Estate, the Receiver fails to properly value TGC's websites as she does not consider the revenue that the websites generate for the Receivership Estate. This objection, however, overlooks a few critical details. Indeed, the total value of all of the websites of TGC (whether they are sold together or individually) is estimated to be less than the total amount of claims that the more than 700 investors are expected to assert against the Estate based on the losses they suffered as a result of their investments with TGC. This number may exceed $90 million. Therefore, retaining all of the websites and selling them (even if the $22 million dollar expression of interest was a legitimate offer) will not generate a sufficient amount to satisfy all of the claims expected to be asserted against the Estate.

Further, many of the investors do not want to receive a distribution of a portion of the amounts they had invested with TGC, but rather would prefer to accept the websites that were assigned to them in full satisfaction of their claims against the Estate with the expectation that they will be made whole over time through the revenues generated from the websites turned over to them. And, the investors who prefer to walk away from the sites assigned to them and instead

receive monetary recoveries from the Estate will leave a significant number of revenue-generating websites with the Estate to satisfy at least a portion of those investors' claims after the sites are liquidated, along with the other assets of the Estate, in a manner so as to maximize the investors' recoveries. Therefore, contrary to Courtright's assertion, the Receiver is acutely aware of the revenues generated by the websites and has factored it into the value assigned to those website in formulating a claims process and partial distribution plan that provides for that value to be transferred directly to the investors who accept the sites or indirectly to those who file claims and receive monetary recoveries derived from, in large part, the Receiver's liquidation of the revenue-generating websites remaining with the Estate.

Pursuant to the Consulting Performance Agreements ("CPA"), each investor was required to pay an upfront fee in exchange for a guaranteed percentage of the assigned websites revenues or minimum amount if the revenues did not reach a certain level. *See* ECF No. 45, p. 22; ECF No. 68-3. Based on the Receiver's analysis of TGC's operations and books and records, this business model as implemented by Defendant Courtright was neither feasible nor profitable. *See* ECF No. 45. Some investors received the return of their full investments plus additional amounts ("net winners"), because they were early investors who received payments over a longer period of time before the commencement of this action, or Defendant Courtright chose to pay them more than the amounts due to them under the CPAs. But the majority of investors received back significantly less than they had invested or nothing at all because they invested closer in time to commencement of this action, or Defendant Courtright chose not to pay them the amounts due to them under the CPAs ("net losers").

Because many of the websites were not generating sufficient revenues for TGC to pay the amounts due to the investors under the CPAs, TGC used upfront fees it obtained from new

4

investors who signed CPAs with TGC and the proceeds of significant loans it received from lenders to pay the minimum payments due to earlier investors. *See* ECF No. 45. And the upfront fees from the investors, the revenues from the websites, and the loan proceeds were all comingled into the same TGC bank account. Because most investors have not received the return of their investment or all of the amounts due to them under the CPAs, these investors will have significant claims against the Receivership Estate to recover their investments. During the first two months of the Receivership, the Receiver and her team fielded hundreds of calls and emails from investors expressing their desires and making demands. Many of them demanded the return of the websites that were assigned to them, while others expressed an interest in receiving a monetary recovery from the Estate. Therefore, the Receiver sought to formulate a claims process and distribution plan that would meet the demands and interests of as many of the investors as possible while taking into account the promises made by TGC and the nature of its operations, resources, and assets, including the websites it was managing for the investors. Accordingly, the Receiver proposed a claims process and partial distribution plan intended to provide the benefit of the bargain to those investors who still wanted it, reduce the number of claims asserted against the Estate, and maximize the amounts distributed to those seeking monetary recoveries. In particular, the Receiver's proposed plan permits investors who want control of the websites that were assigned to them to accept those sites in exchange for a release of their monetary claims against the Estate. This will provide such investors with the benefit of their bargains with TGC by giving them the opportunity to recoup their investment and perhaps realize a profit through the revenues generated by the websites, while reducing the total number and amount of claims that will be asserted against the Estate by several million dollars. *See* ECF Nos. 45, 53. And, the investors who decline to accept the sites assigned to them, preferring instead to assert claims against the Estate, will, if their

5

claims are allowed, receive monetary recoveries derived from the Receiver's liquidation of the revenue-generating sites, among other assets of the Estate.

Therefore, the Receiver places significant value on the revenue that many of the websites generate. However, her review of TGC's books and records and assessment of its operations revealed that such revenue was not sufficient to pay the operating costs of the company and the obligations to the investors under the CPAs. As such, Courtright's claim in the Objection that properly operating and maintaining the websites will generate substantial revenue for the Receivership Estate [*see* ECF No. 68, pp. 3-4] is not supported by TGC's books and records or his track record at the helm of TGC.

