**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TODAYS GROWTH CONSULTANT INC., )<br>doing business as The Income Store, and )<br>KENNETH D COURTRIGHT, III, )<br>)<br>Defendants. ) | No. 19-cv-08454<br><br>Judge Andrea R. Wood |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Securities and Exchange Commission ("SEC") has brought this action against Defendants Todays Growth Consultant Inc. ("TGC") and Kenneth D. Courtright, III, TGC's founder, co-owner, and chairman, for violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a–qq, and the Securities Act of 1933, *id.* § 77a–mm. The SEC alleges a long-running fraud of TGC's investors and creditors, run similarly to a Ponzi scheme. On December 30, 2019, the Court took control of Defendant TGC's assets ("Estate") and appointed Melanie E. Damian of Damian & Valori, LLP as Receiver. (Dkt. No. 19.) Presently before the Court is the Receiver's motion to approve her proposed noticing and claims administration process and partial plan of distribution ("Plan"). (Dkt. No. 53.) Defendant Courtright and certain TGC investors have raised objections to the Plan. (*See* Dkt. Nos. 68, 69.) For the reasons provided below, the Court sustains in part and overrules in part the investors' objections and overrules Courtright's objections. The Receiver's motion is granted subject to her including certain additional information in her notices to potential claimants.

## BACKGROUND

The SEC alleges that between January 2017 and October 2019, Defendants raised at least $75 million from more than 500 investors after making numerous fraudulent misrepresentations, including offering a minimum guaranteed rate of return that Defendants could not deliver. (Compl. ¶¶ 2–5, Dkt. No. 1.) As set out in the Complaint, TGC entered into consulting performance agreements ("Agreements") with investors, in which it committed to create and host websites on their behalves in exchange for up-front payments. (*Id.* ¶ 2; Mot. to Approve Plan at 3, Dkt. No. 53.) Those Agreements promised investors the greater of 50% of their website revenues or certain minimum percentage returns on their initial investments. (Compl. ¶ 3.) But revenues from TGC's websites were much less than it represented. (*Id.* ¶ 5.) According to the SEC, TGC made up that gap in revenue primarily by bringing on new investors or entering into additional Agreements with existing investors, thus employing the typical strategies of a Ponzi scheme. (*Id.* ¶ 6.) Additionally, the SEC alleges that TGC commingled loan proceeds with investor funds and diverted millions of dollars to pay for Courtright's personal expenses. (*Id.* ¶¶ 7–8.)

Contrary to TGC's assertions, the Receiver claims TGC's records show that it owned most of the websites and domains it created on behalf of its investors. (Receiver's Initial Status Report at 22, Dkt. No. 45.) Since her appointment, the Receiver has dedicated significant resources to maintaining those websites. (Receiver's Second Status Report at 9–10, Dkt. No. 81.) She estimates that she is holding approximately 3,130 domain names (*id.* at 19–20), and that operation of those sites costs the Estate between $60,000 and $80,000 per month. (Receiver's Initial Status Report at 22.) As of June 30, 2020, the Receiver held a total of $605,229.58 in cash on hand on behalf of the Estate. (Receiver's Second Interim Appl. for an Order Approving & Authorizing Payment of Fees & Expenses at 4, Dkt. No. 87.) But on August 7, 2020, the Court approved the

Receiver's applications for immediate payments to her and her professionals for work completed on behalf of the Estate from December 26, 2019 through June 30, 2020. (Dkt. No. 94.) The Receiver is in the process of liquidating the Estate's other assets, including its personal property and potential claims against third parties. (Receiver's Second Status Report at 20.) But she has also identified a number of likely creditors of the Estate who gave TGC, in total, $141,518,356 in up-front payments, and received, in total, only $43,569,806 back. (*Id.* at 21 & n.9.)

Presently before the Court is the Receiver's motion to approve her Plan. (Dkt. No. 53.) In short, the Receiver intends to return the websites to qualified claimants as soon as practicable and to delay distribution of the Estate's other assets until she has completed liquidation of those assets. More specifically, the Receiver proposes that within 15 days of the Court's approval of her Plan, she send all potential claimants a legal notice, proof of claims form, and release form, along with a calculation of their estimated claim, where possible (collectively, the "Claims Package"). (*See* Mot. to Approve Plan, Ex. A, Dkt. No. 53-1; *id.* Ex. B, Dkt. No. 53-2.) All claimants must elect either to release their rights to any monetary distribution or to release their rights to their websites. (Mot. to Approve Plan at 6.)

