UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> TODAY'S GROWTH CONSULTANT, INC. : <br> (dba THE INCOME STORE) : <br> : <br> and : <br> : <br> KENNETH D. COURTRIGHT, III, : <br> : <br> Defendants. : <br> : | Civil Action No. 1:19-CV-08454 |

## RECEIVER'S FOURTH STATUS REPORT

Melanie E. Damian, the court-appointed receiver ("Receiver") in the above-captioned enforcement action ("SEC Enforcement Action"), submits her fourth status report concerning the status of the Receivership, established pursuant to the Court's Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief [ECF No. 20] ("TRO") and Order Appointing Receiver ("Appointment Order") [ECF No. 19], which the Court extended in its Preliminary Injunction Orders ("Preliminary Injunction") [ECF Nos. 55, 56]. This interim report sets forth the Receiver's activities and efforts to fulfill her duties under the Appointment Order for the period from October 1, 2020 through December 31, 2020 (the "Reporting Period").

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................3

II. PROCEDURAL BACKGROUND........................................................................4

III. STATUS AND ACTIVITIES OF THE RECEIVERSHIP AND SUMMARY
OF TGC'S OPERATIONS ....................................................................................6

    A. *Maintaining TGC's Operations and Websites
and Otherwise Preserving Assets of the Estate*........................................8
    B. *Implementing Claims Process and Partial Plan of Distribution* ............8
    C. *Communicating with Investors* ................................................................11
    D. *Recovery of TGC's Domains and Websites and Investigation
of Other Potential Estate Assets* ..............................................................11
    E. *Liquidation of Estate Property*................................................................12
    F. *Production of Documents to the Parties and Personal
Assets to Defendant Courtright*................................................................13
    G. *Receiver's Financial Advisor and Forensic Accountants*......................13
    H. *Pursuing Claims Against Third Parties, Affiliates, and Insiders*..........14

IV. CASH ON HAND AND ACCRUED EXPENSES OF ESTATE .....................15

V. RECEIPTS AND DISBURSEMENTS OF RECEIVERSHIP ESTATE .........16

VI. KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE..........................16

VII. KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE .......................17

VIII. RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP &
CONCLUSION.......................................................................................................18

I.    **INTRODUCTION**

Since her appointment on December 30, 2019, the Receiver, with the assistance of her retained professionals, including her lead counsel, local counsel in Pennsylvania and Illinois, and financial advisor and forensic accountants, has worked diligently to continue to fulfill her duties and obligations as set forth in the Appointment Order and to preserve the assets and records of the Receivership Estate ("Receivership Estate" or "Estate"). In particular, the Receiver took control of all known assets of Defendant Today's Growth Consultant d/b/a The Income Store ("TGC"), including but not limited to the many websites and domains owned by TGC, its business operations, and all other known assets. And the Receiver worked on identifying and marshaling all other assets of TGC, including without limitation funds held in bank accounts, funds transferred to or in the possession of third parties, and other personal property of TGC. The Receiver and her counsel also continued to communicate with investors and answer inquiries regarding, among other things, the status of the SEC Enforcement Action, the claims process and partial distribution plan, the status and condition of TGC's websites and revenue generated therefrom, as well as the investors' interests, requests, and expectations with respect to TGC's websites.

The Receiver continues to collect revenues generated by TGC's websites and to liquidate certain Estate assets in order to offset the costs associated with preserving the value of the digital assets of the Estate consisting largely of the websites and domains until at least all websites claimed as part of an "Allowed Claim"[1] are transferred and the remaining websites/domains are liquidated. Further, the Receiver has initiated actions against third parties, affiliates and insiders of the Defendants who improperly received significant recoverable transfers from TGC without providing reasonably equivalent value in exchange therefor and/or facilitated and assisted TGC

---

[1] *See* Receiver's Legal Notice of Claims Administration Process and Partial Plan of Distribution.

and its principal Defendant Kenneth D. Courtright, III ("Courtright") to perpetrate the fraud that is the subject of this enforcement action and receivership.

