# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : |
| | : Civil Action No. 1:19-CV-08454 |
| TODAY'S GROWTH CONSULTANT, INC. (dba THE INCOME STORE) | : |
| and | : |
| KENNETH D. COURTRIGHT, III, | : |
| Defendants. | : |

## **RECEIVER'S FIFTH STATUS REPORT**

Melanie E. Damian, the court-appointed receiver ("Receiver") in the above-captioned enforcement action ("SEC Enforcement Action"), submits her fifth status report concerning the status of the Receivership, established pursuant to the Court's Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief [ECF No. 20] ("TRO") and Order Appointing Receiver ("Appointment Order") [ECF No. 19], which the Court extended in its Preliminary Injunction Orders ("Preliminary Injunction") [ECF Nos. 55, 56]. This interim report sets forth the Receiver's activities and efforts to fulfill her duties under the Appointment Order for the period from January 1, 2021 through March 31, 2021 (the "Reporting Period").

# TABLE OF CONTENTS

I. INTRODUCTION ...........................................................................................................3

II. PROCEDURAL BACKGROUND..................................................................................5

III. STATUS AND ACTIVITIES OF THE RECEIVERSHIP AND SUMMARY
OF TGC'S OPERATIONS ..............................................................................................7

    A. *Maintaining TGC's Operations and Websites
and Otherwise Preserving Assets of the Estate*......................................................8
    B. *Implementing the Court-Approved Claims Process* ..................................................9
    C. *Communicating with Investors* ................................................................................12
    D. *Formulating Plan to Sell All Assets of the Estate* ...................................................12
    E. *Receiver's Financial Advisor and Forensic Accountants*........................................13
    F. *Pursuing Claims Against Third Parties, Affiliates, and Insiders*............................14

IV. CASH ON HAND AND ACCRUED EXPENSES OF ESTATE ..................................16

V. RECEIPTS AND DISBURSEMENTS OF RECEIVERSHIP ESTATE ........................16

VI. KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE.........................................17

VII. KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE.......................................17

VIII. RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP &
CONCLUSION................................................................................................................18

I.   INTRODUCTION

Since her appointment on December 30, 2019, the Receiver, with the assistance of her retained professionals, including her lead counsel, various local counsel, and financial advisor and forensic accountants, has worked diligently to continue to fulfill her duties and obligations as set forth in the Appointment Order and to preserve the assets and records of the Receivership Estate ("Receivership Estate" or "Estate").  In particular, the Receiver took control of all known assets of Defendant Today's Growth Consultant d/b/a The Income Store ("TGC"), including but not limited to the many websites and domains owned by TGC, its business operations, and all other known assets.  And the Receiver worked on identifying and marshaling all other assets of TGC, including without limitation funds held in bank accounts, funds transferred to or in the possession of third parties, and other personal property of TGC.  The Receiver and her counsel also continued to communicate with investors and answer inquiries regarding, among other things, the status of the SEC Enforcement Action, the claims process and partial distribution plan and the Receiver's approval or denial of investors' claims and requests to reconsider same, the status and condition of TGC's websites and revenue generated therefrom, as well as the investors' interests, requests, and expectations with respect to TGC's websites.

The Receiver continues to collect revenues generated by TGC's websites and pay the costs associated with operating those websites and maintaining the domain names, including the salaries of the TGC employees the Receiver has employed to preserve the value of those digital assets, which comprise the majority the assets of the Estate.[1]  As the Receiver has explained at the last two hearings, however, the Receiver will not be able to continue to operate the websites and cover

---

[1] Several of the Estate's websites and domains were transferred to investors pursuant to their election in the Court-approved claims process to receive same in lieu of a monetary distribution.

3

the associated costs without a significant financial investment to pay for additional content writers and advertising, which the Estate cannot afford at this time. As such, and because the value of the websites will significantly decrease as their traffic and revenues decline, the Receiver, during a prior reporting period, filed a Motion to sell all of the assets of the Estate, including TGC's websites and domains, through a public auction. At a hearing held after the Reporting Period, the Court considered the Motion but has not yet ruled on it. No written objection to the Motion has been filed and the SEC filed a notice supporting the Motion. *See* ECF No. 125.

