## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | |
| : | Civil Action No. 1:19-CV-08454 |
| TODAY'S GROWTH CONSULTANT, INC. : | |
| (dba THE INCOME STORE) : | |
| : | |
| and : | |
| : | |
| KENNETH D. COURTRIGHT, III, : | |
| : | |
| Defendants. : | |
| : | |

## <u>RECEIVER'S SIXTH STATUS REPORT</u>

Melanie E. Damian, the court-appointed receiver ("Receiver") in the above-captioned enforcement action ("SEC Enforcement Action"), submits her sixth status report concerning the status of the Receivership, established pursuant to the Court's Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief [ECF No. 20] ("TRO") and Order Appointing Receiver ("Appointment Order") [ECF No. 19], which the Court extended in its Preliminary Injunction Orders ("Preliminary Injunction") [ECF Nos. 55, 56]. This interim report sets forth the Receiver's activities and efforts to fulfill her duties under the Appointment Order for the period from April 1, 2021 through June 30, 2021 (the "Reporting Period"). [1]

---

[1] The Appointment Order required the Receiver to submit her sixth interim status report by July 30, 2021. On July 30, 2021, the Receiver filed her motion to extend the deadline to file her sixth interim status report to August 6, 2021. *See* ECF No. 155.

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................3

II.     PROCEDURAL BACKGROUND..........................................................................5

III.    STATUS AND ACTIVITIES OF THE RECEIVERSHIP AND SUMMARY
        OF TGC'S OPERATIONS .....................................................................................7

        A.      *Maintaining TGC's Operations and Websites*
                *and Otherwise Preserving Assets of the Estate*.........................................9
        B.      *Court-Approved Claims Process and Appeal*............................................9
        C.      *Communicating with Investors* ...............................................................11
        D.      *Online Auction Sale for Assets of the Estate*...........................................12
        E.      *Receiver's Financial Advisor and Forensic Accountants*.......................15
        F.      *Pursuing Claims Against Third Parties, Affiliates, and Insiders*..........17

IV.     CASH ON HAND AND ACCRUED EXPENSES OF ESTATE ....................18

V.      RECEIPTS AND DISBURSEMENTS OF RECEIVERSHIP ESTATE ........19

VI.     KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE.........................19

VII.    KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE .......................20

VIII.   RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP AND
        CONCLUSION.....................................................................................................21

## I.      INTRODUCTION

Since her appointment on December 30, 2019, the Receiver, with the assistance of her retained professionals, including her lead counsel, local counsel, and forensic accountants, has worked diligently to continue to fulfill her duties and obligations as set forth in the Appointment Order and to preserve the assets and records of the Receivership Estate ("Receivership Estate" or "Estate").   In particular, the Receiver took control of all known assets of Defendant Today's Growth Consultant d/b/a The Income Store ("TGC"), including but not limited to the many websites and domains owned by TGC, its business operations, and all other known assets.  And the Receiver worked on identifying and marshaling all other assets of TGC, including without limitation funds held in bank accounts, funds transferred to or in the possession of third parties, and other personal property of TGC.  The Receiver and her counsel also continued to communicate with investors and answer inquiries regarding, among other things, the status of the SEC Enforcement Action, the claims process and partial distribution plan and the Receiver's approval or denial of investors' claims and requests to reconsider same, the status and condition of TGC's websites and revenue generated therefrom, the results of the Court-approved online auction sales, as well as the investors' interests, requests, and expectations with respect to TGC's websites.

During the Reporting Period, the Receiver spent significant time working with her retained Auctioneer, Right of the Dot, LLC ("Auctioneer") to establish the procedures for the Court-approved online auction sale for the remaining Estate assets combined into a single lot.  The Receiver established a secure data room in which confidential asset information was hosted for review by bidders that completed and returned a non-disclosure agreement and declaration of non-affiliation.  The Receiver communicated with and approved bidders to access the data room to conduct their due diligence on the assets in advance of the auction sale.  The Receiver spent

considerable time marketing the assets and working with interested parties to generate interest in the assets to maximize recovery for the Estate. The Receiver further worked with her Auctioneer and her IT professionals to analyze and group the assets into separate lots for the second auction sale after the single lot did not sell at the first auction sale. Until the assets are sold, the Receiver continues to collect revenues generated by TGC's websites and pay the costs associated with operating those websites and maintaining the domain names, including the consulting fees of the former TGC employees the Receiver has engaged to preserve the value of those digital assets, which comprise the majority the assets of the Estate.[2] The Receiver will continue to maintain the assets of the Estate until they are sold to third parties which is the subject of the Receiver's Motion to Modify this Court's Order Granting the Receiver's Motion to Approve Sale of Estate Assets [ECF No. 131] to Authorize the Receiver to Negotiate the Sale of Asset Groups to Third Parties [ECF No. 156] that is set for hearing on August 10, 2021. *See* ECF No. 157.

