**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil Action No. 1:19-CV-08454 |
| : | |
| TODAY'S GROWTH CONSULTANT, INC. : | |
| (dba THE INCOME STORE) : | |
| : | |
| and : | |
| : | |
| KENNETH D. COURTRIGHT, III, : | |
| : | |
| Defendants. : | |
| : | |

## <u>RECEIVER'S SEVENTH STATUS REPORT</u>

Melanie E. Damian, the court-appointed receiver ("Receiver") in the above-captioned enforcement action ("SEC Enforcement Action"), submits her seventh status report concerning the status of the Receivership, established pursuant to the Court's Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief [ECF No. 20] ("TRO") and Order Appointing Receiver ("Appointment Order") [ECF No. 19], which the Court extended in its Preliminary Injunction Orders ("Preliminary Injunction") [ECF Nos. 55, 56]. This interim report sets forth the Receiver's activities and efforts to fulfill her duties under the Appointment Order for the period from July 1, 2021 through September 30, 2021 (the "Reporting Period").

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................3

II.     PROCEDURAL BACKGROUND...................................................................5

III.    STATUS AND ACTIVITIES OF THE RECEIVERSHIP AND SUMMARY
        OF TGC'S OPERATIONS ...............................................................................7

        A.    *Maintaining TGC's Operations and Websites
              and Otherwise Preserving Assets of the Estate*.......................................9
        B.    *Court-Approved Claims Process and Appeal*.........................................9
        C.    *Communicating with Investors* ...........................................................11
        D.    *Online Auction Sale for Assets of the Estate*........................................12
        E.    *Receiver's Financial Advisor and Forensic Accountants*.....................16
        F.    *Pursuing Claims Against Third Parties, Affiliates, and Insiders*...........17

IV.     CASH ON HAND AND ACCRUED EXPENSES OF ESTATE ....................18

V.      RECEIPTS AND DISBURSEMENTS OF RECEIVERSHIP ESTATE ........19

VI.     KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE.........................19

VII.    KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE ......................21

VIII.   RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP AND
        CONCLUSION................................................................................................21

## I.  INTRODUCTION

Since her appointment on December 30, 2019, the Receiver, with the assistance of her retained professionals, including her lead counsel, local counsel, and forensic accountants, has worked diligently to continue to fulfill her duties and obligations as set forth in the Appointment Order and to preserve the assets and records of the Receivership Estate ("Receivership Estate" or "Estate").  In particular, the Receiver took control of all known assets of Defendant Today's Growth Consultant d/b/a The Income Store ("TGC"), including but not limited to the many websites and domains owned by TGC, its business operations, and all other known assets.  And the Receiver worked on identifying and marshaling all other assets of TGC, including without limitation funds held in bank accounts, funds transferred to or in the possession of third parties, and other personal property of TGC.  The Receiver and her counsel also communicated with investors and answered inquiries regarding, among other things, the status of the SEC Enforcement Action, the claims process and timing of investor distributions, the status and condition of TGC's websites and revenue generated therefrom, the investors' claimed interest in and expectations with respect to those websites, the results of the Court-approved sales of TGC's websites and domains, and the Receiver's efforts to recover assets from third parties, affiliates and insiders for the benefit of the Estate.

During the Reporting Period, the Receiver continued to work with her Court-approved digital asset broker, Right of the Dot, LLC ("Broker"), to establish the procedures for the second Court-approved online auction sale for the Estate's Assets comprised of both digital and physical assets (the "Assets") separated into individual and small grouped lots.  The Receiver communicated with and registered bidders, granted access the secure data room which housed confidential asset information, and worked with her Broker to market the second auction sale to

3

generate interest in the Assets to maximize recovery for the Estate. Following the conclusion of the second auction sale, the Receiver worked with her Broker pursuant this Court's Order [ECF No. 162] to negotiate the sale of the Estate's remaining Assets directly to third parties. The Receiver and her Broker were successful in selling a number of the Estate's remaining Assets and worked with her IT professionals to complete the transfer of all domains and websites to buyers as well as finalizing the transfer of domains and websites to investors as part of the Court-approved claims process. The Receiver also continued to collect revenues generated by TGC's websites and pay the costs associated with operating those websites and maintaining the domain names, including the consulting fees of the IT professionals the Receiver had engaged to preserve the value of those digital assets.