> ii. *The Expression of Interest in Purchasing Assets of TGC Is Not Consistent with the Court's Orders and Does not Contemplate the Proposed Claims Process and Partial Distribution Plan.*

Defendant Courtright seems to base his assertion regarding the value of the revenue-generating websites on an expression of interest in the assets of TGC that he received from a third party, which Courtright attached to his Objection. *See* ECF No. 68 at Exhibit 2. This expression of interest appears to be a contingent offer to purchase all tangible and intangible assets of TGC (not limited to websites), subject to confirmation of website traffic and a list of parameters. There are two glaring problems with this expression of interest. First, it requires that Courtright be kept on to run the company as an executive level employee, in clear violation of the Court's Temporary Restraining Order [ECF No. 20] ("TRO"), Stipulation and Order Imposing Preliminary Injunction Freezing Assets and Granting Other Relief [ECF No. 56] ("PI Order"), and the Appointment Order. *See* ECF No. 68-2. Second, the expression of interest was not presented to the Receiver but instead simply attached to Courtright's Objection and addressed "To whom it may concern". Nevertheless, after Courtright filed the Objection, the undersigned counsel for the Receiver

contacted the principal of the party that submitted the expression of interest to discuss the "offer" and explain that any offers should be conveyed directly to the Receiver and must not require Courtright's ongoing involvement. The principal indicated that he understood and would direct all future communications regarding his interest in the assets of TGC to undersigned counsel, and undersigned counsel agreed to notify him after the Court has ruled on the Receiver's Motion. No offers to purchase TGC as a going concern or its assets have been presented to the Receiver as of the date of this filing.

### iii. Investors Were Promised But Did Not Receive Website Ownership

Defendant Courtright's objection to the Receiver's claims process based upon the actual ownership of TGC websites is misguided. While Courtright made promises to investors that they would own the websites they were being assigned pursuant to their CPAs, this is not how the ownership of most of the websites was actually structured. Courtright's objection cannot make his fiction a reality. With a few exceptions, the investor-assigned websites were held in the name of TGC, and many investors never even received a site. *See* ECF No. 45, p. 22; *see also* ECF No. 69-5, 69-7, 69-11 ("[This Investor] was never assigned a website"), 69-12 ("[This Investor was] never assigned a site"), 69-16 ("[M]y…contract guaranteed purchase of three sites…I never got a third."), 69-19 ("[This Investor has] no website and…never received any payments of any kind…").

### iv. The Receiver's Proposed Claims Process Provides the Receiver with Discretion to Determine Which Claims Should Be Allowed.

Defendant Courtright objects to the Receiver's proposal that a claim be disallowed based on the claimant's relationship or affiliation with Courtright, among other factors. The Receiver included this factor because she does not believe it would be fair to allow the claim of an individual who had a close relationship or affiliation with TGC or Courtright because, by virtue of that

relationship or affiliation, he or she presumably had knowledge of TGC's business operations and should have known of the alleged misconduct of Courtright, and thus should not be rewarded with an allowed claim at the expense of the innocent investors alleged to have been defrauded. The Receiver, however, clarifies that, "notwithstanding these factors…the Receiver will analyze each claim individually…" [ECF No. 53, FN 6]. Further, in the Receiver's Notice of Amendment to Proposed Noticing and Claims Administration Process [ECF No. 62], the Receiver proposes that she be granted the discretion to approve the claims of former employees of TGC on a case-by-case basis to ensure that she can allow the claim of an innocent employee who, for instance, may submit a claim for unpaid wages. *See* ECF No. 62 at p. 2.

> **B. The Receiver Has Preserved and Will Continue to Preserve the Assets of the Receivership Estate in Fulfillment of Her Duties Under the Appointment Order in an Unbiased Fashion.**

Defendant Courtright claims that the Receiver has failed to maintain the assets of the Estate, states that he has raised concerns that the Receiver has wasted TGC and the investors' assets, and refers the Court to Exhibits A and E to the Objection for details as to how Courtright believes the Receiver should operate TGC. These Exhibits, however, do not identify any specific assets that are being "wasted". Rather, they only identify what Courtright believes is necessary to maintain the assets of the Estate by keeping the 'status quo'. *See* ECF Nos. 68-1, 68-4. As discussed by the Receiver in her initial report [*see* ECF No. 45], and *supra*, the business model and operations of TGC under Courtright's control are not sustainable, as they involved the use of new investor money and loan proceeds to pay the amounts owed to earlier investors, which the Receiver has no intention of doing. Even setting aside the investor payments, Courtright's operation of TGC was at a substantial monthly and annual loss. The Receiver, to the contrary, continues to diligently operate TGC's business and maintain the assets of the Estate as previously

reported to the Court, in accordance with the Court's directions under the Appointment Order. *See* ECF No. 45, pp. 16, 22; ECF No. 19.