The Receiver requests authority to determine which claims will be allowed without further intervention by this Court. Under her Plan, each investor and creditor must sufficiently demonstrate: (1) either that he or she entered into an Agreement with TGC, paid an upfront fee, and has not received that upfront fee back, or that he or she made a loan to TGC which remains at least partially unpaid; and (2) that the investor or creditor is not a family member of Courtright, was not an employee or affiliate of TGC or of Courtright between December 2009 through December 2019, and was not a paid promoter for TGC. (*Id.* at 8–9.) The Receiver has since filed a notice of amendment to her Plan that would give her the discretion to allow claims by employees

3

and affiliates of TGC and Courtright on a case-by-case basis. (*See* Dkt. No. 62.) Additionally, any "net winners" may obtain their assigned websites if they return the profits they made from Defendants' scheme to the Estate.[1] (Mot. to Approve Plan at 4 n.4.)

The Receiver proposes the following claims schedule: (i) Day 0 marks this Court's approval of the Plan; (ii) on Day 15, the Receiver will send Claim Packages to all known investors and creditors via email or first-class mail; (iii) Day 45 is the deadline for claimants to send their proofs of claims and signed releases to the Receiver; (iv) by Day 65, the Receiver will approve or reject all claims, providing claimants with written explanations of any denials; (v) by Day 95, claimants must appeal any rejected claims to the Receiver;[2] (vi) by Day 105, the Receiver will reject or deny any such appeals; (vii) Day 125 is the deadline for claimants with rejected claims to appeal the Receiver's final determination to this Court; and (viii) on Day 145, the Receiver must file her responses to claimants' appeals with this Court.[3] (Mot. to Approve Plan at 10–13.) Finally, 30 days after the Receiver has liquidated all assets of the Estate, she will file a motion requesting the Court's approval of a monetary distribution plan. (*Id.* at 12–13.)

---

[1] The term "net winners" refers to those "investors who withdrew more than they had invested," as opposed to "net losers," which describes investors who have not received back the amount of money they put into the scheme. *See Dusek v JPMorgan Chase & Co.*, 832 F.3d 1243, 1245 (11th Cir. 2016).

[2] The motion contains a discrepancy as to the date by which rejected claims must be appealed to the Receiver. In one instance, the motion describes the deadline as "twenty (20) days after the Receiver's Initial Determination Date," which would be Day 85 based on the Receiver's proposed timeline. (Mot. to Approve Plan at 11.) However, the Receiver also describes this appeal deadline as "Day 95." (*Id.* at 13.) The Court adopts the latter proposal, which provides claimants 30 days after the Receiver sends rejections to request her reconsideration.

[3] The motion also contains a discrepancy as to the Receiver's deadline to respond to claimants' appeals with this Court. The Receiver proposes that her responses "shall be due within fifteen (15) days after the Appeal Deadline," which is "Day 125" on her timeline. (Mot. to Approve Plan at 12–13.) However, she also describes her own response deadline as "Day 145," which would give her 20 days to file her responses to claimants' appeals. (*Id.* at 13.) The Court adopts the latter proposal, to ensure that the Receiver has adequate time to respond.

**DISCUSSION**

"In supervising an equitable receivership, the primary job of the district court is to ensure that the proposed plan of distribution is fair and reasonable." *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 332 (7th Cir. 2010) (citing *Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC* ("*WorldCom*"), 467 F.3d 73, 84 (2d Cir. 2006)). When carrying out that task, the "court has broad powers and wide discretion to determine the appropriate relief." *SEC v. Cap. Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (quoting *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978)). That includes the "discretion to classify claims sensibly in receivership proceedings." *SEC v. Enter. Tr. Co.*, 559 F.3d 649, 652 (7th Cir. 2009) (citations omitted). The Seventh Circuit reviews district courts' decisions in supervising a receivership for an abuse of discretion. *Wealth Mgmt.*, 628 F.3d at 332–33.

On March 19, 2020, the Receiver filed a status report outlining and addressing the 20 objections she received from TGC's investors and creditors in response to her Plan. (Dkt. No. 69.) Additionally, Courtright filed his own objections to the Plan (*see* Dkt. No. 68), to which the Receiver has responded separately. (Dkt. No. 71.) The Court addresses each set of objections in turn.