In order to maximize the value of the Estate, the Receiver continues to monitor and institute practices that reduce monthly operational costs including, among other things, retaining a minimal group of IT consultants at TGC's Lancaster, Pennsylvania office[2] to assist the Receiver in day-to-day operations, data processing and recovery, asset preservation, reducing expenses and preventing third parties from collecting purported debts for services no longer utilized by TGC, pursuant to the authority granted to the Receiver by the Appointment Order.

On November 30, 2020, the Court entered an Order granting in part the Receiver's Motion to Approve Claims Process and Partial Distribution Plan (the "Claims Process Motion"). *See* ECF No. 109. Pursuant to the Court's Order, the Receiver and her professionals notified all known potential claimants of the claims process and began the process of receiving and processing completed claims forms in order to make an initial determination as to each claim by the February 3, 2021 deadline.

## II. PROCEDURAL BACKGROUND

The Appointment Order entered on December 30, 2019, among other things, directs the Receiver to file with the Court within thirty (30) days after the end of each calendar quarter her report and recommendations regarding the status and activities of the Receivership Estate and TGC's business operations during the prior calendar quarter. *See* ECF No. 19. In particular, the Receiver's quarterly status reports are required to include: (1) a summary of the operations of the Receiver; (2) a summary of cash on hand, accrued administrative expenses, and the amount of

---

[2] As of the filing of this Status Report, TGC's operations have been relocated from the Lancaster office building utilized prior to the commencement of the SEC Enforcement Action to a much smaller and less expensive office space to minimize TGC's monthly expenses.

unencumbered funds in the estate; (3) a schedule of the Receiver's receipts and disbursements; (4) a description of all known Receivership Property; (5) a description of liquidated and unliquidated claims held by the Receivership Estate; (6) a list of all known creditors; (7) a status of Creditor Claims Proceedings (once commenced); and (8) the Receiver's recommendations for a continuation or discontinuation of the receivership. *See* ECF No. 19 at pp. 21-22.

On January 30, 2020, as required under the Appointment Order, the Receiver filed her Initial Report, which described, among other things, the Receiver's activities and efforts to fulfill her obligations under the Appointment Order during the first thirty (30) days of the receivership, identified known assets of the Defendants, and detailed the receipts and disbursements of the Estate since the Receiver's appointment. *See* ECF No. 45. Importantly, in her Initial Report, the Receiver concluded that TGC's business records confirm the allegations as set forth in the SEC's Complaint [ECF No. 1]. *See* EFC No. 45. As such, because TGC's revenue that was generated from all of the websites each month was significantly less than the monthly payment obligations to the investors and are thus not sufficient to cover both monthly payments to investors as well as TGC's monthly overhead expenses, the Receiver concluded that the long-term costs associated with maintaining and preserving the digital assets of TGC is not in the best interest of the Receivership Estate. *See id*. Based on this conclusion and the Receiver's analysis of the equities of all interested parties, including the investors, the receipts and expenses of TGC's operations and of the Receivership Estate, and likely recoveries of the Estate in the future, the Receiver outlined her proposal to promptly seek Court approval for a claims process and partial distribution plan.[3] *See id*.

On March 2, 2020, this Court entered two separate stipulated preliminary injunction orders

---

[3] On February 28, 2020, the Receiver filed her Claims Process Motion. *See* ECF No. 53.

(collectively, the "Preliminary Injunctions") against each of the Defendants, TGC and Courtright, which, among other things, made preliminary findings on the SEC's claims and granted preliminary injunctive relief. *See* ECF Nos. 55, 56.

On June 30, 2020 and October 30, 2020, the Receiver filed her second and third status reports respectively. *See* ECF Nos. 81, 101. The Receiver's second and third status reports detailed the Receiver's continued efforts to carry out her duties and obligations as set forth in the Appointment Order including, without limitation, her efforts to preserve and maintain the assets of the Estate and operate TGC's business. *See id*. The Receiver's status reports further detailed the efforts of the Receiver and her professionals to locate and marshal assets for the Estate while minimizing liabilities and continuously communicating with investors by telephone and via email and the Receivership website to, among other things, provide status updates on the Receivership and the SEC Enforcement Action. *See id*. In both the second and third status reports, the Receiver recommended that the Receivership continue for the purpose of preserving the Estate's assets, including the continued operation of the websites, and, to the extent the Court approves the proposed claims process and partial distribution plan, facilitating the transfer of the websites to the investors who opt to receive them in lieu of monetary distributions and the ultimate liquidation and distribution of the remaining assets of the Estate. *See id*.