During the Reporting Period, the Receiver and her counsel worked diligently to collect and analyze the 481 completed claim forms received from investors and creditors as part of the Court-approved claims process. The Receiver carefully considered each claim and the supporting documentation provided by the claimants and, in accordance with the factors set forth in the Receiver's Motion to Approve (A) Noticing and Claims Administration Process and (B) Partial Plan of Distribution ("Claims Process Motion") [ECF No. 53], determined whether to allow or deny each claim and issued her Initial Determination letters to all claimants who submitted claims. Several claimants whose claims were denied or reduced requested reconsideration of the Receiver's Initial Determination. As such, the Receiver thoroughly reviewed all additional supporting documentation provided by those claimants in connection with considering their requests. The Receiver then issued her Final Determination letters. After the Reporting Period, only one claimant, American Express, filed an appeal of the Receiver's Final Determination, and the Receiver filed a response to that appeal.

During the prior reporting period, the Receiver issued demand letters and filed complaints against third parties, affiliates and insiders of the Defendants who improperly received significant recoverable transfers from TGC without providing reasonably equivalent value in exchange

4

therefor and/or facilitated and assisted TGC and its principal Defendant Kenneth D. Courtright, III ("Courtright") to perpetrate the fraud that is the subject of this enforcement action and receivership. During the Reporting Period, the Receiver continued to follow up on the demand letter, advance the recovery actions, and pursue expeditious resolutions of the Receiver's claims through judicial settlement conference and settlement negotiations. Thus far, the Receiver reached settlements with three defendants and submitted those settlements to this Court for approval. This Court considered the Receiver's Motion to approve those settlements at the hearing held after the Reporting Period but has not yet entered a ruling. No written objection to the Motion has been filed.

Pursuant to the authority granted by the Appointment Order, The Receiver, in order to maximize the value of the Estate, continues to monitor and institute practices that reduce monthly operational costs including, among other things, retaining a minimal group of IT consultants at TGC's office[2] to assist the Receiver in day-to-day operations, data processing and recovery, asset preservation, reducing expenses and preventing third parties from collecting purported debts for services no longer utilized by TGC.

## II.     PROCEDURAL BACKGROUND

The Appointment Order entered on December 30, 2019, among other things, directs the Receiver to file with the Court within thirty (30) days after the end of each calendar quarter her report and recommendations regarding the status and activities of the Receivership Estate and TGC's business operations during the prior calendar quarter. *See* ECF No. 19. In particular, the Receiver's quarterly status reports are required to include: (1) a summary of the operations of the Receiver; (2) a summary of cash on hand, accrued administrative expenses, and the amount of

---

[2] As previously reported, TGC's operations relocated from the Lancaster, Pennsylvania office building utilized prior to the commencement of the SEC Enforcement Action to a much smaller and less expensive office space to minimize TGC's monthly expenses.

unencumbered funds in the estate; (3) a schedule of the Receiver's receipts and disbursements; (4) a description of all known Receivership Property; (5) a description of liquidated and unliquidated claims held by the Receivership Estate; (6) a list of all known creditors; (7) a status of Creditor Claims Proceedings (once commenced); and (8) the Receiver's recommendations for a continuation or discontinuation of the receivership. See ECF No. 19 at pp. 21-22.