During the Reporting Period, the Receiver and her counsel worked diligently to collect and analyze additional completed claim forms received from investors as part of the Court-approved claims process. The Receiver considered each claim received after the claims bar date and determined on a case-by-case basis whether to allow each untimely submission. The Receiver analyzed the supporting documentation provided by the claimants with their completed claims forms and issued her Initial Determination letters as to same. Only one claimant, American Express Travel Related Services Company, Inc., and American Express National Bank (collectively, "Amex"), filed an appeal of the Receiver's Final Determination, and the Receiver

---

[2] Several of the Estate's websites and domains were transferred to investors pursuant to their election in the Court-approved claims process to receive same in lieu of a monetary distribution. A total of 68 websites will be transferred to investors which represents a value to the Estate of almost $8 million.

filed a response to that appeal with the parties agreeing to settle the matter. The settlement is currently being finalized.

During the prior reporting period, the Receiver continued to litigate the Estate's claims against third parties, affiliates and insiders of the Defendants who improperly received significant recoverable transfers from TGC without providing reasonably equivalent value in exchange therefor and/or facilitated and assisted TGC and its principal Defendant Kenneth D. Courtright, III ("Courtright") to perpetrate the fraud that is the subject of this enforcement action and receivership. During the Reporting Period, the Receiver continued to follow up on the demand letters, advance the recovery actions, and pursue expeditious resolutions of the Receiver's claims through judicial settlement conference and settlement negotiations. Thus far, the Receiver reached settlements with three defendants which have been approved by this Court. *See* ECF No. 130.

Pursuant to the authority granted by the Appointment Order, the Receiver, in order to maximize the value of the Estate, continues to monitor and institute practices that reduce monthly operational costs including, among other things, retaining a minimal group of IT consultants at TGC's office[3] to assist the Receiver in day-to-day operations, data processing and recovery, asset preservation, reducing expenses and preventing third parties from collecting purported debts for services no longer utilized by TGC.

## II.     PROCEDURAL BACKGROUND

The Appointment Order entered on December 30, 2019, among other things, directs the Receiver to file with the Court within thirty (30) days after the end of each calendar quarter her report and recommendations regarding the status and activities of the Receivership Estate and

---

[3] As previously reported, TGC's operations relocated from the Lancaster, Pennsylvania office building utilized prior to the commencement of the SEC Enforcement Action to a much smaller and less expensive office space to minimize TGC's monthly expenses.

TGC's business operations during the prior calendar quarter.  *See* ECF No. 19.  In particular, the Receiver's quarterly status reports are required to include: (1) a summary of the operations of the Receiver; (2) a summary of cash on hand, accrued administrative expenses, and the amount of unencumbered funds in the estate; (3) a schedule of the Receiver's receipts and disbursements; (4) a description of all known Receivership Property; (5) a description of liquidated and unliquidated claims held by the Receivership Estate; (6) a list of all known creditors; (7) a status of Creditor Claims Proceedings (once commenced); and (8) the Receiver's recommendations for a continuation or discontinuation of the receivership.  *See* ECF No. 19 at pp. 21-22.

On January 30, 2020, as required under the Appointment Order, the Receiver filed her Initial Status Report, which described, among other things, the Receiver's activities and efforts to fulfill her obligations under the Appointment Order during the first thirty (30) days of the receivership.  *See* ECF No. 45.  Importantly, in her Initial Status Report, the Receiver concluded that TGC's business records confirm the allegations as set forth in the SEC's Complaint [ECF No. 1].  *See* EFC No. 45.  Specifically, because TGC's revenue that was generated from all of the websites each month was significantly less than the monthly payment obligations to the investors and are thus not sufficient to cover both monthly payments to investors as well as TGC's monthly overhead expenses, the Receiver concluded that the long-term costs associated with maintaining and preserving the digital assets of TGC is not in the best interest of the Receivership Estate.  *See id*.  Based on this conclusion and the Receiver's analysis of the equities of all interested parties, including the investors, the receipts and expenses of TGC's operations and of the Receivership Estate, and likely recoveries of the Estate in the future, the Receiver outlined her proposal to promptly seek Court approval for a claims process and partial distribution plan which provided for, among other things, the transfer of websites to investors electing to receive them in lieu of

monetary distributions.  *See id*.  On February 28, 2020, the Receiver filed her Claims Process Motion.  *See* ECF No. 53.