Also during the Reporting Period, the Receiver and her counsel continued to receive and process late-filed claims from investors who may not have received notice of the Court-approved claims process and amended claims from investors who had submitted timely claims. The Receiver analyzed and determined whether, and the extent to which to allow, each such claim. Only one claimant, American Express Travel Related Services Company, Inc., and American Express National Bank (collectively, "Amex"), had filed an appeal of the Receiver's Final Determination disallowing its claim, and the Receiver filed a response to that appeal. During the Reporting Period, the Receiver and Amex finalized a settlement of the Receiver's determination and Amex's appeal and submitted a stipulated order approving that settlement, which this Court entered on August 9, 2021 [ECF No. 161].

As detailed in her prior status reports, the Receiver continued to litigate the Estate's claims against third parties, affiliates and insiders of the Defendants who improperly received significant recoverable transfers from TGC without providing reasonably equivalent value in exchange

therefor and/or facilitated and assisted TGC and its principal Defendant Kenneth D. Courtright, III ("Courtright") to perpetrate the fraud that is the subject of this enforcement action and receivership. During the Reporting Period, the Receiver continued to advance the recovery actions and pursue expeditious resolutions of the Receiver's claims through judicial settlement conference and settlement negotiations. During the Reporting Period, the Receiver and two defendants reached settlements which this Court approved. *See* ECF Nos. 170, 171.

To maximize the value of the Estate, the Receiver continued to formulate, monitor, and institute practices that reduce operational costs including, among other things, reducing the number of IT consultants at TGC's office[1] to the bare minimum necessary to preserve the value of the remaining websites and domains until they are sold and to assist with their transfer to the purchasers. The Receiver is on track to have all websites transferred and be able to reduce expenses solely to domain carrying costs by November 30, 2021.

## II.     PROCEDURAL BACKGROUND

The Appointment Order entered on December 30, 2019, among other things, directs the Receiver to file with the Court within thirty (30) days after the end of each calendar quarter her report and recommendations regarding the status and activities of the Receivership Estate and TGC's business operations during the prior calendar quarter. *See* ECF No. 19. In particular, the Receiver's quarterly status reports are required to include: (1) a summary of the operations of the Receiver; (2) a summary of cash on hand, accrued administrative expenses, and the amount of unencumbered funds in the estate; (3) a schedule of the Receiver's receipts and disbursements; (4) a description of all known Receivership Property; (5) a description of liquidated and unliquidated

---

[1] As previously reported, the Receiver relocated TGC's operations from the Lancaster, Pennsylvania office building utilized prior to the commencement of the SEC Enforcement Action to a much smaller and less expensive office space to minimize TGC's monthly expenses.

5

claims held by the Receivership Estate; (6) a list of all known creditors; (7) a status of Creditor Claims Proceedings (once commenced); and (8) the Receiver's recommendations for a continuation or discontinuation of the receivership. *See* ECF No. 19 at pp. 21-22.

On January 30, 2020, as required under the Appointment Order, the Receiver filed her Initial Status Report, which described, among other things, the Receiver's activities and efforts to fulfill her obligations under the Appointment Order during the first thirty (30) days of the receivership. *See* ECF No. 45. Importantly, in her Initial Status Report, the Receiver concluded that TGC's business records confirm the allegations as set forth in the SEC's Complaint [ECF No. 1]. *See* EFC No. 45. Specifically, because TGC's revenue that was generated from all of the websites each month was significantly less than the monthly payment obligations to the investors and are thus not sufficient to cover both monthly payments to investors as well as TGC's monthly overhead expenses, the Receiver concluded that the long-term costs associated with maintaining and preserving the digital assets of TGC is not in the best interest of the Receivership Estate.[2] *See id*. Based on this conclusion and the Receiver's analysis of the equities of all interested parties, including the investors, the receipts and expenses of TGC's operations and of the Receivership Estate, and likely recoveries of the Estate in the future, the Receiver outlined her proposal to promptly seek Court approval for a claims process and partial distribution plan which provided for, among other things, the transfer of websites to investors electing to receive them in lieu of monetary distributions. *See id*. On February 28, 2020, the Receiver filed her Claims Process Motion. *See* ECF No. 53.

---

[2] Indeed, since her appointment, the Receiver has detailed in her quarterly status reports the significant expenses associated with merely maintaining the Assets including retaining a skeletal group of IT professionals and the ongoing carrying costs of the domains and websites. *See* ECF Nos. 45, 81, 101, 115, 127, 160.