Defendant Courtright further accuses the Receiver of using biased language including "Ponzi scheme" when referring to TGC. However, the Receiver and her professionals' analysis of TGC's books and records and operations prior to the commencement of this action indicate that, in fact, TGC resembled a Ponzi scheme. Indeed, as explained in her initial report, based on the Receiver's review of the books and records of TGC, new investor funds and loan proceeds were used to pay the investors rather than the revenues from the websites assigned to those investors. *See* ECF No. 45, p. 6. For example, in 2018 website revenue was less than $2 million and website payout to investors was approximately $12.7 million, and likewise in 2019 website revenue was less than $4 million and website investor payout was $16.5 million. This conduct fits the definition of a Ponzi scheme. *Id.* Therefore, the Receiver merely provided the Court a description of her findings. Likewise, the remainder of the Receiver's initial report accurately reported the books and records of the Company. A forensic audit will be conducted as necessary and additional findings will be reported as the Receiver proceeds with her work.

**C. *The Receiver and Her Team are Entitled to their Reasonable Fees.***

Defendant Courtright sets forth a broad and general objection to the Receiver's First Interim Application for an Order Approving and Authorizing Payment of Fees and Expenses of Receiver and Her Professionals [ECF No. 60] ("Fee Application") that lacks any specificity,

making it deficient[3] and ineffective in challenging the Receiver's right to recover reasonable fees and costs.[4]

Courtright's objection to the Receiver's entitlement to fees is unfounded.  Pursuant to Section XV ("Fees, Expenses, and Accounting") of the Appointment Order entered on December 30, 2019, the Receiver and her professionals are entitled to reasonable compensation and expense reimbursement from the Receivership Estate.[5]  A District Court's award of a receiver's compensation is, of course, firmly within its discretion.  *See Gaskill v. Gordon*, 27 F.3d 248, 254 (7th Cir. 1994) (citing *Crites, Inc. v. Prudential Ins. Co.,* 322 U.S. 408, 418, 88 L. Ed. 1356, 64 S. Ct. 1075 (1944)); *SEC v. First Sec. Co.,* 528 F.2d 449, 451 (7th Cir. 1976).   The court may consider all of the factors involved in a particular receivership in determining an appropriate fee.  *See id.* (citing *Donovan v. Robbins*, 588 F. Supp. 1268, 1273 (N.D. Ill. 1984)).  Moreover, "[e]ven though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation."  *Id.* (citing *SEC v. Elliott,* 953 F.2d at 1577); *see also Donovan,* 588 F. Supp. at 1273.

---

[3] "[T]he "party objecting to a fee application may not do so based on the general proposition that the fee sought is simply too much."  *Fed. Trade Comm'n v. A1 Janitorial Supply Corp.,* 2020 WL 887386, at *5 (N.D. Ill. Feb. 24, 2020) (citing *Fed. Trade Comm'n v. Capital Acquisitions & Mgmt. Corp.*, No. 04 C 7781, 2005 U.S. Dist. LEXIS 18504, 2005 WL 3676529, at *4 (N.D. Ill. Aug. 26, 2005)).  Rather, "[t]he objector must, at some point, identify any allegedly improper, insufficient, or excessive entries and direct the court's attention to them." *Id.*; "[O]bjectors have an obligation to 'identify any allegedly improper, insufficient, or excessive entries' as specifically as they can." *Fed. Trade Comm'n v. Capital Acquisitions & Mgmt. Corp.*, No. 04 C 7781, 2005 U.S. Dist. LEXIS 18504, 2005 WL 3676529, at *4 (N.D. Ill. Aug. 26, 2005) (*finding* that an objection to an award of fees and costs that do not specifically identify any entries—or even categories of entries—cannot be sustained).

[4] *See* ECF No. 19, pp. 22-23.

[5] The Appointment Order further requires that the Receiver comply with the Billing Instructions for Receiver's in Civil Actions Commenced by the U.S. Securities and Exchange Commission, which the Received has done, as represented in the Fee Application.  *See generally* ECF No. 60.