### I. Objections from TGC's Investors and Creditors

The Receiver provided investors' objections to the Court and placed their complaints into five overall categories. (*See* Receiver's Notice of Compliance with Court Order & Status Report Regarding Objs. ("Receiver's Resp."), Dkt. No. 69.) First, seven claimants object to the Receiver's amendment requesting that she be permitted to consider claims by affiliates of TGC and Courtright. (*See id.* at 3; *id.* Exs. A–G, Dkt. Nos. 69-1–69-7.) The Receiver contends that any such claims will be limited "to those few TGC [e]mployees that may be prejudiced by this

5

enforcement action." (Receiver's Resp. at 3.) The Court finds the Receiver's case-by-case approach to be a fair and reasonable solution, as it will ensure payout to a greater number of victims while preventing payments to individuals who participated in Defendants' scheme. Therefore, the first set of objections is overruled.

Second, three claimants object to the Receiver's requirement that they return any net winnings before receiving their assigned websites. (*See id.* at 4; *id.* Ex. G; *id.* Ex. H, Dkt. No. 69-8; *id.* Ex. J, Dkt. No. 69-10.) Some investors point out that they may be net winners as to their first Agreement with TGC, but they are net losers as to their second, and net losers overall. The Receiver responds that all winnings must be returned before she can distribute websites to investors because "such winnings were derived from the investments of other, subsequent investors rather than from actual revenues of TGC." (Receiver's Resp. at 4–5.) Additionally, the Receiver argues that she must treat each Agreement separately for the purposes of distributing websites. However, she intends to look at investors' cumulative gains or losses when she proposes a monetary distribution plan.

"It is settled that an equity receiver has the power to bring ancillary actions to recover assets which were fraudulently transferred to investors in a Ponzi scheme." *CFTC v. Am. Commodity Grp. Corp.*, 753 F.2d 862, 866 n.6 (11th Cir. 1984); *see also Janvey v. Brown*, 767 F.3d 430, 441 (5th Cir. 2014) (affirming the district court's clawback from investors because "to allow an investor to enforce his contract to recover promised returns in excess of his undertaking would be to further the debtors' fraudulent scheme a[t] the expense of other investors" (alterations and citations omitted)). Similarly, courts have found it fair and reasonable to approve distribution plans that exclude net winners from the recovery. *See, e.g.*, *WorldCom*, 467 F.3d at 84; *SEC v. Certain Unknown Purchasers of the Common Stock of & Call Options for the Common Stock of*

6

*Santa Fe Int'l Corp.*, 817 F.2d 1018, 1021 (2d Cir. 1987). Here, the Receiver does not propose excluding net winners entirely from the distribution. Instead, her Plan offers them the option to return their winnings and receive their websites instead. Given the Receiver's representations that the Estate's assets will not be sufficient to compensate all claimants' losses, the Court finds that her proposal fairly and reasonably addresses the concerns of net winners who may prefer their websites over their monetary claims. At this early stage, it is also reasonable for the Receiver to approach each Agreement individually and avoid having to calculate each investor's overall losses or gains. Thus, the second group of objections is overruled.

The third group of objectors opposes the Receiver's mandate that investors choose between their assigned websites and their monetary claims against the Estate. (*See* Receiver's Resp. at 5–6; *id.* Ex. A; *id.* Exs. L–N, Dkt. Nos. 69-12–69-14.) Several investors who never received access to their websites argue that the Plan disadvantages them because they have no immediate option for distribution. Others oppose transferring income-generating websites to their assigned investors, arguing that the websites should be liquidated and distributed among all claimants. In response, the Receiver notes that the Plan "is not perfect," but seeks to "balance the multiple competing interests." (Receiver's Response at 6.) The Court agrees. The third set of objections is overruled. The Receiver's approach is a reasonable distribution of the Estate's assets, which are unlikely to cover all of Defendants' liabilities. *See WorldCom*, 467 F.3d at 84 ("[W]hen funds are limited, hard choices must be made."). Furthermore, the Receiver has represented that the monthly income from investors' websites cannot fully offset the Estate's monthly costs of maintaining those websites. (Receiver's Initial Report at 22.) Immediate distribution of the websites will conserve the Estate's assets, thus maximizing the potential monetary claims for investors who have not been assigned websites. While the Plan has disadvantages, it offers a fair

7

approach calculated to ensure that the greatest number of claimants get something of value.