This fourth status report describes the Receiver's efforts and accomplishments during the current Reporting Period and includes all of the information required under the Appointment Order.

    **III.**    **STATUS AND ACTIVITIES OF THE RECEIVERSHIP AND SUMMARY OF TGC'S OPERATIONS**

The Receiver, with the assistance of her professionals, continues to perform all duties and obligations as set forth in the Appointment Order. During the Reporting Period, the Receiver

focused her attention and resources on: (A) working with TGC's IT team to maintain and preserve the assets of the Receivership Estate, including the operating websites and associated domains including investing in content for certain revenue generating websites to preserve the value of the websites prior to transfer or sale; (B) implementing the Court-approved claims process and partial plan of distribution, including revising the Legal Notice pursuant to the Court's Order and sending the Claims Package by email and U.S. Mail/FedEx to all known potential claimants, communicating with investors to address all questions related to the claims process including but not limited to completing the claims form and submitting supporting documentation, receiving, organizing, and processing completed claims, and making initial determinations of those claims; (C) further communicating with investors to address their questions and concerns regarding the SEC Enforcement Action and the Receivership and to obtain information necessary to effectively manage TGC's websites; (D) continuing to identify, locate, and marshal all websites and domains of TGC and other assets of the Receivership Estate; (E) liquidating property of TGC and the Estate; (F) locating and producing documents pursuant to their discovery requests; (G) working with her financial advisor and forensic accountant to analyze the books and records of TGC for purposes of determining the amounts transferred between investors and TGC to assist in processing investor claims in the claims process, trace funds transferred from TGC to insiders, affiliates and third parties, and provide transferee reports to the Receiver and her counsel for purposes of investigating and formulating claims against such transferees; and (H) pursuing the claims of TGC and the Estate to recover for the benefit of the Estate fraudulent transfers and damages sustained by TGC and its investors by sending demand letters and filing complaints against insiders, affiliates and third parties who received significant transfers from TGC without providing reasonable equivalent value

to TGC, and/or facilitated and assisted TGC and Courtright to commit the fraud that is the subject of the SEC Enforcement Action.[4]

### A. Maintaining TGC's Operations and Websites and Otherwise Preserving Assets of the Estate

During the current Reporting Period, the Receiver continued to work with her professionals and TGC's IT consultants on a day-to-day basis to preserve, maintain and improve TGC's many actively-operating websites to maximize the value of the Receivership Estate. In particular, the Receiver and her professionals closely monitored the functionality and performance of the websites, identifying and resolving a number of issues necessary to maintain and increase their traffic and revenue and ultimate value. These issues included, but were not limited to, broken website links, malfunctioning/crashing domains, expiring hosting agreements/costs, varying website traffic, and unauthorized access to websites and backend access. TGC's IT team continued to be critically important in addressing these and other day-to-day issues that arose and required continual dialogue between and among the IT team and the Receiver, her counsel, her financial advisor and forensic accountant.

With the assistance of her professionals and TGC's IT team, the Receiver will continue to address any issues that may arise with the websites or other aspects of TGC's business operations and maintain the value of the Estate's assets in accordance with her duties and obligations under the Appointment Order.

### B. Implementing Claims Process and Partial Plan of Distribution

On November 30, 2020, the Court entered a Memorandum Opinion and Order that granted the Receiver's Claims Process Motion but also required the Receiver to include additional data

---

[4] The Receiver's professionals are pursuing such claims on a contingency fee basis to preserve the limited resources of the Estate [*see* ECF No. 103].

8

metrics in the Legal Notice of Claims Administration Process and Partial Plan of Distribution ("Legal Notice") prior to disseminating the Legal Notice and Proof of Claim and Release Form (collectively, "Claims Package") to all known investors/creditors on or before December 15, 2020. *See* ECF No. 109.