On January 30, 2020, as required under the Appointment Order, the Receiver filed her Initial Status Report, which described, among other things, the Receiver's activities and efforts to fulfill her obligations under the Appointment Order during the first thirty (30) days of the receivership, identified known assets of the Defendants, and detailed the receipts and disbursements of the Estate since the Receiver's appointment. See ECF No. 45. Importantly, in her Initial Status Report, the Receiver concluded that TGC's business records confirm the allegations as set forth in the SEC's Complaint [ECF No. 1]. See EFC No. 45. As such, because TGC's revenue that was generated from all of the websites each month was significantly less than the monthly payment obligations to the investors and are thus not sufficient to cover both monthly payments to investors as well as TGC's monthly overhead expenses, the Receiver concluded that the long-term costs associated with maintaining and preserving the digital assets of TGC is not in the best interest of the Receivership Estate. See id. Based on this conclusion and the Receiver's analysis of the equities of all interested parties, including the investors, the receipts and expenses of TGC's operations and of the Receivership Estate, and likely recoveries of the Estate in the future, the Receiver outlined her proposal to promptly seek Court approval for a claims process and partial distribution plan which provided for, among other things, the transfer of websites to investors electing to receive them in lieu of monetary distributions.[3] See id.

---

[3] On February 28, 2020, the Receiver filed her Claims Process Motion. See ECF No. 53.

On March 2, 2020, this Court entered two separate stipulated preliminary injunction orders (collectively, the "Preliminary Injunctions") against each of the Defendants, TGC and Courtright, which, among other things, made preliminary findings on the SEC's claims and granted preliminary injunctive relief. *See* ECF Nos. 55, 56.

The Receiver's second, third, and fourth status reports, filed on June 30, 2020, October 29, 2020, and February 1, 2021, respectively, detailed, among other things, the Receiver's continued efforts to carry out her duties and obligations as set forth in the Appointment Order including, without limitation, her efforts to preserve and maintain the assets of the Estate and operate TGC's business. *See* ECF Nos. 81, 101, 115. The Receiver's status reports further detailed the efforts of the Receiver and her professionals to locate and marshal assets for the Estate while minimizing liabilities, implement the Court-approved claims process, and continuously communicate with investors by telephone and email and through the Receivership website to, among other things, assist and answer questions with respect to their participation in the claims process, and provide status updates on the Receivership and the SEC Enforcement Action. *See id*.

### III. STATUS AND ACTIVITIES OF THE RECEIVERSHIP AND SUMMARY OF TGC'S OPERATIONS

The Receiver, with the assistance of her professionals, continues to perform all duties and obligations as set forth in the Appointment Order. During the Reporting Period, the Receiver focused her attention and resources on: (A) working with TGC's IT team to maintain and preserve the assets of the Receivership Estate, including the operating websites and associated domains including investing in content for certain revenue generating websites to preserve the value of the websites prior to transfer or sale; (B) implementing the Court-approved claims process, receiving, organizing and analyzing completed claims packages while working closely with investors and creditors to answer questions, gathering documentation necessary to properly consider each claim,

and approve and deny claims through issuance of the Initial and Final Determination letters; (C) further communicating with investors to address their questions and concerns regarding the SEC Enforcement Action and the Receivership and to obtain information necessary to effectively manage TGC's websites; (D) continuing to identify, locate, and marshal all websites and domains of TGC and other assets of the Receivership Estate; (E) formulating and presenting to the Court a plan to liquidate all assets of the Estate; (F) working with her financial advisor and forensic accountant to analyze the books and records of TGC for purposes of determining the amounts transferred between investors and creditors and TGC to assist in processing claims submitted in the claims process, trace funds transferred from TGC to insiders, affiliates and third parties, and provide transferee reports to the Receiver and her counsel for purposes of investigating and formulating claims against such transferees; and (G) pursuing the claims of TGC and the Estate by sending and following up on demand letters to, as well as litigating pending recovery actions, investigating additional claims, and commencing new actions against, insiders, affiliates and third parties who received significant transfers from TGC without providing reasonable equivalent value to TGC, and/or facilitated and assisted TGC and Courtright to commit the fraud that is the subject of the SEC Enforcement Action.[4]

### A. Maintaining TGC's Operations and Websites and Otherwise Preserving Assets of the Estate

During the current Reporting Period, the Receiver continued to work with her professionals and TGC's IT consultants on a day-to-day basis to preserve, maintain and improve TGC's many actively-operating websites to maximize the value of the Receivership Estate. In particular, the Receiver and her professionals closely monitored the functionality and performance of the

---

[4] The Receiver's professionals are pursuing such recovery claims on a contingency fee basis to preserve the limited resources of the Estate. *See* ECF No. 103.

websites, identifying and resolving a number of issues necessary to maintain and increase their traffic and revenue and ultimate value. TGC's IT team continued to be critically important in addressing these and other day-to-day issues that arose and required continual dialogue between and among the IT team and the Receiver, her counsel, her financial advisor and forensic accountant.