The Receiver's second, third, fourth, and fifth status reports, filed on June 30, 2020, October 29, 2020, February 1, 2021, and April 30, 2021 respectively, detailed, among other things, the Receiver's continued efforts to carry out her duties and obligations as set forth in the Appointment Order including, without limitation, her efforts to preserve and maintain the assets of the Estate and operate TGC's business.  *See* ECF Nos. 81, 101, 115, 127.  The Receiver's status reports further detailed the Receiver's and her professionals' efforts to locate and marshal assets for the Estate while minimizing liabilities, research and bring claims against third parties that received transfers from TGC, implement the Court-approved claims process, and continuously communicate with investors by telephone and email and through the Receivership website to, among other things, assist and answer questions with respect to their participation in the claims process, oversee the transfer of websites to eligible claimants that elected to receive a website as part of the Court-approved claims process, and provide status updates on the Receivership and the SEC Enforcement Action.  *See id*.

### III.  STATUS AND ACTIVITIES OF THE RECEIVERSHIP AND SUMMARY OF TGC'S OPERATIONS

The Receiver, with the assistance of her professionals, continues to perform all duties and obligations as set forth in the Appointment Order.  During the Reporting Period, the Receiver focused her attention and resources on:  (A) working with TGC's IT team to maintain and preserve the assets of the Receivership Estate, including the operating websites and associated domains to preserve the value of the websites prior to transfer or sale; (B) continuing to implement and monitor the Court-approved claims process, receiving, organizing and analyzing completed and amended claims packages while working closely with investors and creditors to answer questions, gathering

documentation necessary to properly consider each claim, and approve and deny claims through issuance of the Initial and Final Determination letters as well as respond to and resolve any appeals; (C) working with TGC's IT team to facilitate and oversee the transfer of websites to claimants with an approved claim that elected to receive a website previously assigned to them by TGC in exchange for relinquishing any right to monetary distribution from the Receivership Estate; (D) further communicating with investors to address their questions and concerns regarding the SEC Enforcement Action and the Receivership and to obtain information necessary to effectively manage TGC's websites; (E) continuing to identify, locate, and marshal all websites and domains of TGC and other assets of the Receivership Estate; (F) working with the Receiver's retained Auctioneer to develop, refine, and execute the Court-approved plan to liquidate all remaining assets of the Estate by way of an online auction sale; (G) establish a secure data room that hosts confidential information related to the Estate's assets as well as communicate with and register bidders for the online auction sale and provide them access to the data room to conduct their due diligence on the assets; (H) working with her financial advisor and forensic accountant to analyze the books and records of TGC for purposes of determining the amounts transferred between investors and creditors and TGC to assist in processing claims submitted in the claims process, trace funds transferred from TGC to insiders, affiliates and third parties, and provide transferee reports to the Receiver and her counsel for purposes of investigating and formulating claims against such transferees; and (I) pursuing the claims of TGC and the Estate by following up on demand letters and continuing to litigate pending recovery actions, investigating additional claims, and commencing and settling actions against, insiders, affiliates and third parties who received significant transfers from TGC without providing reasonable equivalent value to TGC, and/or

facilitated and assisted TGC and Courtright to commit the fraud that is the subject of the SEC Enforcement Action.[4]

### A. Maintaining TGC's Operations and Websites and Otherwise Preserving Assets of the Estate

During the current Reporting Period, the Receiver continued to work with her professionals and TGC's IT consultants to preserve, maintain and improve TGC's many actively-operating websites to maximize the value of the Receivership Estate in advance of the online auction sale. In particular, the Receiver and her professionals closely monitored the functionality and performance of the websites, identifying and resolving a number of issues necessary to maintain and increase their traffic and revenue and ultimate value. The Receiver's IT team continued to be critically important in addressing these and other day-to-day issues that arose and required continual dialogue between and among the IT team and the Receiver, her counsel, her financial advisor and forensic accountant.