The Receiver's subsequent status reports[3] detailed, among other things, the Receiver's continued efforts to carry out her duties and obligations as set forth in the Appointment Order including, without limitation, her efforts to preserve and maintain the Assets of the Estate. *See* ECF Nos. 81, 101, 115, 127, 160. The Receiver's status reports further detailed the Receiver's and her professionals' efforts to locate and marshal assets for the Estate while minimizing liabilities, liquidate the Estate's Assets pursuant to this Court's Orders to maximize recovery for the benefit of the Estate, research and bring claims against third parties that received transfers from TGC, implement the Court-approved claims process, and continuously communicate with investors by telephone and email and through the Receivership website to, among other things, assist and answer questions with respect to their participation in the claims process, oversee the transfer of websites to eligible claimants that elected to receive a website as part of the Court-approved claims process, and provide status updates on the Receivership and the SEC Enforcement Action. *See id*.

### III. STATUS AND ACTIVITIES OF THE RECEIVERSHIP AND SUMMARY OF TGC'S OPERATIONS

The Receiver, with the assistance of her professionals, continues to perform all duties and obligations as set forth in the Appointment Order. During the Reporting Period, the Receiver focused her attention and resources on: (A) working with TGC's IT team to maintain and preserve the Assets of the Receivership Estate, including the operating websites and associated domains to preserve the value of the websites prior to sale and transfer; (B) continuing to implement and monitor the Court-approved claims process, receiving, organizing and analyzing completed and amended claims packages while working closely with investors and creditors to answer questions,

---

[3] The Receiver's second, third, fourth, fifth, and sixth status reports were filed on June 30, 2020, October 29, 2020, February 1, 2021, April 30, 2021, and August 9, 2021, respectively,

gathering documentation necessary to properly consider each claim, and approve and deny claims through issuance of the Initial and Final Determination letters as well as respond to and resolve any appeals; (C) working with TGC's IT team to facilitate and oversee the transfer of websites to claimants with an approved claim that elected to receive a website previously assigned to them by TGC in exchange for relinquishing any right to monetary distribution from the Receivership Estate; (D) further communicating with investors to address their questions and concerns regarding the SEC Enforcement Action and the Receivership and to obtain information necessary to effectively manage TGC's websites; (E) continuing to identify, locate, and marshal all websites and domains of TGC and other assets of the Receivership Estate; (F) working with the Receiver's digital assets Broker to develop, refine, and execute the Court-approved plan to liquidate all remaining Assets of the Estate by way of an online auction sale and negotiating sales directly with third parties as authorized by this Court [ECF No. 162]; (G) maintaining current information in the secure data room that hosts confidential information related to the Estate's Assets as well as communicating with and registering bidders for the online auction sale and providing them access to the data room to conduct their due diligence on the Assets; (H) working with her financial advisor and forensic accountant to analyze the books and records of TGC for purposes of determining the amounts transferred between investors or creditors and TGC to assist in processing claims submitted in the claims process, tracing funds transferred from TGC to insiders, affiliates and third parties, and providing transferee reports to the Receiver and her counsel for purposes of investigating and formulating claims against such transferees; and (I) pursuing the claims of TGC and the Estate by continuing to litigate pending recovery actions against insiders, affiliates and third parties who received significant transfers from TGC without providing reasonable equivalent value to TGC, and/or facilitated and assisted TGC and Courtright to commit the fraud that is the

subject of the SEC Enforcement Action, investigating additional claims against insiders, affiliates and third parties, and settling claims.[4]

### A. Maintaining TGC's Operations and Websites and Otherwise Preserving Assets of the Estate

During the Reporting Period, the Receiver continued to work with her professionals and TGC's IT consultants to preserve, maintain and improve TGC's many actively-operating websites to maximize the proceeds of their sale to third parties and the ultimate recovery by the Receivership Estate. In particular, the Receiver and her professionals closely monitored the functionality and performance of the websites, identifying and resolving issues necessary to maintain their traffic and revenue, and thus their value, while reporting these important metrics to investors and potential buyers. The Receiver's IT team continued to be critically important in addressing these and other day-to-day issues that arose and required continual dialogue with the Receiver, her counsel, and her financial advisor and forensic accountant.

With the assistance of her professionals and the IT team, the Receiver will continue to address any issues that may arise with the websites until they are sold and transferred to their respective buyers and will maintain the value of the Estate's Assets in accordance with her duties and obligations under the Appointment Order.

### B. Court-Approved Claims Process and Appeal

As previously reported, in accordance with this Court's Memorandum and Opinion Order granting the Receiver's Claims Process Motion [ECF No. 109], on December 15, 2020, the Receiver sent Claims Packages to 832 potential claimants (including government taxing agencies) via email and another 24 Claims Packages via U.S. Mail or Federal Express. Shortly after sending

---

[4] As authorized by this Court, the Receiver's counsel are pursuing such recovery claims on a contingency fee basis to preserve the limited resources of the Estate. *See* ECF No. 103.

out the Claims Packages, the Receiver and her professionals began receiving, organizing, and processing completed claim forms that claimants had sent to the Receiver's email address established for the claims process (IncomeStoreClaims@dvllp.com).