Defendant Courtright's argument that the Receiver and her professionals are not entitled to their fees and costs is, in part, based upon his claim that the Receiver does not understand TGC's business and the value of the Receivership Estate. *See* ECF No. 68, pp. 9-10. As discussed above, however, this claim is without merit as the Receiver has a thorough understanding of TGC's business as described in her initial report [*see* ECF No. 45]. Other than the general and conclusory statement, Courtright has not set forth any specific facts or evidence to suggest that the Receiver has a fundamental misunderstanding of TGC's business or that the Receiver has wasted or diminished the assets of the Estate. Even if the Receiver did not have a complete understanding of TGC's business at the end the initial reporting period (only one month after she was appointed), denying payment of any fees or reimbursement of any costs to the Receiver is not supported by any applicable case law. As long as the Receiver reasonably and diligently discharges her duties, she is entitled to compensation. *See Gaskill*, 27 F.3d at 254.

Additionally, Courtright's representation of the amount of fees and costs being sought by the Receiver is incorrect and misleading. The Fee Application makes clear that the Receiver is requesting that the Court enter an Order approving all of the fees and costs sought therein but authorizing payment of 80% of the fees incurred and 100% of the costs incurred. *See* ECF No. 60, pp. 9-10. Therefore, while the Receiver is seeking approval of $170,255.49 in fees and costs incurred by four professional firms, the Receiver's employment of which has been approved by this Court, the Receiver is only seeking payment of $138,444.81 at this time.[6] Courtright's

---

[6] The Receiver is requesting authority to pay the following amounts from the Estate: Damian & Valori, LLP - $67,501.05 (comprising $55,745.12 in fees (80% of $69,681.40) and $11,755.93 in costs); Rachlis Duff & Peel, LLC - $18,724.96 (comprising $18,257.60 in fees (80% of $22,822.00) and $467.36 in costs); Semanoff Ormsby Greenberg & Torchia, LLC - $29,560.68 (comprising $28,204.00 in fees (80% of $35,255.00) and $1,356.68 in costs); and Kapila Mukamal, LLP - $22,658.12 (comprising $22,614.40 in fees (80% of $28,268.00) and $43.72 in costs).

objection focusses on the $170,255.49 in fees and costs for which the Receiver is seeking approval without addressing any of the detailed time entries describing the extensive work the Receiver and her professionals performed during the one-month application period pursuant to the Appointment Order or the significantly discounted rates (up to 47%) and fee reduction provided by the Receiver and her professionals. Further, Courtright's argument that the Receiver and her professionals should not be entitled to fees and costs requested in the Fee Application until the Receiver specifies what her future fees and costs will be is unsupported by the Appointment Order, case law, or any standard or custom in receivership matters. Nevertheless, the Receiver can report that, during any one-month period throughout the course of this Receivership, she does not expect to incur fees and costs equal to or greater than the amount sought in the initial Fee Application.

As a final matter, Courtright accuses the Receiver of "grossly misleading" conduct in titling the Fee Application as "unopposed". However, this accusation is unfounded. The Fee Application is not titled as "unopposed" nor is there any representation in it that Defendant Courtright does not oppose it. *See* ECF No. 60. Rather, as stated in the Fee Application's Certification of Conference, the Receiver presented the Fee Application to Courtright's counsel prior to its filing, which the Objection admits, and Courtright's counsel informed undersigned counsel that they were reserving the right to object to or comment on the Fee Application in the future.[7] As such, Courtright's accusation that the Receiver is misleading the Court by presenting the Fee Application as "unopposed" is baseless and should be disregarded.

---

[7] "Counsel for Defendant Courtright confirmed receipt of the draft Application and invoices but informed undersigned counsel that they were unable to review them with Defendant Courtright prior to the filing of the Application and, thus, reserved the right to object to or comment on the Application." ECF No. 60, p. 8.

### III.     CONCLUSION

For the foregoing reasons, the Receiver respectfully requests that the Court (i) overrule all of Defendant Courtright's objections, (ii) grant the Receiver's Motion to approve the claims process and distribution plan, and (iii) grant the Receiver's initial Fee Application.

This 30th day of March, 2020.

Respectfully submitted,

**DAMIAN & VALORI, LLP**
*Counsel for Melanie E. Damian, Receiver*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

*/s/ Kenneth Dante Murena*
Kenneth Dante Murena, Esq.
Florida Bar No. 147486
E-mail: kmurena@dvllp.com

*Admitted Pro Hac Vice*


### <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on March 30, 2020 on all counsel or parties who have appeared in the above-styled action.

*/s/Kenneth Dante Murena*
Kenneth Dante Murena, Esq.
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*

*Admitted Pro Hac Vice*

13