The fourth category of objections complains that the Receiver's Plan is vague or lacking in detail, particularly concerning the worth of investors' websites or future monetary distributions. (*See* Mot. to Approve Plan at 6–7; *id.* Ex. A; *id.* Exs. O–Q, Dkt. Nos. 69-15–69-17.) The Receiver dismisses these objections as premature and incorrect. (Mot. to Approve Plan at 7.) She notes that she "cannot predict what amounts are recoverable" before she receives investors' forms releasing either their websites or monetary claims. (*Id.*)[4]

The Court sustains in part and overrules in part this fourth set of objections. It is not reasonable to require the Receiver to provide investors with detailed estimates of their anticipated monetary awards, especially when such awards depend upon the future elections of investors. But potential claimants are entitled to more guidance to make an informed choice between their websites and their money. Thus, the Court directs that the Receiver include in her Claims Packages the following information:[5] (i) the total amount of money Defendants received in investments and loans and the total amount of payments they made to creditors and investors (*i.e.*, the total value of potential claims against the Estate); (ii) the total number of potential claimants; (iii) the total number of websites the Receiver is holding on behalf of the Estate; (iv) the mean and median monthly income from each website the Receiver is holding on behalf of the Estate from the date on which the Receiver took control of those websites, and the average monthly costs of maintaining each website; (v) the total amount of cash on hand the Receiver is holding on behalf of the Estate; (vi) an estimate of, or, at a minimum, a brief description of the Estate's other assets,

---

[4] One objector also pointed out that the language in the Receiver's proposed Claims Packages regarding transfer of websites does not include language guaranteeing transfer of associated passwords. The Receiver has represented that she will remedy that oversight and the Court trusts that she will do so.

[5] The Court understands that these numbers may be uncertain. Accordingly, the Receiver may qualify her representations to investors and creditors by explaining that she is providing estimates, made to the best of her knowledge based on all the information she has reviewed so far and as of a particular date.

including unliquidated claims against third parties; and (vii) the date by which the Receiver expects to conclude liquidation of the Estate's assets, or, at a minimum, a brief description of the remaining the steps the Receiver must take before such liquidation will be completed. The Court will also require that the Receiver amend the summary of upcoming deadlines in her legal notice to claimants, as the summary includes terms not defined in that document. (*See* Mot. to Approve Plan, Ex. A at 6.) The Receiver shall instead provide investors with brief descriptions of what they must do or what will occur on each date.

Finally, several investors lodged objections regarding future monetary distributions, arguing that they should be given higher priority for monetary claims. (*See* Mot. to Approve Plan at 7–8; *id.* Ex. I, Dkt. No. 69-9; *id.* Exs. Q–T, Dkt. Nos. 69-17–69-20.) These objections are overruled as premature. The Court will entertain any such objections when it reviews the Receiver's eventual motion to approve a plan for monetary distribution.

## II.     Objections from Defendant Courtright

Courtright raises three primary objections to the Receiver's Plan. (Def. Kenneth D. Courtright's Combined Obj. to the Plan and Receiver's First Interim Appl. for Fees at 3–6, Dkt. No. 68.) First, he argues that the Receiver has drastically underestimated TGC's value. Second, he claims that the proposal to give websites to investors is flawed because such websites are already owned by investors. And third, Courtright objects that preventing his family and his and TGC's associates from submitting claims is overly restrictive and arbitrary.

Courtright's objections are overruled. As to his first objection, Courtright has not presented any persuasive evidence that TGC's value is higher than what the Receiver represents. He points to TGC's income from its Agreements—the very contracts that give rise to the claims for fraud—as well as a March 2020 offer from a third party to purchase TGC for $22 million. (*Id.*

9

at 3–4; *id.* Ex. B., Dkt. No. 68-2.) As the Receiver noted, the alleged purchase offer includes terms that, if accepted, would violate a previous Order of this Court. (*See* Stipulation & Order Imposing Prelim. Inj. Freezing Assets & Granting Other Relief, Dkt. No. 56.) And the Court finds that the Receiver has adequately considered the value of TGC's Agreements in her Plan. As to Courtright's second objection, he has failed to present any evidence that investors already own the domain names that TGC created on their behalves, other than pointing to relevant sections of investors' Agreements. The Court declines to rely on the truth of statements made in those allegedly fraudulent Agreements. Finally, the Court finds that the Receiver's amendment proposing to approach claims made by Defendants' associates on a case-by-case basis fairly addresses Courtright's third objection.

## CONCLUSION

The Receiver's motion to approve her Plan (Dkt. No. 53) is granted, subject to certain revisions in her Claims Packages to investors, as described above. Investors' objections are overruled in part and sustained in part. Defendant Courtright's objections are overruled.

ENTERED:

Dated: November 30, 2020

_____
Andrea R. Wood
United States District Judge