Specifically, the Court ordered the Receiver to include in the Legal Notice the following information: (i) the total amount of money Defendants received in investments and loans and the total amount of payments they made to investors and creditors (*i.e.*, the total value of potential claims against the Estate); (ii) the total number of potential claimants of the Estate; (iii) the total number of websites owned and operated by TGC under the control of the Receiver; (iv) the mean and median monthly income from each TGC website from the date on which the Receiver took control of those websites, and the average monthly costs of maintaining each website; (v) the total amount of cash on hand the Receiver is holding on behalf of the Estate; (vi) an estimate of, or, at a minimum, a brief description of the Estate's other assets, including unliquidated claims against third parties; and (vii) the date by which the Receiver expects to conclude liquidation of the Estate's assets, or, at a minimum, a brief description of the remaining steps the Receiver must take before such liquidation will be completed. *See id.*

The Receiver with the assistance of her professionals and TGC employees made the Court-ordered amendments to the Legal Notice. On December 9, 2020, the Receiver filed her unopposed motion to approve the amended Legal Notice. *See* ECF No. 112. On December 14, 2020, the Court granted the Receiver's unopposed motion, approving the amended Legal Notice and authorizing the Receiver to send the revised Claims Package to all known investors/creditors to initiate the claims process. *See* ECF No. 113.

The Receiver and her professionals utilized several sources to compile a complete database containing email and physical address information for all known investors and creditors. On December 15, 2020, the Receiver sent Claims Packages to 832 potential claimants (including government taxing agencies) via email[5] and another 24 Claims Packages via U.S. Mail or Federal Express. After sending the Claims Package to all known potential claimants, the Receiver and her professionals immediately began responding to hundreds of emails and phone calls from investors addressing inquiries related to proper completion of the claim forms, where and how to return completed claim forms, and other related inquiries. The Receiver and her professionals further provided investors with additional historical website revenue information (in addition to the revenue information included in the Claims Package) as well as traffic metrics for websites to provide comprehensive data to investors to assist in their decision to receive a monetary distribution based upon their net losses or to claim their previously assigned websites. Shortly after sending out the Claims Packages, the Receiver and her professionals began receiving, organizing, and processing completed claim forms that claimants sent to the Receiver's email address for the claims process (IncomeStoreClaims@dvllp.com).

After the Reporting Period, potential claimants continued to submit completed claim forms and supporting documentation through the January 15, 2021 claims bar date. And, the Receiver continued to communicate with claimants to answer questions related to, among other things, the

---

[5] After emailing Claims Packages to all known potential claimants, the Receiver was made aware that many claimants using a Google email account ("Gmail") reported not having received the Claims Package. Upon further investigation, the Receiver learned that Google experienced a disruption of services on December 15, 2020, the same day the Receiver sent Claims Packages to potential claimants. As such, on December 21, 2020, the Receiver sent a second email to all known claimants with a Gmail address to advise of the service disruption on December 15, 2020, provided a link to access the Claims Package, and further directed claimants to the Receivership website to review the original email sent on December 15, 2020, and to access the Claims Package.

claims process and to review and process completed claim forms in order to meet the February 3, 2021 deadline to send out her initial determination of all timely filed claims.

### C. Communicating with Investors

During the Reporting Period, the Receiver continued to regularly communicate with investors through the email account, telephone number, and Receivership website established to provide information to, and address the questions and concerns of, investors. As mentioned above and detailed in the Legal Notice provided to potential claimants of the Estate, the Receiver also created a new email account (IncomeStoreClaims@dvllp.com) to receive completed claims forms and supporting documentation from and communicate with investors and creditors regarding the claims process. Through this email account, and the general email account and telephone line set up soon after the commencement of the Receivership, the Receiver's professionals also responded to investors' inquiries regarding the Court-approved claims process and partial distribution plan, completing the proof of claim form, transferring websites to the investors pursuant to their elections in the claims process, the SEC Enforcement Action, and the Receivership in general.

The Receiver also continued to receive information from investors regarding website functionality that facilitated the Receiver's maintenance and operation of TGC's many websites.