With the assistance of her professionals and TGC's IT team, the Receiver will continue to address any issues that may arise with the websites until they are sold through the proposed auction sale (subject to Court approval) or other aspects of TGC's business operations and will maintain the value of the Estate's assets in accordance with her duties and obligations under the Appointment Order.

### B. *Implementing the Court-Approved Claims Process*

As previously reported, in accordance with this Court's Memorandum and Opinion Order granting the Receiver's Claims Process Motion [ECF No. 109], on December 15, 2020, the Receiver sent Claims Packages to 832 potential claimants (including government taxing agencies) via email[5] and another 24 Claims Packages via U.S. Mail or Federal Express. After sending the Claims Package to all known potential claimants, the Receiver and her professionals immediately began responding to hundreds of emails and phone calls from investors addressing questions related to proper completion of the claim forms, where and how to return completed claim forms,

---

[5] After emailing Claims Packages to all known potential claimants, the Receiver was made aware that many claimants using a Google email account ("Gmail") reported not having received the Claims Package. Upon further investigation, the Receiver learned that Google experienced a disruption of services on December 15, 2020, the same day the Receiver sent Claims Packages to potential claimants. As such, on December 21, 2020, the Receiver sent a second email to all known claimants with a Gmail address to advise of the service disruption on December 15, 2020, provided a link to access the Claims Package, and further directed claimants to the Receivership website to review the original email sent on December 15, 2020, and to access the Claims Package.

and other inquiries. The Receiver and her professionals further provided investors with additional historical website revenue information (in addition to the revenue information included in the Claims Package) as well as traffic metrics for websites to provide comprehensive data to assist investors in their election to receive a monetary distribution based upon their net losses or the websites TGC had previously assigned to them in connection with their investments. Shortly after sending out the Claims Packages, the Receiver and her professionals began receiving, organizing, and processing completed claim forms that claimants had sent to the Receiver's email address established for the claims process (IncomeStoreClaims@dvllp.com).

During the current Reporting Period, claimants continued to submit completed claim forms and provide supporting documentation through and after the January 15, 2021 claims bar date.[6] The Receiver and her professionals spent considerable time documenting, processing, and analyzing completed claim forms that, in many cases, attached voluminous records to support claims, including but not limited to consulting performance agreements, bank account statements evidencing payments to and from TGC, invoices, and copies of correspondences with TGC's employees. After processing each claim, the Receiver prepared and sent Initial Determination letters to 481 claimants[7] that had submitted completed claims forms.

---

[6] Pursuant to the Legal Notice, the claims bar date was January 15, 2021. However, to permit as many defrauded investors to submit a claim as possible, the Receiver agreed to accept claims packages after that date from claimants that, for a number of reasons, claimed they were not aware of the claims bar date or had difficulty submitting their claims in a timely manner.

[7] In total, 464 letters were sent to investors and 8 letters were sent to creditors of the Estate. In addition to the investor and creditor claims, the Receiver received 9 completed claim forms from former employees of TGC for unpaid wages and in return sent Initial Determination letters to those former employees.

Following the issuance of the Initial Determination letters, the Receiver continued to spend significant time communicating with investors and creditors to answer questions regarding the Initial Determination letters and, among other things, the process for requesting reconsideration of same. The Receiver received 32 requests for reconsideration of her Initial Determination of claims that were reduced and/or denied. The Receiver thoroughly analyzed each such request along with the accompanying documentation and, on March 15, 2021, issued her Final Determination letters to all claimants that had requested reconsideration.