With the assistance of her professionals and the IT team, the Receiver will continue to address any issues that may arise with the websites until they are sold and transferred to their respective buyers and will maintain the value of the Estate's assets in accordance with her duties and obligations under the Appointment Order.

### B. Court-Approved Claims Process and Appeal

As previously reported, in accordance with this Court's Memorandum and Opinion Order granting the Receiver's Claims Process Motion [ECF No. 109], on December 15, 2020, the Receiver sent Claims Packages to 832 potential claimants (including government taxing agencies) via email and another 24 Claims Packages via U.S. Mail or Federal Express. After sending the

---

[4] The Receiver's professionals are pursuing such recovery claims on a contingency fee basis to preserve the limited resources of the Estate. *See* ECF No. 103.

Claims Package to all known potential claimants, the Receiver and her professionals immediately began responding to hundreds of emails and phone calls from investors addressing questions related to proper completion of the claim forms, where and how to return completed claim forms, and other inquiries. Shortly after sending out the Claims Packages, the Receiver and her professionals began receiving, organizing, and processing completed claim forms that claimants had sent to the Receiver's email address established for the claims process (IncomeStoreClaims@dvllp.com).

During the current Reporting Period, the Receiver continued to receive completed claim forms after the January 15, 2021 claims bar date.[5] The Receiver also received several amended claims forms from claimants electing to change their remedy from website turnover to monetary recovery or vice versa. The Receiver continued to spend significant time communicating with investors and creditors to answer questions regarding the Initial and Final Determination letters and, among other things, the forthcoming distribution process.

The Receiver received only one (1) appeal in response to the Receiver's Final Determination letters. On April 2, 2021, Amex filed its appeal of the Receiver's final determination denying Amex's claim. *See* ECF No. 119. On May 10, 2021, the District Court held a status conference hearing at which counsel for Amex agreed to amend its claim. On May 13, 2021, the Receiver received six (6) amended claim forms that were executed by counsel for Amex on behalf of Amex. The Receiver and her counsel worked with counsel for Amex to resolve

---

[5] The claims bar date was January 15, 2021. However, to permit as many defrauded investors to submit a claim as possible, the Receiver agreed to accept claims packages on a case-by-case basis after that date from claimants that, for a number of reasons, claimed they were not aware of the claims bar date or had difficulty submitting their claims in a timely manner. During the Reporting Period, the Receiver received six (6) new completed claims forms from investors that were processed and Initial Determination letters were issued.

the Amex appeal and on June 15, 2021, the Receiver filed a notice of settlement of Amex's appeal of the Receiver's final determination indicating, among other things, that the parties reached a settlement in principle regarding Amex's appeal of the Receiver's final determination and that the Receiver and Amex would soon finalize the details of the settlement and notify the Court of same. *See* ECF No. 145. The Receiver expects the resolution of Amex's claim to be finalized by August 6, 2021.

Pursuant to her Final Determinations, the Receiver approved claims for monetary distribution to investors totaling approximately $70,112,531.82, to creditors totaling approximately $357,695.87, and to former employees totaling approximately $12,780.60. Of the 471 claims from investors, 32 investors elected to receive one or more of the websites that TGC had assigned to them, thereby forfeiting their right to monetary distributions from the Estate. The Receiver's approval of the claims of those 32 investors resulted in the turnover of 68 websites. After each of the 68 websites are transferred, the Estate will be left with 2,950 websites and domains, which, as explained below, the Receiver is proposing to sell directly to third parties. The return of websites eliminated $7,873,540.20 in potential monetary claims against the Estate.

### C.  *Communicating with Investors*

During the Reporting Period, the Receiver continued to regularly communicate with investors through the email accounts, telephone number, and Receivership website established to provide information to, and address the questions and concerns of, investors. In particular, through the email accounts established for the Receivership (IncomeStore@dvllp.com; IncomeStoreClaims@dvllp.com) and telephone number set up soon after the commencement of the Receivership, the Receiver's professionals responded to investors' inquiries regarding the

Court-approved claims process and forthcoming distribution plan, completing the proof of claim form, transferring websites to the investors pursuant to their elections in the claims process, requests for reconsideration of the Receiver's Initial Determination of claims, the SEC Enforcement Action, the Estate assets being sold at the online auction sale and the results of the sale, and the Receivership in general.

The Receiver also continued to receive information from investors regarding website functionality that facilitated the Receiver's maintenance and operation of TGC's many websites.