During the Reporting Period, the Receiver continued to receive and process completed claim forms.[5]  The Receiver also received several amended claims forms from claimants electing to change their remedy from website turnover to monetary recovery or vice versa and further sent updated initial determination letters acknowledging certain investors' change in remedy and to correct minor typographical errors.  The Receiver continued to communicate with investors and creditors to answer questions regarding the Initial and Final Determination letters and, among other things, the eventual distribution process.

As previously reported, the Receiver received only one (1) appeal in response to the Receiver's Final Determination letters.  On April 2, 2021, Amex filed its appeal of the Receiver's final determination denying Amex's claim.  *See* ECF No. 119.  The Receiver and her counsel worked with counsel for Amex to resolve the Amex appeal and on June 15, 2021, the Receiver filed a notice of settlement of Amex's appeal of the Receiver's final determination indicating, among other things, that the parties reached a settlement in principle regarding Amex's appeal of the Receiver's final determination and that the Receiver and Amex would soon finalize the details of the settlement and notify the Court of same.  *See* ECF No. 145.  During the Reporting Period, the Receiver continued to work with Amex's counsel to finalize the settlement and, on August 9,

---

[5] While the claims bar date was January 15, 2021, the Receiver, to permit as many defrauded investors to submit a claim as possible, agreed to accept completed claims packages after that date from investors who claimed they were not aware of the claims bar date or had difficulty submitting their claims in a timely manner.  During the Reporting Period, the Receiver received two (2) new completed claims forms from investors, processed those claims, and issued determination letters.

2021, the parties filed a stipulation for dismissal and order of dismissal of Amex's appeal [ECF No. 159][6] which this Court entered on August 9, 2021, dismissing Amex's appeal [ECF No. 160].

Pursuant to her Final Determinations, the Receiver approved claims for monetary distribution to investors totaling approximately $70,128,469.32, to creditors totaling approximately $1,118,248.04, and to former employees totaling approximately $12,780.60. Of the 472 claims from investors, 33 investors elected to receive one or more of the websites that TGC had assigned to them and forfeit their right to monetary distributions from the Estate. Pursuant to the approval of these claims, the Receiver transferred 69 websites to the 33 investors and satisfied $7,890,102.70[7] in potential monetary claims against the Estate.

### C. Communicating with Investors

During the Reporting Period, the Receiver continued to regularly communicate with investors through the email accounts, telephone number, and Receivership website established to provide information to, and address the questions and concerns of, investors. In particular, through the email accounts established for the Receivership (IncomeStore@dvllp.com; IncomeStoreClaims@dvllp.com) and telephone number set up soon after the commencement of the Receivership, the Receiver's professionals responded to investors' inquiries regarding the Court-approved claims process and forthcoming distribution plan, completing the proof of claim

---

[6] As part of the Court-approved claims process, Amex initially submitted a claim in the amount of $1,875,155.85. Pursuant to Amex's representations at the Court's status conference hearing held on May 10, 2021 [ECF No. 134], Amex amended its claim form to reflect a reduced claim in the amount of $950,690.21. Pursuant to the terms of the settlement, Amex's claim was reduced to $760,552.17 and fully subordinated to the claims of the investors. The resolution of Amex's claim resulted in a savings of over $1 million for the benefit of the Estate.

[7] This amount includes the amended monetary claim calculated as a result of the receipt of an amended claim form submitted by an investor who elected to modify his claim to receive a website previously assigned to him which resulted in a reduction of his monetary claim and an additional satisfied claim by the Estate in the amount of $16,653.

form, transferring websites and corresponding social media channels to the investors pursuant to their elections in the claims process, requests for reconsideration of the Receiver's Initial Determination of claims, the Estate Assets being sold at the online auction sale and the results of the sale, and the SEC Enforcement Action and Receivership in general.

The Receiver also continued to receive information from investors regarding website functionality that facilitated the Receiver's maintenance and operation of TGC's many websites.

### D. *Online Auction Sale for Assets of the Estate*

During the Reporting Period, the Receiver continued to work with her Broker to determine the value of TGC's digital and physical Assets, to prepare for and oversee the online auction sale as well as negotiate the sale of Assets directly to third parties to maximize the recovery for the Estate.