### D. Recovery of TGC's Domains and Websites and Investigation of Other Potential Estate Assets

During the Reporting Period, pursuant to the Appointment Order, the Receiver continued to investigate, identify, locate, and marshal assets of the Estate for the benefit of the investors and creditors of TGC. As previously reported, the Receiver's counsel discovered that numerous websites and domains having significant value, which are owned by TGC, were under the control of a Romanian national purporting to maintain them and otherwise provide services to TGC, and accordingly, demanded turnover of control of those websites and domains. During the current

11

Reporting Period, the Receiver's counsel secured that Romanian national's agreement to turn over those websites and domains. The Receiver's counsel and TGC's IT team then worked to transfer control of most of the websites and domains back to the TGC, significantly increasing the value of the Estate. And, after the Reporting Period, they continued to work to complete the transfer of control of the websites and domains.

The Receiver will continue to investigate, locate, and marshal other assets of TGC and the Receivership Estate that she and her professionals may identify, pursuant to her duties and obligations under the Appointment Order.

### E. Liquidation of Estate Property

During the prior reporting period, on September 22, 2020, H.K. Keller, the auction company hired by the Receiver to liquidate the assets in TGC's office in Lancaster, Pennsylvania, held the third and final auction of the remaining assets of TGC (not essential to its operations). During the Reporting Period, on October 7, 2020, the Receiver received a check in the amount of $48,649.19 representing the net proceeds of that auction sale.

Also, during the Reporting Period, the Receiver continued to work with certain third parties with experience purchasing and selling domain names and websites to determine the value of TGC's sizable domain and website portfolio. With the Court having granted the Receiver's Claims Process Motion, the Receiver and her professionals will review the claims that request transfer of a previously assigned website, determine whether each such claim is "allowed" pursuant to the eligibility requirements set forth in the Legal Notice, and, if each such claim is allowed, will work with her professionals and claimants to transfer websites to eligible claimants. After the successful transfer of all claimed websites subject to an allowed claim, the Receiver will seek to obtain a valuation of the remaining websites and domains that comprise TGC's portfolio. This will enable

the Receiver to determine whether the Receiver should liquidate TGC's entire remaining domain portfolio or sell each individual domain and website in order to best maximize the value for the Estate and the ultimate monetary distributions that will be made to the defrauded investors who suffered losses, submitted claims for those losses (that are allowed by the Receiver), and elected to receive monetary distributions.

### F. *Production of Documents to the Parties and Personal Assets to Defendant Courtright*

During the Reporting Period, the Receiver continued to gather and produce documents requested by the parties pursuant to their discovery requests in the SEC Enforcement Action. Further, the Receiver and her counsel located and sent to Defendant Courtright certain personal assets of Defendant Courtright and/or his wife that were stored in TGC's office in Minooka, Illinois or Lancaster, Pennsylvania.

### G. *Receiver's Financial Advisor and Forensic Accountants*

During the initial reporting period, the Receiver retained Kapila Mukamal ("Kapila") as her financial advisor and forensic accountants to assist her to fulfill her duties under the Appointment Order. Kapila assisted the Receiver with an in-depth investigation of TGC's former business operations.

During the current Reporting Period, Kapila continued to investigate TGC's accounting and banking records to determine the amount of funds that TGC received from and transferred to investors, the amount of funds that TGC obtained from other sources including the operation of TGC's websites, the transfer of funds from TGC to insiders, affiliates and third parties, and other transfers and uses of TGC and investor funds. Kapila has identified 26 bank accounts and 9 credit card accounts held in the name of TGC and 10 bank accounts and 7 credit cards held in the name of Kenneth Courtright and other entities or individuals with which he is associated. During the

13

Reporting Period, Kapila continued to analyze and reconstruct the transactions in these accounts in order to provide information to the Receiver for use in the claims process and identifying potential assets of the Receivership Estate including potential causes of action against insiders, affiliates and third parties. As of the filing of this Report, Kapila's consolidated account reconstruction contains 78,000 line-items and reflects approximately $180 million as having flowed in and out of the bank accounts prior to the commencement of the SEC Enforcement Action.