Pursuant to her Final Determinations, the Receiver approved claims for monetary distribution to investors totaling approximately $77,495,415.88, to creditors totaling approximately $432,695.87, and to former employees totaling approximately $12,780.60. Of the 481 claims from investors, 30 investors elected to receive one or more of the websites that TGC had assigned to them, thereby forfeiting their right to monetary distributions. The Receiver's approval of the claims of those 30 investors resulted in the turnover of 82 websites some of which are still in the process of being transferred. After all 82 websites are transferred, the Estate will be left with 3,318 websites and domains[8], which, as explained below, the Receiver is proposing to sell through a public auction. The return of websites eliminated $6,950,048.45 in potential monetary claims against the Estate.

---

[8] The Receiver is working with the IT team to confirm the precise number of domains in TGC's control in advance of the liquidation of same. After the Reporting Period, the IT team confirmed that there are 3400 domains in the TGC portfolio, rather than the previously reported 3130, potentially more. As additional information becomes available, the Receiver will continue to update this Court. Furthermore, after the Reporting Period, the Receiver traveled to the offices of TGC's current consultants to check on the status of the Receivership Estate's operations and, with the assistance of her forensic IT professional, audit the assets of TGC. Said audit is ongoing.

The deadline to file an appeal of the Receiver's Final Determinations was April 4, 2021. None of the investors, and only one creditor, American Express, filed an appeal. The Receiver responded to the appeal at ECF No. 126.

### C. Communicating with Investors

During the Reporting Period, the Receiver continued to regularly communicate with investors through the email accounts, telephone number, and Receivership website established to provide information to, and address the questions and concerns of, investors. In particular, through the email accounts established for the Receivership (IncomeStore@dvllp.com; IncomeStoreClaims@dvllp.com) and telephone number set up soon after the commencement of the Receivership, the Receiver's professionals responded to investors' inquiries regarding the Court-approved claims process and partial distribution plan, completing the proof of claim form, transferring websites to the investors pursuant to their elections in the claims process, requests for reconsideration of the Receiver's Initial Determination of claims, the SEC Enforcement Action, and the Receivership in general.

The Receiver also continued to receive information from investors regarding website functionality that facilitated the Receiver's maintenance and operation of TGC's many websites.

### D. Formulating Plan to Sell All Assets of the Estate

During the Reporting Period, the Receiver continued to work with a broker, Right of the Dot, LLC, with extensive experience facilitating the purchase and sale of domain names and websites through public auctions and private sales, to determine the value of TGC's sizable domain and website portfolio and the most advantageous process for selling those assets and maximizing the recovery by the Estate. With the assistance of this broker, the Receiver determined that the best method to sell the Estate's assets is through a competitive online auction sale. Accordingly,

after the Reporting Period, the Receiver prepared and filed a Motion seeking (i) authority for Right of the Dot, LLC to conduct an online auction sale of the Estate's assets, (ii) approval of the form of the notice of the proposed auction sale to be provided to potential purchasers, interested parties and all known claimants, and (iii) approval of the Receiver's sale of the assets to the winning bidder at the auction in accordance with the procedures set forth in the Motion. *See* ECF No. 123. At the April 8, 2021 Status Conference, the Court considered this Motion and the general objection raised by Courtright and asked the Receiver to submit a revised non-affiliation declaration that the Receiver proposed to have all potential bidders sign prior to participating in the auction. Soon thereafter, the Receiver submitted the declaration to the Court and the parties for approval. No interested party has filed a written objection to that declaration or the Motion, which is ripe for this Court's determination.

### E. *Receiver's Financial Advisor and Forensic Accountants*

During the initial reporting period, the Receiver retained Kapila Mukamal ("Kapila") as her financial advisor and forensic accountant to assist her to fulfill her duties under the Appointment Order. Kapila assisted the Receiver with an in-depth investigation of TGC's former business operations, accounting and banking records, and transactions involving investors, creditors, affiliates, insiders and third parties.