### D. *Online Auction Sale for Assets of the Estate*

During the Reporting Period, the Receiver continued to work with her Auctioneer to determine the value of TGC's digital and physical assets and the most advantageous process for selling those assets to maximize the recovery by the Estate. To provide the most open and transparent initial process, the Receiver determined that the best method to sell the Estate's assets would be through a competitive public online auction sale. Accordingly, on April 7, 2021, the Receiver prepared and filed a Motion seeking, among other things, authority for the Auctioneer to conduct an online auction sale of the Estate's remaining assets. *See* ECF No. 123. At the April 8, 2021 status conference hearing, the Court considered the Receiver's Motion and the general objection raised by Courtright and asked the Receiver to submit a revised non-affiliation declaration that the Receiver proposed to have all potential bidders sign prior to participating in the auction. Soon thereafter, the Receiver submitted the declaration to the Court for approval and on May 7, 2021, this Court entered an Order approving the Receiver's declaration and granting the Receiver's Motion to Approve the Sale of the Estate's Assets ("Asset Sale Order") authorizing the Receiver to, among other things, retain the services of the Auctioneer to assist the Receiver in selling the assets at an online auction sale. *See* ECF No. 131. The Court's Order mandated that

12

the online auction sale for the assets grouped together as a single lot take place at least forty (40) days after entry of the Asset Sale Order and, if the assets are not sold as a single lot at the first online auction sale, a second online auction sale at which the assets would be separated into lots take place at least fifteen (15) days after the date on which the original auction sale (of the single lot auction) was to take place. *See id*.

The Receiver and her Auctioneer set the auction date for the sale of the single lot to occur on June 10, 2021 and spent significant time preparing for the sale. The Receiver established a secure data room that hosted confidential documentation related to the assets including a full domain and website list, revenue and traffic information for the websites, advertising affiliate accounts, trademarks, and a detail description of the physical assets (office furniture, computers, etc.). The Receiver required all potential bidders to execute a non-disclosure agreement and declaration of non-affiliation prior to being granted access to the confidential data room wherein bidders could conduct their due diligence on the assets prior to registering to bid at the auction sale. The Receiver also required bidders to post a deposit prior to being qualified to bid at the auction sale that would be fully refundable if the bidder did not successfully bid on the assets. The Receiver and her Auctioneer spent significant time communicating with potential bidders and registering interested parties for the auction sale. The Receiver received significant interest from potential bidders.[6]

---

[6] Several parties communicated a need for additional time to conduct their due diligence on the assets and to post the required deposit before the date for the first online auction sale. As such, on June 10, 2021, the Receiver filed her Unopposed Motion for Six-Day Extension of Time to Conduct the Asset Sale. *See* ECF No. 142. The Receiver's motion also included a date of July 9, 2021 for the second auction sale at which the Assets would be separated into smaller lots in the event that the single lot did not sell. *See id*. On June 10, 2021, the Court entered an Order granting the Receiver's request for a six-day extension of time setting the auction sale for the single lot to occur on June 16, 2021 and further setting the date for the second auction sale for July 9, 2021. *See* ECF Nos. 143, 144.

While the Receiver and her Auctioneer worked diligently to generate interest in the assets and to register and qualify potential bidders, successfully registering over sixty (60) bidders for the single lot sale, the single lot comprised of all remaining assets of TGC did not receive a bid at the reserve price and was not sold at the June 16, 2021 auction sale.  However, several interested parties expressed their desire to bid on specific assets separated into smaller lots at the second auction sale.  As such, the Receiver, her retained professionals, and her Auctioneer immediately began working to separate the assets into smaller groups based on several factors including but not limited to websites that have generated the most interest from bidders, websites that generate revenue, traffic metrics, and ownership of affiliate accounts in preparation for the second asset sale for the assets separated into smaller groups.[7]

In the time leading up to the second auction sale, the Receiver, her retained professionals, and her Auctioneer continued to work with interested parties to determine how to best separate the assets into smaller lots that would generate the most interest from bidders thus resulting in the best possible recovery for the Estate.  After spending significant time grouping the nearly 3,000 domains and websites into smaller groups, the Receiver determined that the assets would attract the most interest when separated into approximately forty (40) different lots with separate lots for the top revenue generating websites, a separate lot for the physical assets, separate lots for the trademarks, and multiple separate lots for the numerous domains grouped into lots by category (for example, one lot for lifestyle websites, one lot for sports websites, etc.).  While the Receiver