As previously reported, the Receiver determined that the best method to sell the Estate's Assets would be through a competitive public online auction sale. Accordingly, on April 7, 2021, the Receiver prepared and filed a Motion seeking, among other things, authority for the Broker to conduct an online auction sale of the Estate's remaining assets. *See* ECF No. 123. And on May 7, 2021, this Court entered an Order approving the Receiver's Motion to Approve the Sale of the Estate's Assets ("Asset Sale Order") authorizing the Receiver to, among other things, retain the services of the Broker to assist the Receiver in selling the assets at an online auction sale. *See* ECF No. 131.

The Receiver and her Broker set the date for the auction sale of the single lot to occur on June 10, 2021 and spent significant time preparing for the sale. The Receiver established a secure data room that hosted confidential documentation related to the assets including a full domain and website list, revenue and traffic information for the websites, advertising affiliate accounts,

trademarks, and a detail description of the physical assets (office furniture, computers, etc.). The Receiver and her Broker devoted significant time to communicating with potential bidders and registering interested parties for the auction sale. And, a significant number of potential bidders expressed their interest purchasing the Assets.[8]

While the Receiver and her Broker worked diligently to generate interest in the Assets and to register and qualify potential bidders, successfully registering over sixty (60) bidders for the auction sale of the single lot of all remaining Assets of TGC, none of those registered bidders submitted a bid at the reserve price and, thus, the Assets were not sold at the June 16, 2021 auction sale. However, several interested parties expressed their desire to bid on the Assets when separated into smaller lots at the second auction sale. As such, the Receiver, her retained professionals, and her Broker immediately began working to separate the Assets into smaller groups based on several factors in preparation for the second auction sale for the assets separated into smaller groups.[9]

In preparation for the second auction sale, the Receiver, her retained professionals, and her Broker continued to work with interested parties to determine how to best separate the Assets into

---

[8] Several parties communicated a need for additional time to conduct their due diligence on the Assets and to post the required deposit before the date for the first online auction sale. As such, on June 10, 2021, the Receiver filed her Unopposed Motion for Six-Day Extension of Time to Conduct the Asset Sale. *See* ECF No. 142. The Receiver's motion also included a date of July 9, 2021 for the second auction sale at which the Assets would be separated into smaller lots in the event that the single lot did not sell. *See id*. On June 10, 2021, the Court entered an Order granting the Receiver's request for a six-day extension of time setting the auction sale for the single lot to occur on June 16, 2021 and further setting the date for the second auction sale for July 9, 2021. *See* ECF Nos. 143, 144.

[9] On July 6, 2021, to provide potential bidders with adequate time to complete any remaining due diligence as to the Assets, the Receiver filed her Motion for Extension of Time to Conduct the Second Asset Sale setting a new date for the second auction sale of July 28, 2021. *See* ECF No. 147. On July 7, 2021, the Court entered an Order granting the Receiver's Motion for Extension of Time to Conduct the Second Asset Sale authorizing the Receiver to conduct the second auction sale on or before July 28, 2021. *See* ECF No. 149.

smaller lots in order to generate the most interest from bidders and thus maximize the recovery for the Estate. After spending significant time grouping the nearly 3,000 domains and websites into smaller groups, the Receiver determined that the Assets would attract the most interest when separated into approximately forty (40) different lots, with separate lots for the top revenue generating websites, a separate lot for the physical assets, separate lots for the trademarks, and multiple separate lots for the numerous domains grouped by category (for example, one lot for lifestyle websites, one lot for sports websites, etc.). While the Receiver and her Broker worked diligently to generate interest in the assets and to communicate with, register, and qualify potential bidders, registering a total of ninety (90) bidders for the second auction sale, the only lot that received a bid above the reserve price was the lot comprised of the physical assets. The remaining lots did not receive a bid at the reserve prices and were not sold at the July 28, 2021 auction sale.

Nevertheless, the Receiver continued to remain in contact with several interested parties that registered for the auction sales and expressed their desire to purchase certain of the Assets outside of an auction sale setting. As such, the Receiver determined that in order to maximize the value of the remaining Assets and to streamline negotiations and sales, the best method to liquidate the remaining Assets would be to negotiate sales directly with interested parties. Thus, on August 4, 2021, the Receiver filed her Motion to Modify this Court's Order Granting the Receiver's Motion to Approve Sale of Estate Assets [ECF No. 131] to Authorize the Receiver to Negotiate the Sale of Asset Groups to Third Parties [ECF No. 156]. On August 10, 2021, this Court granted the Receiver's Motion permitting the Receiver to directly negotiate the sale of the Estate's remaining Assets with third parties. *See* ECF No. 162.