With respect to the claims process, Kapila prepared a database of all investor data available from the bank records, accounting records, and investor databases maintained by TGC. And the Receiver and her counsel are utilizing this database to track and process the claims submitted by the investors.

Finally, to assist the Receiver in her asset recovery efforts, Kapila generated reports from the consolidated account reconstruction of various transfers from TGC to insiders, affiliates and third parties. The Receiver and her counsel utilized these reports to investigate and formulate claims against such transferees (i) who received significant transfers without having provided reasonable equivalent value to TGC, (ii) who promoting the fraudulent scheme that is the subject of this SEC Enforcement Action, and/or (iii) who facilitated and assisted TGC and Courtright to perpetrate and perpetuate the fraud.

### H. *Pursuing Claims Against Third Parties, Affiliates, and Insiders*

During the Reporting Period, upon determining that several transfers from TGC to insiders, affiliates and third parties were improper and recoverable under applicable law and that certain third parties facilitated and/or assisted TGC and Courtright to perpetrate the fraud upon which this action is based, the Receiver and her counsel continued to formulate the Estate's recovery claims,

gather evidence to support those claims, prepare demand letters, and draft Complaints to recover the transfers and other damages for the benefit of the Estate. This process included investigation of professionals and institutions that may have facilitated, benefited from TGC's and Courtright's alleged fraudulent activities, and/or otherwise contributed to the damages alleged to have been sustained by the Defendants' investors. Also during the Reporting Period, the Receiver and her counsel sent demand letters to these transferees and began communicating with them to discuss their involvement with TGC and/or Courtright, determine the origin, purpose, and amount of funds that each received from TGC, and seek to recover those funds or negotiate a settlement. Additionally, on or before December 30, 2020, the Receiver and her counsel drafted and filed fraudulent transfer complaints against several transferees in this District, the Eastern District of Pennsylvania, the Southern District of New York and the Western District of Washington. Subsequently, after the Reporting Period, the Receiver and her counsel began the process of serving the defendants to those recovery actions and, in some cases, agreed with the defendants to engage in an early judicial settlement conference to expedite the resolution of the matters.[6]

### IV. CASH ON HAND AND ACCRUED EXPENSES OF ESTATE

As of the end of the Reporting Period (December 31, 2020), the Estate held a total of $195,777.63 in cash on hand, which it had recovered from TGC's business operations (including website revenue deposited in TGC's operating accounts). *See* **Exhibit A**. The Receiver deposited

---

[6] As detailed in the Receiver's prior Status Report, in order to preserve the minimal funds in the Receivership Estate, the Receiver and her counsel did not bill the Estate for the formulation of the foregoing claims or the preparation of the demand letters and complaints, with the intention of proposing to the Court that the Receiver and her counsel pursue such claims on a contingency fee basis. Indeed, on September 16, 2020, the Receiver filed her Motion for Approval of Contingency Fee Arrangement [ECF No. 99] (the "Contingency Fee Motion") seeking Court authority to compensate her counsel on a contingency fee basis in connection with pursuing these claims. On November 5, 2020, the Court granted the Receiver's Contingency Fee Motion. *See* ECF No. 103.

such funds in her fiduciary account for the Receivership Estate at City National Bank in Miami, Florida.

During the Reporting Period, the Receivership Estate incurred administrative expenses in the form of fees and costs of the Receiver and her professionals for the work they performed in connection with fulfilling the Receiver's duties under the Court's Orders. Pursuant to the Appointment Order, the Receiver will file an application seeking approval and payment of those fees and costs from the funds the Receiver has marshalled and deposited into her fiduciary account since she was appointed.

### V. RECEIPTS AND DISBURSEMENTS OF RECEIVERSHIP ESTATE

During the Reporting Period, the Receiver made disbursements (totaling $394,361.21) from the Receiver's fiduciary account and TGC's operating accounts for expenses necessary to preserve and administer the Receivership Estate[7] as well as to operate TGC's websites and preserve the Estate's assets and their value. Such expenses included payroll to TGC's IT contractors and content writers who continue to assist the Receiver to operate the business in a limited capacity, utilities, data expense, domain hosting, maintenance fees, and fees for bank account services and maintenance. *See* Exhibit A.