During the current Reporting Period, Kapila continued to investigate TGC's accounting and banking records to quantify the amount of funds obtained from investors and other sources including the operation of TGC's websites to determine the use and location of those funds. During its investigation, Kapila identified 40 bank accounts and 28 credit card accounts for a total of 68 financial accounts with which TGC held accounts or was otherwise associated. Kapila analyzed the records from the financial institutions and prepared a reconstruction of selected

accounts in the name of TGC and Courtright which contained the relevant activity. An account reconstruction was necessary because TGC's internal accounting records were significantly incomplete.

The data associated with the bank accounts and accounting records is significant. The bank reconstruction contains more than 126,000 line-items with approximately $206 million of funds flowing through the accounts. In many instances, TGC utilized batch payment processing to make payments to vendors, investors, and other parties. Batch payments are reflected as one transaction on a bank statement but are comprised of hundreds of disbursements to different parties that comprise the batch payment amount. These batch payments substantially increase the number of line-item transactions within the bank reconstruction. In the Receiver's prior Status Report, Kapila's bank reconstruction comprised of 78,000 line-items with approximately $180 million in funds flowing through the accounts. Since filing that Report, the Receiver acquired additional records from financial institutions regarding the critical batch payment details and provided them to Kapila to incorporate into the reconstruction.

Kapila utilized the account reconstruction to provide information to the Receiver for use in identifying potential assets of TGC and claims of the Estate that assisted the Receiver in pursuing fraudulent transfer actions against third parties, affiliates and insiders.

### F. *Pursuing Claims Against Third Parties, Affiliates, and Insiders*

During the Reporting Period, the Receiver and her counsel continued to formulate the Estate's recovery claims, gather evidence to support those claims, prepare and send out demand letters, prepare and file Complaints to recover improper transfers and other damages for the benefit of the Estate, and litigate the actions against third parties, affiliates and insiders filed during the

last reporting period.[9] The Receiver and her counsel were also able to resolve the Estate's fraudulent transfers claims against three transferees who were defendants in three separate recovery actions. On April 7, 2021, after the Reporting Period, the Receiver filed a Motion to approve these settlements [*see* ECF No. 122], and, at the April 8, 2021 Status Conference, the Court considered that Motion and the objection voiced by Defendant Courtright. As explained above, no interested party filed an objection to the Motion, and it is ripe for this Court's determination. If the settlements are approved by this Court, the Estate will recover substantial sums that are necessary to maintain and preserve the value of TGC's websites and domains.

In addition, the Receiver and her counsel continued to investigate several professionals and institutions, including merchant cash advance companies that facilitated and benefited from TGC's and Courtright's alleged fraudulent activities and/or otherwise contributed to the damages sustained by TGC and its investors. And, the Receiver prepared and filed a Complaint against eight merchant cash advance companies and one broker for such companies to recover the substantial funds they received from, and the significant damages they caused to, TGC.

Further, the Receiver sent additional demand letters to recipients of significant transfers from TGC and continued to communicate with transferees to whom demand letters were previously sent to discuss their involvement with TGC and/or Courtright, determine the origin,

---

[9] As detailed in the Receiver's prior Status Report, to preserve the minimal funds in the Receivership Estate, the Receiver and her counsel did not bill the Estate for the formulation of the foregoing claims or the preparation of the demand letters and Complaints, with the intention of proposing to the Court that the Receiver and her counsel pursue such claims on a contingency fee basis. On September 16, 2020, the Receiver filed her Motion for Approval of Contingency Fee Arrangement for such claims. *See* ECF No. 99. And on November 5, 2020, the Court granted that Motion. *See* ECF No. 103.

purpose, and net amount of the funds they received from TGC, and seek to recover their net gains through informal settlement negotiations.

### IV. CASH ON HAND AND ACCRUED EXPENSES OF ESTATE

As of the end of the Reporting Period (March 31, 2021), the Estate held a total of $104,297.77 in cash on hand, which it had recovered from TGC's business operations (including website revenue deposited in TGC's operating accounts). *See* **Exhibit A**. The Receiver deposited such funds in her fiduciary account for the Receivership Estate at City National Bank in Miami, Florida.