---

[7] On July 6, 2021, to provide potential bidders with adequate time to complete any remaining due diligence as to the assets, the Receiver filed her Motion for Extension of Time to Conduct the Second Asset Sale setting a new date for the second auction sale of July 28, 2021.  *See* ECF No. 147.  On July 7, 2021, the Court entered an Order granting the Receiver's Motion for Extension of Time to Conduct the Second Asset Sale authorizing the Receiver to conduct the second auction sale through and including July 28, 2021.  *See* ECF No. 149.

and her Auctioneer worked diligently to generate interest in the assets and to communicate with, register, and qualify potential bidders, registering a total of ninety (90) bidders for the second auction sale, the only lot that received a bid above the reserve price was the lot comprised of the physical assets. The remaining lots did not receive a bid at the reserve price and were not sold at the July 28, 2021 auction sale.

However, the Receiver remains in contact with several interested parties that registered for the auction sale and have expressed their desire to purchase a portion of the assets outside of an auction sale setting. As such, the Receiver and her Auctioneer agree that the assets still have significant value and should ultimately be sold to third parties thus resulting in substantial recovery for the benefit of the Estate. Accordingly, outside of the current Reporting Period on August 4, 2021, the Receiver filed her Motion to Modify this Court's Order Granting the Receiver's Motion to Approve Sale of Estate Assets [ECF No. 131] to Authorize the Receiver to Negotiate the Sale of Asset Groups to Third Parties [ECF No. 156] which the Court set for hearing for August 10, 2021 [ECF No. 157].

### E.    Receiver's Financial Advisor and Forensic Accountants

During the initial reporting period, the Receiver retained Kapila Mukamal ("Kapila") as her financial advisor and forensic accountant to assist her to fulfill her duties under the Appointment Order. Kapila assisted the Receiver with an in-depth investigation of TGC's former business operations, accounting and banking records, and transactions involving investors, creditors, affiliates, insiders and third parties.

During the current Reporting Period, Kapila continued to prepare and analyze the forensic bank reconstruction of the TGC and Courtright personal bank accounts. The data associated with the bank accounts and accounting records is significant. In the Receiver's prior Status Report, the

Receiver reported that Kapila's bank reconstruction comprised of more than 126,000 line-items with approximately $206 million of funds flowing through the accounts. Since filing that Report, the Receiver acquired additional records from financial institutions regarding the critical batch payment details and provided them to Kapila to incorporate into the reconstruction. In many instances, TGC utilized batch payment processing to make payments to vendors, investors, and other parties. Batch payments are reflected as one transaction on a bank statement but are comprised of hundreds of disbursements to different parties that comprise the batch payment amount. These batch payments substantially increase the number of line-item transactions within the bank reconstruction.

Kapila continues to address communications between claimants and counsel, prepare transaction detail schedules to address the Receiver's and claimants' inquiries regarding the claims process and otherwise, and provide supporting documentation. Similarly, Kapila provided transaction detail schedules and support for the transferees that the Receiver is investigating.

Kapila researched and investigated various mortgage loans with the activity reported in the forensic bank reconstruction for the Courtright and TGC accounts to address inquiries from the Receiver regarding loan funds received and paid.

Kapila further prepared transaction detail analysis of the Amex transaction activity reported in QuickBooks and in the TGC bank reconstructions to assist the Receiver in responding to and attempting to resolve Amex's appeal of the Receiver final determination denying Amex's claim submitted as part of the Court-approved claims process. Kapila helped provide detail as to the $13.4 million that TGC paid to Amex over the course of several years. Kapila also researched remaining credit card accounts to provide the Receiver with a summary of Courtright's personal credit card accounts and TGC's credit card accounts.

16

Additionally, during the current Reporting Period, Kapila assisted in preparing the Federal Tax Return Form 1120SF (US Settlement Fund Income Tax Return) for 2020.

Kapila continues to work with Receiver to obtain the remaining bank documents that are needed to complete the forensic bank reconstruction.

### F.     Pursuing Claims Against Third Parties, Affiliates, and Insiders

During the Reporting Period, the Receiver and her counsel continued to formulate the Estate's recovery claims, gather evidence to support those claims, prepare and file Complaints to recover improper transfers and other damages for the benefit of the Estate, and litigate the actions against third parties, affiliates and insiders filed during the prior reporting periods.[8]  The Receiver and her counsel were also able to resolve the Estate's fraudulent transfers claims against three transferees who were defendants in three separate recovery actions.  On April 7, 2021, the Receiver filed a Motion to approve these settlements [*see* ECF No. 122], and, at the April 8, 2021 status conference, the Court considered that Motion and the objection voiced by Defendant Courtright. On May 7, 2021, the Court entered an Order granting the Receiver's motion to approve the settlement reached with the aforementioned third parties.