Thereafter, the Receiver negotiated directly with several third parties and, on beginning on September 1, 2021, accepted offers to purchase 408 websites, which sales generated gross

proceeds totaling $470,150.00 for the Estate.[10]  The Receiver and her IT professionals are finalizing the transfer of the purchased websites to their respective buyers and will collect the net sale proceeds (after deducting the Broker's fees and costs) from the third-party escrow account upon completion of the website transfers.

Upon completing these sales directly to third parties, the Receiver and her Broker determined that a final no-reserve online auction to be held on October 27, 2021 (after the Reporting Period) would be the best way to attempt to liquidate all of the remaining Assets, maximize the recovery by the Estate, and minimize the associated costs.  In preparation for the final no-reserve online auction, the Receiver and her Broker re-organized the remaining Estate Assets into individual lots each requiring a minimum bid of $500.00.  The Receiver's Broker marketed this final online auction to its worldwide list of buyers in the industry.  The Receiver also worked with her Broker to notify investors and third parties who previously expressed their interest in the assets of the final online auction sale.  The auction was held on October 27, 2021 and 103 websites/domains were sold, generating gross proceeds totaling $89,150.00 for the Estate. While a number of websites/domains did not sell at the auction, several potential buyers indicated that they would make offers to purchase larger groups of those Assets, and the Receiver will continue to work with her Broker to negotiate any further sales to those and other potential buyers.

Finally, the Receiver continued to speak with investors with allowed claims to determine whether any of the investors are interested in claiming a previously assigned website or domain in exchange for a reduction in their monetary claim against the Estate.  The Receiver will continue

---

[10] These amounts represent the sales of websites/domains to date and include sales after the current Reporting Period, during Q4 2021.  Further, these amounts represent the sales of websites/domains directly to third parties and do not include the proceeds from the online auction sale conducted on October 27, 2021 as such sales are being finalized and invoiced.

to explore this option to further reduce the total claims against the Estate and thus increase the total distribution that each investor with an allowed monetary claim will receive from the Estate. Because the carrying cost of the websites now exceed their value, by November 30, 2021 the Receiver will convert all remining websites to domains only and sell those assets as quickly as possible.

### E. Receiver's Financial Advisor and Forensic Accountants

During the initial reporting period, the Receiver retained Kapila Mukamal ("Kapila") as her financial advisor and forensic accountant to assist her to fulfill her duties under the Appointment Order. Kapila assisted the Receiver with an in-depth investigation of TGC's former business operations, accounting and banking records, and transactions involving investors, creditors, affiliates, insiders and third parties.

As previously reported, Kapila analyzed thousands of bank and accounting records of TGC and bank records of Courtright and prepared a forensic reconstruction of the bank accounts of TGC and Courtright. In the Receiver's prior Status Report, the Receiver reported that Kapila's forensic reconstruction comprised more than 126,000 line-items reflecting approximately $206 million of funds flowing through the various accounts. Since filing that Report, the Receiver has continued to seek to acquire additional records from financial institutions, including batch payment details, and provided them to Kapila to incorporate into the reconstruction.

During the Reporting Period, Kapila continued to prepare transaction detail schedules and gather supporting documentation to address the Receiver's and claimants' inquiries regarding the claims process and other subjects, and for purposes of the Receiver's claims against third parties, affiliates and insiders who had received significant transfers from TGC.

16

Kapila also prepared detailed analyses of the Amex transaction activity reported in TGC's QuickBooks records and in the forensic account reconstructions to assist the Receiver in resolving Amex's appeal of the Receiver's denial of Amex's claim in the Court-approved claims process.

Finally, Kapila prepared the Federal Tax Return Form 1120SF (US Settlement Fund Income Tax Return) for 2020.

### F. Pursuing Claims Against Third Parties, Affiliates, and Insiders

During the Reporting Period, the Receiver and her counsel continued to pursue the Estate's claims against third parties, affiliates and insiders, including gathering evidence to support those claims and litigating the actions brought against such parties during prior reporting periods.[11] During the Reporting Period, the Receiver and her counsel were able to resolve the Estate's fraudulent transfers claims against two transferees who were defendants in two separate recovery actions. On August 30, 2021 and September 2, 2021, the Receiver filed two separate Motions to approve these settlements [*see* ECF Nos. 163 and 166], and, at the September 7, 2021 status conference, the Court considered the Motions and the objection voiced by Defendant Courtright. *See* ECF No. 169. On September 7, 2021, the Court entered two separate Orders granting the Receiver's Motions to approve the settlements reached with the aforementioned third parties. *See* ECF Nos. 170, 171.