### VI. KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE

The Receiver is in possession, custody or control of the following assets of the Receivership Estate:

- $195,777.63 in cash on hand in the Receiver's fiduciary account and TGC's operating accounts.

---

[7] The disbursements made during the Reporting Period include payments to the Receiver's professionals pursuant to the Receiver's third fee application, which this Court granted. *See* ECF No. 110. Specifically, $119,249.71 was disbursed to the Receiver's professionals during the Reporting Period. *See* Exhibit A. The remainder of the disbursements were made to third-parties to preserve the assets of the Estate.

- Approximately 3,130 domain names and revenues generated by operational websites (value currently unknown), as detailed in Exhibit C to the Receiver's Initial Status Report. *See* ECF No. 45-3.

- Additional personal property located in TGC's office, including computers and related equipment, office equipment, and inventory for fulfillment of certain e-commerce websites not liquidated by the auction sales facilitated by H.K. Keller as detailed *supra* (value currently unknown).

- Claims against third parties, affiliates and insiders (value currently unknown)

## VII.  KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE

As explained in the Receiver's Initial Report, the Receiver has identified more than seven hundred (700) Consulting Performance Agreements which resulted in $141,518,356.00[8] in up-front payments to TGC from investors, many of whom will likely qualify as eligible claimants of the Receivership Estate. *See* ECF No. 45. As detailed in her prior status reports, the Receiver and her professionals received and responded to correspondences from potential (non-investor) creditors of the Estate and, during the current Reporting Period, provided copies of the Claims Package to each such creditor so that they may complete the claim form and make a claim against the Estate for TGC's purported debts to them. *See* ECF Nos. 81, 101.

As previously reported, the Receiver has been contacted by one company claiming that TGC owes it several million dollars. The Receiver has not completed her investigation of this purported indebtedness.

---

[8] TGC's internal records reflect that $43,569,806 was paid to investors between 2013 and 2019. The Receiver's professionals continue their work to audit and verify TGC's accounting records.

## VIII. RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP AND CONCLUSION

The Receiver recommends the Receivership continue to preserve and maximize the value of the Estate's assets for the benefit of the investors and creditors of the Estate. Until further order of the Court, the Receiver will continue to work with her team of professionals to locate, marshal and preserve all known and potential assets of the Estate in accordance with the Appointment Order. Further, as authorized by the Appointment Order, the Receiver will continue to investigate, pursue, and litigate existing and potential claims against third parties, affiliates and insiders on behalf of the Estate. The Receiver will also continue to investigate and gather information regarding the Defendants' assets through subpoenas, depositions, and other inquiries to financial institutions, and other entities and persons with any connection to the Defendants to discover additional potential claims against third parties, affiliates and insiders and other sources of recovery for the Estate. Pursuant to this Court's Order entered on November 30, 2020, the Receiver and her professionals will adhere to the timeline and deadlines set forth in the Legal Notice in carrying out the Court-ordered claims process.

The Receiver will continue to perform all other duties as mandated by the Appointment Order and will continue updating the Court on a quarterly basis as to the status and activities of the Receivership and business operations of TGC.

Respectfully submitted this 1st day of February, 2021.

                Respectfully submitted,

                */s/Kenneth Dante Murena*
                Kenneth Dante Murena, Esq.
                Florida Bar No. 147486
                DAMIAN & VALORI LLP
                1000 Brickell Avenue, Suite 1020
                Miami, Florida 33131
                Telephone: (305) 371-3960
                Facsimile: (305) 371-3965
                Email: kmurena@dvllp.com
                *Counsel for Melanie E. Damian,*
                *Court-Appointed Receiver*
                *Admitted Pro Hac*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on February 1, 2021 on all counsel or parties who have appeared in the above-styled action.

                */s/Kenneth Dante Murena*
                Kenneth Dante Murena,
                *Counsel for Melanie E. Damian,*
                *Court-Appointed Receiver*