During the Reporting Period, the Receivership Estate incurred administrative expenses in the form of fees and costs of the Receiver and her professionals for the work they performed in connection with fulfilling the Receiver's duties under the Court's Orders. Pursuant to the Appointment Order, the Receiver will file an application seeking approval and payment of those fees and costs from the funds the Receiver has marshalled and deposited into her fiduciary account since she was appointed.

### V. RECEIPTS AND DISBURSEMENTS OF RECEIVERSHIP ESTATE

During the Reporting Period, the Receiver made disbursements totaling $330,262.42 from TGC's operating accounts for expenses necessary to operate and preserve the value of TGC's websites and domains. Such expenses included payroll to TGC's IT contractors and content writers who continue to assist the Receiver to operate the business in a limited capacity, utilities, data expense, domain hosting, maintenance fees, and fees for bank account services and maintenance. *See* Exhibit A.

## VI. KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE

The Receiver is in possession, custody or control of the following assets of the Receivership Estate:

- $104,297.77 in cash on hand in the Receiver's fiduciary account and TGC's operating accounts.

- Approximately 3,318[10] domain names and revenues generated by operational websites (precise value currently unknown), as detailed in Exhibit C to the Receiver's Initial Status Report. *See* ECF No. 45-3.

- Additional personal property located in TGC's office, including computers and related equipment, office equipment, and inventory for fulfillment of certain e-commerce websites not sold in the auctions conducted by H.K. Keller as detailed in the Receiver's prior Status Reports (precise value currently unknown).

- Trademarks (precise value currently unknown)

- Claims against third parties, affiliates, and insiders (precise value currently unknown)

## VII. KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE

As explained in the Receiver's Initial Status Report, the Receiver identified more than seven hundred (700) Consulting Performance Agreements which resulted in $141,518,356.00 in up-front payments to TGC from investors, many of whom qualified as eligible claimants of the Receivership Estate through the Court-approved claims process. *See* ECF No. 45. The Receiver and her professionals received and responded to inquiries from many of these investors, along with creditors and former employees of TGC, and provided them with the Claims Package so they could participate in the claims process. *See* ECF Nos. 81, 101. As explained above, 464 investors, 8

---

[10] This total is less than the 3,400 websites/domains as explained above because 82 of the websites/domains were transferred or are in the process of being transferred to the investors who elected to receive them in the claims process.

17

creditors and 9 former employees submitted claims in the claims process, and the Receiver allowed $77,495,415.88 in investor claims, $432,695.87 in creditor claims, and $12,780.60 in employee claims.

### VIII. RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP AND CONCLUSION

The Receiver recommends the Receivership continue to preserve and maximize the value of the Estate's assets for the benefit of the investors and creditors of the Estate, and for the Receiver to conclude the claims process and propose and implement any distribution plan which the Court may approve. Until further order of the Court, the Receiver will continue to work with her team of professionals to locate, marshal, and preserve all known and potential assets of the Estate in accordance with the Appointment Order. Further, the Receiver will continue to investigate, pursue, and litigate existing and potential claims against third parties, affiliates, and insiders on behalf of the Estate. The Receiver will also continue to investigate and gather information regarding the Defendants' assets through subpoenas, depositions, and other inquiries to financial institutions, and other entities and persons with any connection to the Defendants to discover additional potential claims against third parties, affiliates and insiders and other sources of recovery for the Estate.

The Receiver will continue to perform all other duties as mandated by the Appointment Order and will continue updating the Court on a quarterly basis as to the status and activities of the Receivership and business operations of TGC.

Respectfully submitted this 30th day of April, 2021.

/s/Kenneth Dante Murena
Kenneth Dante Murena, Esq.
Florida Bar No. 147486
DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
Email: kmurena@dvllp.com
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*

*Admitted Pro Hac and General Admission*
*to Northern District of Illinois*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on April 30, 2021 on all counsel or parties who have appeared in the above-styled action.

/s/Kenneth Dante Murena
Kenneth Dante Murena,
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*