Moreover, the Receiver also recovered additional settlement funds from one of the third-party transferees that surrendered additional funds to the Estate provided the Receiver's counsel agree not to apportion such proceeds for use in payment of the Receiver's professional fees.

---

[8] As detailed in the Receiver's prior Status Report, to preserve the minimal funds in the Receivership Estate, the Receiver and her counsel did not bill the Estate for the formulation and litigation of the foregoing claims.  Rather, on September 16, 2020, the Receiver filed her Motion for Approval of Contingency Fee Arrangement for such claims.  *See* ECF No. 99.  And on November 5, 2020, the Court granted that Motion.  *See* ECF No. 103.

In addition, the Receiver and her counsel continued to investigate several professionals and institutions that facilitated and benefited from TGC's and Courtright's alleged fraudulent activities and/or otherwise contributed to the damages sustained by TGC and its investors.

Further, the Receiver and her counsel continued to pursue third parties that received significant transfers from TGC to whom the Receiver previously sent demand letters to discuss their involvement with TGC and/or Courtright, determine the origin, purpose, and net amount of the funds they received from TGC, to evaluate each parties' ability to assist in the Receiver in her pursuit of claims against transferees, and seek to recover net gains through informal settlement negotiations.

### IV.     CASH ON HAND AND ACCRUED EXPENSES OF ESTATE

As of the end of the Reporting Period (June 30, 2021), the Estate held a total of $180,938.08 in cash on hand, which it had recovered from TGC's business operations (including website revenue deposited in TGC's operating accounts) as well as settlement funds received from third party transferees against whom the Estate has fraudulent transfer claims. *See* **Exhibit A**. The Receiver deposited such funds in her fiduciary account for the Receivership Estate at City National Bank in Miami, Florida.

During the Reporting Period, the Receivership Estate incurred administrative expenses in the form of fees and costs of the Receiver and her professionals for the work they performed in connection with fulfilling the Receiver's duties under the Court's Orders. Pursuant to the Appointment Order, and in accordance with the timeline set forth in this Court's Order granting the Receiver's Motion for Extension of Deadline to File Fourth and Fifth Interim Applications for an Order Approving and Authorizing Payment of Fees and Expenses of Receiver and Her Professionals [ECF No. 146] as modified by the Receiver's *Ore Tenus* Motion made at the Status Conference on July 7, 2021, the Receiver will file an application by the Court Ordered deadline

seeking approval and payment of the fees and costs from the funds the Receiver has marshalled and deposited into her fiduciary account since she was appointed.

## V. RECEIPTS AND DISBURSEMENTS OF RECEIVERSHIP ESTATE

During the Reporting Period, the Receiver made disbursements totaling $363,979.96 from TGC's operating accounts for expenses necessary to operate and preserve the value of TGC's websites and domains. Such expenses included primarily payments to the IT contractors who continue to assist the Receiver to operate the business in a limited capacity, utilities, data expense, domain hosting, maintenance fees, and fees for bank account services and maintenance. *See* Exhibit A.

## VI. KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE

The Receiver is in possession, custody or control of the following assets of the Receivership Estate:

- $180,938.08 in cash on hand in the Receiver's fiduciary account and TGC's operating accounts.

- Approximately 2,950 domain names and revenues generated by operational websites (precise value currently unknown), as detailed in Exhibit C to the Receiver's Initial Status Report. *See* ECF No. 45-3.

- Additional personal property located in TGC's office, including computers and related equipment, office equipment, and inventory for fulfillment of certain e-commerce websites not sold in the auctions conducted by H.K. Keller as detailed in the Receiver's prior Status Reports (precise value currently unknown). The Receiver received a bid above the reserve price for the physical assets at the second auction sale held on July 28, 2021 and the Receiver is currently working with the winning bidder to finalize the sale.