The Receiver continued to litigate her actions against Heartland Bank and PNC Bank and against several merchant cash advance companies, which parties the Receiver asserts facilitated

---

[11] As detailed in the Receiver's prior Status Report, to preserve the minimal funds in the Receivership Estate, the Receiver and her counsel did not bill the Estate for the formulation and litigation of these recovery claims. Rather, on September 16, 2020, the Receiver filed her Motion for Approval of Contingency Fee Arrangement for such claims. *See* ECF No. 99. And on November 5, 2020, the Court granted that Motion. *See* ECF No. 103.

and benefited from TGC's and Courtright's alleged fraudulent activities and/or otherwise contributed to the damages sustained by TGC and its investors. Those actions are still in the pleading phase, with motions to dismiss fully briefed and awaiting the Courts' determinations.

Finally, the Receiver and her counsel continued to follow up with third parties that received transfers from TGC to whom the Receiver previously sent demand letters to discuss their involvement with TGC and/or Courtright, confirm the origin, purpose, and net amount of the funds they received from TGC, evaluate each parties' ability to assist the Receiver in her pursuit of claims against transferees, and seek to recover net gains through informal settlement negotiations.

## IV.    CASH ON HAND AND ACCRUED EXPENSES OF ESTATE

As of the end of the Reporting Period (September 30, 2021), the Estate held a total of $173,087.64 in cash on hand, which it had recovered from TGC's business operations (including website revenue deposited in TGC's operating accounts) as well as settlement funds received from third party transferees against whom the Estate has fraudulent transfer claims. *See* **Exhibit A**. The Receiver deposited such funds in her fiduciary account for the Receivership Estate at City National Bank in Miami, Florida.

During the Reporting Period, the Receivership Estate incurred administrative expenses in the form of fees and costs of the Receiver and her professionals for the work they performed in connection with fulfilling the Receiver's duties under the Court's Orders. Pursuant to the Appointment Order, and in accordance with the timeline set forth in this Court's Order as outlined during the status conference hearing held on September 7, 2021 [ECF No. 169], the Receiver will file her Fourth Quarter 2020, First Quarter 2021, and Second Quarter 2021 fee applications by November 1, 2021[12] seeking approval and payment of the Estate's fees and costs from the funds

---

[12] The Court's minute entry Order directs the Receiver to file the combined Fourth Quarter 2020, First Quarter 2021, and Second Quarter 2021 fee application by October 30, 2021. *See* ECF No.

the Receiver has marshalled and deposited into her fiduciary account since she was appointed.

## V.    RECEIPTS AND DISBURSEMENTS OF RECEIVERSHIP ESTATE

During the Reporting Period, the Receiver made disbursements totaling $188,415.76 from TGC's operating accounts for expenses necessary to operate and preserve the value of TGC's websites and domains.  Such expenses primarily included payments to the IT contractors who continue to assist the Receiver to preserve the assets, transfer the websites, and operate the business in a limited capacity, utilities, data expense, domain hosting, maintenance fees, and fees for bank account services and maintenance.  *See* Exhibit A.

## VI.    KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE

As of the end of the Reporting Period (September 30, 2021), the Receiver was in possession, custody or control of the following assets of the Receivership Estate:

- $173,087.64 in cash on hand in the Receiver's fiduciary account and TGC's operating accounts.

- Approximately 2,441 domain names and revenues generated by operational websites (precise value currently unknown), as detailed in Exhibit C to the Receiver's Initial Status Report.  *See* ECF No. 45-3.

- Trademarks (precise value currently unknown)

- Claims against third parties, affiliates, and insiders (precise value currently unknown, however, in total the Receiver seeks in excess of $70 million) including fraudulent transfer and/or aiding and abetting actions filed by the Receiver against the following parties:

  - Heartland Bank & Trust Company and PNC Bank, N.A.; Case No. 1:20-cv-07819; Venue in the United States District Court for the Northern District of Illinois

  - William Courtright and Courtright Consulting, Inc.; Case No. 2:20-cv-01012; Venue in the United States District Court for the Middle District of Florida

---

169.  However, October 30, 2021 falls on a Saturday and, as such, the Receiver filed the fee application on the following Monday, November 1, 2021.

- o Asher Milgrom, Danial Giordano, Daniel Meyer, and JDS Consulting, LLC; Case No. 5:20-cv-06546; Venue in the United States District Court for the Eastern District of Pennsylvania

- o Don Shire Ministries, Joliet Catholic Academy, Legacy Families, and Messiah Lutheran Church; Case No. 1:20-cv-07817; Venue in the United States District Court for the Northern District of Illinois
    - On May 7, 2021, this Court entered an Order approving the Receiver's settlement with Don Shire Ministries in the amount of $50,000. *See* ECF No. 130.