- Trademarks (precise value currently unknown)

- Claims against third parties, affiliates, and insiders (precise value currently unknown, however, in total the Receiver seeks in excess of $70 million) including fraudulent transfer and/or aiding and abetting lawsuits filed by the Receiver against the following parties:

- o Heartland Bank & Trust Company and PNC Bank, N.A.; Case No. 1:20-cv-07819; Venue in the United States District Court for the Northern District of Illinois
- o William Courtright and Courtright Consulting, Inc.; Case No. 2:20-cv-01012; Venue in the United States District Court for the Middle District of Florida
- o Asher Milgrom, Danial Giordano, Daniel Meyer, and JDS Consulting, LLC; Case No. 5:20-cv-06546; Venue in the United States District Court for the Eastern District of Pennsylvania
- o Don Shire Ministries, Joliet Catholic Academy, Legacy Families, and Messiah Lutheran Church; Case No. 1:20-cv-07817; Venue in the United States District Court for the Northern District of Illinois
- o Conklin Web Properties, LLC d/b/a Conklin Media, Conklin Media, LLC, Prospect MX, LLC, Dave Conklin, Jodi Conklin, Emily Lasko, and Haley Hirthler; Case No. 5:20-cv-06297; Venue in the United States District Court for the Eastern District of Pennsylvania
- o Empire Flippers, LLC and CMS United, Inc.; Case No. 1:20-cv-07811; Venue in the United States District Court for the Northern District of Illinois
- o Mike Engstrom; Case No. 1:20-cv-07087; Venue in the United States District Court for the Northern District of Illinois
- o William Longcore; Case No. 5:20-cv-06538; Venue in the United States District Court for the Eastern District of Pennsylvania
- o Ronald Fossum; Case No. 2:20-cv-01868; Venue in the United States District Court for the Western District of Washington
- o Pepperdine University; Case No. 1:21-cv-02371; Venue in the United States District Court for the Northern District of Illinois
- o EIN Cap, Inc., Alpha Capital Source, Inc., BMF Capital, LLC, FundKite, LLC, AKF, Inc., World Global Capital, LLC, Fox Capital Group, Inc., High Five Group, LLC, and Sutton Funding NY, Inc.; Case No. 21-cv-01792; Venue in the United States District Court for the Northern District of Illinois
- o Click Intelligence, Ltd.; Case No. 1:20-cv-11066; Venue in the United States District Court for the Southern District of New York

## VII. KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE

As explained in the Receiver's Initial Status Report, the Receiver identified more than seven hundred (700) Consulting Performance Agreements which resulted in $141,518,356.00 in up-front payments to TGC from investors, many of whom qualified as eligible claimants of the Receivership Estate through the Court-approved claims process. *See* ECF No. 45. The Receiver

and her professionals received and responded to inquiries from many of these investors, along with creditors and former employees of TGC, and provided them with the Claims Package so they could participate in the claims process. *See* ECF Nos. 81, 101. As explained above, 471 investors, 8 creditors, and 9 former employees submitted claims in the claims process, and the Receiver allowed $70,112,531.82 in investor claims, $357,695.87 in creditor claims, and $12,780.60 in employee claims.

## VIII.   RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP AND CONCLUSION

The Receiver recommends the Receivership continue to preserve and maximize the value of the Estate's assets for the benefit of the investors and creditors of the Estate while the Receiver and her Auctioneer finalize the sale of the Estate's remaining assets, and for the Receiver to conclude the claims process and propose and implement any distribution plan which the Court may approve. Until further order of the Court, the Receiver will continue to work with her team of professionals to locate, marshal, and preserve all known and potential assets of the Estate in accordance with the Appointment Order. Further, the Receiver will continue to investigate, pursue, and litigate existing and potential claims against third parties, affiliates, and insiders on behalf of the Estate. The Receiver will also continue to investigate and gather information regarding the Defendants' assets through subpoenas, depositions, and other inquiries to financial institutions, and other entities and persons with any connection to the Defendants to discover additional potential claims against third parties, affiliates and insiders and other sources of recovery for the Estate.

The Receiver will continue to perform all other duties as mandated by the Appointment Order and will continue updating the Court on a quarterly basis as to the status and activities of the Receivership and business operations of TGC.

21

Respectfully submitted this 6th day of August, 2021.

Respectfully submitted,

/s/ Kenneth Dante Murena
Kenneth Dante Murena, Esq.
Florida Bar No. 147486
DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
Email: kmurena@dvllp.com
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*

*Admitted Pro Hac and General Admission*
*to Northern District of Illinois*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on August 6, 2021 on all counsel or parties who have appeared in the above-styled action.

/s/Kenneth Dante Murena
Kenneth Dante Murena,
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*