- o Conklin Web Properties, LLC d/b/a Conklin Media, Conklin Media, LLC, Prospect MX, LLC, Dave Conklin, Jodi Conklin, Emily Lasko, and Haley Hirthler; Case No. 5:20-cv-06297; Venue in the United States District Court for the Eastern District of Pennsylvania
- o Empire Flippers, LLC and CMS United, Inc.; Case No. 1:20-cv-07811; Venue in the United States District Court for the Northern District of Illinois
    - On May 7, 2021, this Court entered an Order approving the Receiver's settlement with CMS United, Inc. and Empire Flippers in the amount of $250,000. *See* ECF No. 130. Moreover, the Receiver also recovered additional settlement funds from Empire Flippers in the amount of $66,526.08 provided the Receiver's counsel agree not to apportion such proceeds for use in payment of the Receiver's professional fees.

- o Mike Engstrom; Case No. 1:20-cv-07087; Venue in the United States District Court for the Northern District of Illinois
    - On September 7, 2021, this Court entered an Order approving the Receiver's settlement with Michael Engstrom in the amount of $290,000. *See* ECF No. 171.

- o William Longcore; Case No. 5:20-cv-06538; Venue in the United States District Court for the Eastern District of Pennsylvania
    - On May 7, 2021, this Court entered an Order approving the Receiver's settlement with William Longcore in the amount of $22,500. *See* ECF No. 130.
- o Ronald Fossum; Case No. 2:20-cv-01868; Venue in the United States District Court for the Western District of Washington

- o Pepperdine University; Case No. 1:21-cv-02371; Venue in the United States District Court for the Northern District of Illinois

- o EIN Cap, Inc., Alpha Capital Source, Inc., BMF Capital, LLC,

FundKite, LLC, AKF, Inc., World Global Capital, LLC, Fox Capital Group, Inc., High Five Group, LLC, and Sutton Funding NY, Inc.; Case No. 21-cv-01792; Venue in the United States District Court for the Northern District of Illinois

- On September 9, 2021, this Court entered an Order approving the Receiver's settlement with Sutton Funding NY, Inc. in the amount of $55,000. *See* ECF No. 170.

o Click Intelligence, Ltd.; Case No. 1:20-cv-11066; Venue in the United States District Court for the Southern District of New York

o Cody Neer.; Case No. 1:21-cv-01999; Venue in the United States District Court for the Middle District of Florida, Tampa Division

## VII.    KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE

As explained above, 472 investors, 8 creditors, and 9 former employees submitted claims in the claims process, and the Receiver allowed $70,128,469.32 in investor claims, $1,118,248.04 in creditor claims, and $12,780.60 in employee claims.  Of the 472 claims from investors, 33 investors elected to receive one or more of the websites that TGC had assigned to them and forfeit their right to monetary distributions from the Estate.  Pursuant to the approval of these claims, the Receiver transferred 69 websites to the 33 investors and satisfied $7,890,102.70 in potential monetary claims against the Estate.

## VIII.    RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP AND CONCLUSION

The Receiver recommends the Receivership continue to preserve and maximize the value of the Estate's assets for the benefit of the investors and creditors of the Estate while the Receiver and her Broker finalize the sale of the Estate's remaining assets, and for the Receiver to conclude the claims process and propose and implement any distribution plan which the Court may approve. Until further order of the Court, the Receiver will continue to work with her team of professionals to locate, marshal, and preserve all known and potential assets of the Estate in accordance with the Appointment Order.  Further, the Receiver will continue to investigate, pursue, and litigate existing

and potential claims against third parties, affiliates, and insiders on behalf of the Estate. The Receiver will also continue to investigate and gather information regarding the Defendants' assets through subpoenas, depositions, and other inquiries to financial institutions, and other entities and persons with any connection to the Defendants to discover additional potential claims against third parties, affiliates and insiders and other sources of recovery for the Estate.

The Receiver will continue to perform all other duties as mandated by the Appointment Order and will continue updating the Court on a quarterly basis as to the status and activities of the Receivership and business operations of TGC.

Respectfully submitted this 1st day of November, 2021.

Respectfully submitted,

*/s/ Kenneth Dante Murena*
Kenneth Dante Murena, Esq.
Florida Bar No. 147486
DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
Email: kmurena@dvllp.com
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*

*Admitted Pro Hac and General Admission*
*to Northern District of Illinois*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on November 1, 2021 on all counsel or parties who have appeared in the above-styled action.

*/s/Kenneth Dante Murena*
Kenneth Dante Murena,
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*