**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) |
| **Plaintiff,** | ) ) ) **Civil Action No. 1:19-CV-08454** |
| **v.** | ) ) **Hon. Andrea R. Wood** |
| **TODAY'S GROWTH CONSULTANT, INC. (d/b/a THE INCOME STORE),** | ) ) ) ) |
| **and** | ) ) |
| **KENNETH D. COURTRIGHT, III,** | ) ) ) |
| **Defendants.** | ) ) |

**RECEIVER'S FOURTH, FIFTH, AND SIXTH INTERIM APPLICATION FOR AN
ORDER APPROVING AND AUTHORIZING PAYMENT OF FEES
AND EXPENSES OF RECEIVER AND HER PROFESSIONALS**

Melanie E. Damian, Esq., the court-appointed receiver ("Receiver") in the above-captioned United States Securities and Exchange Commission (the "SEC") enforcement action, files her fourth, fifth, and sixth interim applications (the "Application") seeking the Court's (a) approval of all of the fees and costs that the Receiver and her professionals incurred for the 9 month period from October 1, 2020, through June 30, 2021, which includes the time period of the Fourth, Fifth and Sixth Status Reports (the "Application Period"); and (b) authorization to immediately pay 80% of the fees (with a 20% holdback) and all of the costs from funds held in the receivership estate (the "Estate") when such funds are available. In support of her Application, the Receiver states as follows:

I.    **SUMMARY**

During the nine-month Application Period, the Receiver and her professionals worked diligently to carry out the duties and responsibilities of the Receiver pursuant to the Order Appointing Receiver [ECF No. 19] (the "Receivership Order") and the Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief [ECF No. 20] (the "TRO").  All such work is described in detail in the Receiver's Fourth, Fifth, and Sixth Status Reports filed with the Court on February 1, 2021, April 30, 2021, and August 6, 2021, respectively. *See* ECF Nos. 115, 127, 158.

In performing this work, the Receiver and her lead counsel in Florida, Damian & Valori LLP ("Lead Counsel"), incurred $449,165.50 in fees and $4,719.35 in costs.  And, the Receiver's local counsel in the Northern District of Illinois, Rachlis Duff & Peel, LLC ("Illinois Counsel"), incurred $9,069.00 in fees and no costs.  Further, the Receiver's local counsel in the Eastern District of Pennsylvania, Semanoff Ormsby Greenberg & Torchia, LLC ("Pennsylvania Counsel"), incurred $825.00 in fees and no costs.  And, the Receiver's forensic accountant and financial and tax consultant, Kapila Mukamal LLP (the "Forensic Accountant"), incurred $345,995.50 in fees and $1,562.48 in costs.    Finally, the Receiver's transactional counsel, Maspons Advisory Services ("Transactional Counsel"), incurred $3,950.00 in fees and no costs. As explained in further detail below, the Receiver and most of her professionals capped their hourly rates for this matter at $290, representing a reduction by as much as forty-seven percent (47%), and reduced their fees incurred during the Reporting Period by more than 6 percent (6%).[1]

---

[1] The reduced hourly rates of the Receiver and her professionals and paraprofessionals are set forth in Section V, *infra*.

The foregoing fees and costs were necessary and reasonable to fulfill the Receiver's duties and responsibilities pursuant to the Receivership Order and the TRO. While the fees are significant the large part of the Receivership work has been completed earlier than is normal for a Receivership, including the claims process, a large portion of the complicated distribution of digital assets, transferring value to and reducing the claims of investors by approximately $8 million, and the forensic accounting work to accomplish those tasks. In addition, several fraudulent transfer actions were pursued on a contingency basis that will result in the recovery of $734,026.08, with those actions seeking much larger sums still pending. The Receiver remains hopeful that these actions will provide funds to provide a monetary distribution to claimants in the near future.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

### A. Appointment of Receiver and Employment of Professionals

On December 30, 2019, this Court entered the Receivership Order [ECF No. 19], appointing Melanie E. Damian, Esq. as Receiver of Today's Growth Consultant, Inc. d/b/a The Income Store ("TGC" or the "Receivership Defendant").[2] The Receivership Order authorizes the Receiver "[t]o engage and employ persons in her discretion to assist her in carrying out her duties and responsibilities hereunder, including, but not limited to, accountants, attorneys. . . ." *See* Receivership Order [ECF No. 19] at ¶ 8(G). The Receiver, however, must seek Court approval prior to retaining any personnel. *See* Receivership Order [ECF No. 19] at ¶61. Accordingly, the Receiver sought authorization to employ various professionals, including Lead Counsel, Illinois Counsel, Pennsylvania Counsel, and the Forensic Accountant. On January 13, 2020, this Court

---

[2] Capitalized terms herein not otherwise defined are given the definition ascribed to such terms in the Court's Orders.

entered an order approving the Receiver's application to employ Lead Counsel, Illinois Counsel and Pennsylvania Counsel. ECF No. 30. And on January 30, 2020, the Court approved the Receiver's application to employ the Forensic Accountant. ECF No. 42.

### B. Compensation and Reimbursement of Expenses

Pursuant to the Receivership Order, the Receiver and her court-approved professionals are entitled to reasonable compensation for services rendered and reimbursement of expenses incurred in connection therewith. *See* Receivership Order [ECF No. 19] at ¶62. To receive such compensation and reimbursement, the Receiver is required to, within forty-five (45) days after the end of each calendar quarter, file with the Court an application for payment from the Receivership Estate of the fees and costs incurred by the Receiver and her court-approved professionals during the prior calendar quarter. *See* Receivership Order [E.C.F. No. 19] at ¶ 63. On July 7, 2021, the Court approved the Receiver's unopposed motion for extension of deadline to file her fourth and fifth interim applications. *See* ECF 148. On September 3, 2021, the Court approved the Receiver's unopposed joint motion for extension of deadline to file her fourth, fifth, and sixth interim applications. On September 7, 2021, the Court held a status conference hearing at which the Court further extended the deadline for the Receiver to file her Fourth Quarter 2020, First Quarter 2021 and Second Quarter 2021 fee applications to coincide with the filing of the Receiver's Third Quarter 2021 status report on October 30, 2021. *See* ECF No. 169. The Court further requested that the Receiver provide the parties with a draft of the combined fee application by September 30, 2021. *See id*. Accordingly, the Receiver files this application for payment of fees and costs (the "Fee Application") seeking the Court's approval of all of the fees and costs that the Receiver and her professionals incurred during the nine-month Application Period, and authorization to pay 80% of the fees (with a 20% holdback) and 100% of the costs.

### C. Financial Condition and Receipts and Disbursements of Estate Since Inception of Receivership

Following the entry of the Appointment Order, the Receiver filed her initial report [ECF No. 45] detailing the financial condition of the Estate. *See* ECF No. 45. The Receiver with the assistance of her forensic accountants analyzed the business operations and determined that without additional investor funds the operations were not sustainable even in the short term. *See id*. Even with substantial infusion of investor funds, TGC's records indicated a loss in 2018 of ($5.7 million) and in 2019 of ($7.5 million). *See id*. The payroll expense alone exceeded the website/e-commerce revenue. *See* ECF No. 45-6. As a result, the Receiver terminated the employment of nearly all of TGC's workforce of approximately 110 employees, while retaining 6 IT employees necessary to preserve and maintain TGC's digital assets including the vast domain portfolio, which was the most valuable remaining asset of the Estate. *See* ECF No. 45. The Receiver's initial report further detailed the receipts and disbursements of the Estate. *See id*. In particular, the Receiver reported that at the time of the Appointment Order the Estate had $159,520.23 in funds available which included receipts from website revenue and transfers from TGC's bank accounts. *See* ECF No. 45-1. The Receiver's initial report further detailed disbursements in the first thirty (30) days of the Receivership through January 30, 2020, in the amount of $60,110.30 for, among other things, payroll for the Receiver's IT professionals and utility bill payments for TGC's office location. *See id*.

The Receiver's quarterly status reports continued to provide updates on the receipts and disbursements of the Estate necessary to preserve and maintain the Estate's digital assets until such a time that the District Court entered an Order on the Receiver's Motion to Approve the Claims Administration Process and Partial Plan of Distribution filed on February 28, 2020 [ECF No. 53], which, if granted, would authorize the Receiver to liquidate the Estate's assets including the

domain portfolio. The Receiver's second status report, covering the five-month period from February 1, 2020 through June 30, 2020, reported the Estate's receipts of $910,343.14, the majority of which came from operating the websites to the extent possible, and disbursements of $404,472.15 for expenses necessary to satisfy payroll for the Receiver's IT professionals and the ongoing carrying costs of maintaining the domains and websites. *See* ECF No. 81-1. The Receiver's second status report further detailed the complexity of maintaining the value of the Estate's domain portfolio and websites as well as the day-to-day issues that would arise on connection therewith. The Receiver explained the critical importance of the role played by the Receiver's IT professionals in maintaining the websites and domains as they possessed detailed working knowledge of TGC's website operations and ownership/domain structure. *See* ECF No. 81. The skill and knowledge of the Receiver's IT professionals would also prove crucial in administrating the claims process and transferring websites and domains to investors and buyers.

The Receiver's third status report, covering the period from July 1, 2020 through September 30, 2020, reported the Estate's receipts in the amount of $406,150.79 which included $70,034 in sale proceeds from the Receiver's auction sale of physical assets remaining at TGC's office. *See* ECF No. 101-1. These receipts begin to show the declining revenues generated by the websites and the depreciation of the digital assets without the influx of investor funds to continue a high level of operations. *See* ECF No. 101-1. The Receiver's third status report further detailed the Estate's disbursements in the amount of $659,706.80 to cover (i) payroll for the Receiver's IT professionals, (ii) the carrying costs for maintaining the Estate's digital assets, including investing in updated content of the websites in an attempt to preserve their value,[3] and (iii) payment of

---

[3] After the third reporting period, the Receiver determined that paying to maintain the Estate's Shopify websites was becoming too expensive in light of the decreasing revenue generated by the digital assets and decided to shut down those websites as a cost-saving measure.

professional fees and costs incurred by the Receiver and her counsel ($278,659.71) and the Receiver's forensic accountants ($101,339.25) from the inception of the Receivership on December 30, 2019 through the end of the second reporting period on June 30, 2020, as authorized by Court Order. *See id*; *see also* ECF Nos. 97, 98. The payment of professional fees and costs reported in the Receiver's third status report represents the first instance in which the Receiver and her professionals received any payment from the Estate for the work they performed and costs they incurred in this Receivership.

In her fourth status report that covered the period from October 1, 2020 through December 31, 2020, the Receiver reported the Estate's receipts in the amount of $238,465.27, which included $48,649.19 in sale proceeds from an additional auction sale of physical assets from TGC's office. *See* ECF No. 115-1. The Receiver further detailed the Estate's disbursements during this reporting period in the amount of $394,361.21, the majority of which covered the carrying costs associated with maintaining the Estate's digital assets. *See id*. Because of the slow down in proceedings associated with COVID19, the Estate was diminishing in value and by the fourth quarter operating at a deficit, however, the Receiver's pending motion to approve a claims process that included potentially providing websites to claimants required maintenance of the websites. The Estate's disbursements further included payment of professional fees and costs incurred by the Receiver and her counsel ($73,978.88) and the Receiver's forensic accountant ($45,270.83) during the third quarter of 2020 (the third reporting period), as authorized by Order of the District Court. *See id*; *see also* ECF No. 111. The Receiver did not seek approval of the fees and costs incurred by the Receiver and her professionals during the fourth quarter of 2020 (the fourth reporting period), and this Court granted the Receiver an extension of time to do so, because the Estate did not have sufficient funds to pay such fees and costs.

The Receiver's fifth status report, covering the time period January 1, 2021 through March 31, 2021, reported the Estate's receipts in the amount of $238,782.56, which included $72,500 in settlement proceeds recovered from third-party transferees (*see infra*). *See* ECF No. 127-1. Further, the report detailed the Estate's disbursements during the reporting period in the amount of $330,262.42 for expenses incurred to preserve the Estate's digital assets to be sold or transferred to investors in the claims process. *See id*. Given that the Estate's receipts during the fifth reporting period again were less than its disbursements, the Estate did not have sufficient funds to pay the outstanding fees and costs of the Receiver and her professionals. As such, the Receiver filed a motion for extension of time to file the Receiver's fourth and fifth fee applications seeking the approval and payment of professional fees and costs incurred during the fourth and fifth reporting periods until the auction sale of the Estate's digital assets after which the Receiver anticipated there would be sufficient funds in the Estate to pay those fees and costs. *See* ECF No. 118.

The Receiver's sixth status report, covering the time period from April 1, 2021 through June 30, 2021, detailed the Estate's receipts in the amount of $440,620.27, which included $316,526.08 in settlement proceeds recovered from third-party transferees (*see infra*). *See* ECF No. 158-1. The Receiver's sixth status report further detailed the Estate's disbursements during the reporting period in the amount of $255,428.96. *See id*. Without the recoveries from the third-party transferees, the Estate's receipts would have been significantly less than its disbursements due to the diminishing value and revenues of the digital assets as they were being preserved to the best of the Receiver's ability for sale or transfer to investors.

The Receiver's seventh status report, covering the time period from July 1, 2021 through September 30, 2021, detailed the Estate's receipts in the amount of $211,349.81 including an

additional $3.53 in interest accrued in the Receiver's operating bank account.[4]  The Receiver's seventh status report further detailed the Estate's disbursements during the reporting period in the amount of $188,415.76.

### D.  Court-Approved Claims Process

The Receiver's sixth status report also detailed the then current status of the Court-approved claims process and partial distribution plan.  *See* ECF No. 158.  Following the entry of the District Court's Memorandum and Opinion Order granting the Receiver's Claims Process Motion [ECF No. 109], on December 15, 2020, the Receiver sent Claims Packages to 856 potential claimants (including government taxing agencies).   With the assistance of her forensic accountants, the Receiver began immediately processing completed claim forms, analyzing documentation provided by investors to support their claims, and comparing investor information with TGC's books and records as compiled and organized by the Receiver's forensic accountants in addition to their forensic reconstruction of TGC's bank accounts in order to determine which investors had allowed claims and to formulate her final determinations.  The Receiver approved claims for monetary distribution to investors totaling approximately $70,128,469.32, to creditors totaling approximately $1,118,248.04, and to former employees totaling approximately $12,780.60.  Of the 472 claims from investors, 33 investors elected to receive one or more of the websites that TGC had assigned to them, thereby forfeiting their right to monetary distributions from the Estate.  The Receiver's approval of the claims of those 33 investors resulted in the turnover of 69 websites and eliminated $7,890,102.70 in potential monetary claims against the Estate.

---

[4] As of the filing of this fee application, the Receiver has not yet received an ECF Number for her seventh status report.

### E. Liquidation Sale of the Estate's Remaining Assets

The Receiver worked with her IT professionals to transfer websites to investors with allowed claims that elected to receive their website as part of the Court-approved claims process. To maximize the value of the Estate's remaining assets, the Receiver determined that the websites and domains not transferred to investors, as well as the Estate's other remaining assets, would be liquidated in an online auction sale. As such, on April 7, 2021, the Receiver filed her Motion to Approve the Sale of the Estate's Assets. *See* ECF No. 123. The Receiver's digital asset broker, who specializes in marketing and selling digital assets, websites and domains in particular, advertised the sale of TGC's assets to hundreds of industry buyers around the world to generate interest and maximize the proceeds of the sale of the assets at the online auction. The Receiver set up a confidential data room that hosted traffic and revenue information for the Estate's domain portfolio to permit bidders to conduct their due diligence on the assets prior to registering for the auction sale. As detailed in her sixth status report, the Receiver and her digital asset broker registered over 150 bidders for two separate auction sales for the remaining assets of the Estate. However, the digital assets did not receive a bid at the reserve price at either of the two auction sales. As such, the Receiver sought and obtained from this Court permission to directly negotiate the sale of the Estate's remaining assets with third parties in lieu of an online auction sale. *See* ECF No. 162. To date, the Receiver has sold 408 websites directly to third parties generating a total of $470,150.00 for the Estate.[5] The Receiver and her IT professionals are finalizing the transfer of the purchased websites to their respective buyers and will collect the purchase prices

---

[5] Each invoice generated by the Receiver's Broker and sent to the third-party buyers included a "Buyer's Premium" - an additional charge of 1.5% of the total purchase price that was added to each invoice to cover the Broker's fees associated with banking charges, processing fees, and wire fees. The combined Buyer's Premium for all invoices issued by the Broker totaled $7,089.76, which amount was paid by the buyers.

from the third-party escrow account upon completion of the transfers. On October 27, 2021, the Receiver and her digital asset Broker held a no-reserve online auction sale to sell the remaining digital assets and generate additional funds for the Estate. The October 27, 2021 online auction sale resulted in the sale of 103 websites generating $89,150 in sale proceeds, which will be remitted to the Estate (after deducting the Broker's commission) in short order. Several buyers have requested to review the database of remaining websites and domains so they may submit offers to purchase additional assets. Finally, the Receiver has contacted investors with allowed claims to determine if any of them are interested in the websites or domains either for purchase or in exchange for a reduction in their monetary claims against the Estate. After the Application Period, one investor elected to modify his monetary claim to request a website previously assigned to him in exchange for a reduction of his monetary claim. This modification resulted in a reduction of his monetary claim and a savings for the Estate in the amount of $16,653. The Receiver is continuing to explore this option to maximize recovery to the investors.

### F. Receiver's Actions Against Third Parties and Recoveries

In addition to the sale of the Estate's remaining assets, the Receiver continues to litigate and settle claims against third parties, affiliates, and insiders including fraudulent transfer actions filed by the Receiver against the following parties:

- Heartland Bank & Trust Company and PNC Bank, N.A.; Case No. 1:20-cv-07819; Venue in the United States District Court for the Northern District of Illinois;

- William Courtright and Courtright Consulting, Inc.; Case No. 2:20-cv-01012; Venue in the United States District Court for the Middle District of Florida;

- Asher Milgrom, Danial Giordano, Daniel Meyer, and JDS Consulting, LLC; Case No. 5:20-cv-06546; Venue in the United States District Court for the Eastern District of Pennsylvania;

- o Don Shire Ministries, Joliet Catholic Academy, Legacy Families, and Messiah Lutheran Church; Case No. 1:20-cv-07817; Venue in the United States District Court for the Northern District of Illinois;
  - On May 7, 2021, this Court entered an Order approving the Receiver's settlement with Don Shire Ministries in the amount of $50,000. *See* ECF No. 130.
  - On November 1, 2021, the Receiver filed a Motion to approve the Receiver's settlement with Joliet Catholic Academy in the amount of $100,000. *See* ECF No. 173.

- o Conklin Web Properties, LLC d/b/a Conklin Media, Conklin Media, LLC, Prospect MX, LLC, Dave Conklin, Jodi Conklin, Emily Lasko, and Haley Hirthler; Case No. 5:20-cv-06297; Venue in the United States District Court for the Eastern District of Pennsylvania;

- o Empire Flippers, LLC and CMS United, Inc.; Case No. 1:20-cv-07811; Venue in the United States District Court for the Northern District of Illinois;
  - On May 7, 2021, this Court entered an Order approving the Receiver's settlement with CMS United, Inc. and Empire Flippers in the amount of $250,000. *See* ECF No. 130. Empire Flippers paid this amount plus an additional $66,526.08 not subject to a contingency fee to the Receiver's counsel.

- o Mike Engstrom; Case No. 1:20-cv-07087; Venue in the United States District Court for the Northern District of Illinois;
  - On September 7, 2021, this Court entered an Order approving the Receiver's settlement with Michael Engstrom in the amount of $290,000. *See* ECF No. 171.

- o William Longcore; Case No. 5:20-cv-06538; Venue in the United States District Court for the Eastern District of Pennsylvania;
  - On May 7, 2021, this Court entered an Order approving the Receiver's settlement with William Longcore in the amount of $22,500. *See* ECF No. 130.

- o Ronald Fossum; Case No. 2:20-cv-01868; Venue in the United States District Court for the Western District of Washington;

- o Pepperdine University; Case No. 1:21-cv-02371; Venue in the United States District Court for the Northern District of Illinois;

- o EIN Cap, Inc., Alpha Capital Source, Inc., BMF Capital, LLC, FundKite, LLC, AKF, Inc., World Global Capital, LLC, Fox Capital Group, Inc., High Five Group, LLC, and Sutton Funding NY, Inc.; Case No. 21-cv-01792;

Venue in the United States District Court for the Northern District of Illinois;

- On September 9, 2021, this Court entered an Order approving the Receiver's settlement with Sutton Funding NY, Inc. in the amount of $55,000. *See* ECF No. 170.

o Click Intelligence, Ltd.; Case No. 1:20-cv-11066; Venue in the United States District Court for the Southern District of New York; and

o Cody Neer.; Case No. 1:21-cv-01999; Venue in the United States District Court for the Middle District of Florida, Tampa Division.

The Receiver and her counsel have successfully resolved several of the foregoing claims and have recovered or will recover significant funds for the Estate, a portion of which was applied or will be applied to pay the Court-approved contingency fees for the work performed by the Receiver's counsel in connection with pursuing such claims, as detailed below:

William Longcore (approved by Court):
Settlement: $22,500
33% Fee: $7,425
Approximate Net to Estate: $15,075

Don Shire Ministries (approved by Court):
Settlement: $50,000
33% Fee: $16,500
Approximate Net to Estate: $33,500

Empire Flippers (approved by Court):
Settlement: $250,000
33% Fee: $82,500
Additional Payment: $66,526.08
No Additional Fee
Total Payment: $316,526.08
Approximate Net to Estate: $234,026.08

Mike Engstrom (approved by Court):
Settlement: $290,000 ($90,000 plus $200,000 within 1 year)
33% Fee: $95,700
Approximate Net to Estate: $194,300

Sutton Funding (approved by Court):
Settlement: $55,000 ($15,000 plus $5,000 per month for 8 months)
33% Fee: $18,150

Approximate. Net to Estate: $36,850

Total Settlement Amounts Approved by Court: $734,026

Total Settlement Amounts the Estate Received to Date: $479,026.08

Total Contingency Fees Approved by Court: $220,275 (30% reduced from 33% as third party Empire Flippers provided additional $66,526.08 from which the Receiver's counsel did not receive fees)

Total Approximate Net Recovery the Estate Will Receive Upon Full Payment of Settlement Amounts: $513,751.08

Total Approximate Net Recovery the Estate Received to Date: $342,901.08 (still owed $134,000 net from Engstrom settlement and $36,850 net from Sutton Funding settlement)

Total Contingency Fees Paid to Date: $136,125 (28% reduced from 33% as third-party Empire Flippers provided additional $66,526.08 from which the Receiver's counsel did not receive fees)

After the instant Application Period, the Receiver reached a settlement with one of the third-party transferees, Joliet Catholic, for $100,000 (with an initial payment of $50,000 and $10,000 to be paid each subsequent month for 5 months). The Receiver filed a Motion to approve the settlement agreement, which is pending before this Court. In the event this Court approves this settlement and the disbursement of the 33% contingency fee to the Receiver's counsel in the amount of $33,333.33, the Estate will receive a net recovery of approximately $66,666.67.

## III.    CASH ON HAND AND REVENUES OF THE RECEIVERSHIP DEFENDANT DURING THE APPLICATION PERIOD

As of the end of the Application Period, the Receiver held a total of $180,938.08 in cash on hand in her fiduciary account for the Receivership Estate at City National Bank in Miami, Florida.[6] These funds comprised revenues from the business operations, and the balances in

---

[6] Currently, the Receiver does not have sufficient funds in her fiduciary account for the Receivership Estate to pay all the fees and costs for which approval and authority to pay is sought

accounts, of the Receivership Defendant during the Application Period. *See* Receiver's Sixth Status Report [ECF No.158].

The SEC's Standardized Fund Accounting Report (the "SFAR") for the Application Period is attached hereto as **Exhibit A**. Further, a full summary of the receipts and disbursements of the Estate as of the end of the Application Period is set forth in section V of the Receiver's Fourth, Fifth and Sixth Status Reports. *See* ECF Nos. 115, 127, 158.

After the Application Period, the Receiver recovered the initial settlement payment of $90,000 from Mr. Engstrom, the initial settlement payment of $15,000 from Sutton Funding, and the first $5,000 monthly settlement payment from Sutton Funding. Therefore, as of the filing of this Fee Application, the Estate has cash on hand in the amount of $125,340.64.

## IV. WORK PERFORMED BY THE RECEIVER AND HER PROFESSIONALS DURING THE APPLICATION PERIOD

The Receiver's Fourth, Fifth, and Sixth Status Report describes in detail the work performed by the Receiver and her professionals during the Application Period. *See* ECF No. 115, 127, 158. The complete time records for such work are set forth in the invoices attached hereto as **Exhibits B through F**. In particular, the time records describing the work performed by the Receiver and Lead Counsel are set forth in the invoices attached hereto as **Exhibit B**. And, the time records for the work performed by Illinois Counsel are set forth in the invoices attached hereto as **Exhibit C**. Further, the time records describing the work performed by Pennsylvania Counsel are set forth in the invoices attached hereto as **Exhibit D**. And, the time records for the work performed by the Forensic Accountant are set forth in the invoices attached hereto as **Exhibit E**.

---

in this Fee Application. The Receiver proposes to pay such fees and costs upon the Receivership Estate's receipt of sufficient funds through TGC's business operations and/or the sale of the Estate's assets.

Finally, the time records for the work performed by Transactional Counsel are set forth in the invoice attached hereto as **Exhibit F**.

## V.   REDUCED HOURLY RATES AND FEES

As explained above, the Receiver, Lead Counsel and the Forensic Accountant capped their hourly rates at $290 for this matter in accordance with the agreement between the Receiver and the SEC.[7]   And, Pennsylvania Counsel capped their hourly rates at $300, and Illinois Counsel capped their hourly rates at $440.  The foregoing caps represent significant reductions from the standard hourly rates of the Receiver and her professionals and will result in significant savings for the Receivership Estate.[8]   In fact, the Receiver and her Lead Counsel reduced their rates by as much as 47% and her Forensic Accountant reduced its rates by as much as 41%.

In addition to significantly reducing their hourly rates, the Receiver and her Lead Counsel reduced their fees by approximately $28,030.79 (6.24%).  And neither the Receiver nor her professionals billed for the time expended while traveling, preparing this Fee Application, or preparing and finalizing their invoices.  As a result of the reduced rates and fees, the blended hourly rate (total fees incurred divided by total hours expended) for the Receiver and Lead Counsel during the Application Period was only $237.42.[9]

---

[7] While the Forensic Accountant capped its hourly rates at $290 for general forensic accounting and financial consulting work, any expert witness and tax consulting services it may be asked to provide will be billed at its standard hourly rates.

[8] For example, the Receiver's and her Lead Counsel's hourly rates have been reduced as follows:

| | |
|---|---|
| a) Partners (including Receiver) – | From $500-$550 reduced to $290 |
| c) Of Counsel – | From $350-$550 reduced to $275-$285 |
| d) Associate Attorneys – | From $175-$350 reduced to $200-$265 |
| e) Non-attorney professionals – | From $125-$175 reduced to $75-$150 |

[9] The blended hourly rates for the Receiver's other professionals were as follows:

## VI.     REQUEST FOR FEES AND COSTS

As set forth in paragraphs 62 and 63 of the Receivership Order, the Receiver is authorized to seek compensation for her activities and those of her retained professionals.  *See* ECF No. 19. Accordingly, by this Application, the Receiver is seeking this Court's approval of all of the fees and costs incurred by the Receiver and her professionals during the Application Period, and authorization to pay from the funds in the Estate 80% of such fees (with a holdback of 20% of the fees) and 100% of such costs.

As reflected in the attached invoices, the total amount of fees and costs incurred by the Receiver and each of her professionals during the Application Period (October 1, 2020 through June 30, 2021) is as follows:

   a.  The Receiver and Damian & Valori, LLP incurred fees and costs totaling $453,884.85 (including $449,165.50 in fees and $4,719.35 in costs).  ***See* Exhibit B**.

   b.  Rachlis Duff & Peel, LLC (Illinois Counsel) incurred fees and costs totaling $9,069.00 (including $9,069.00 in fees and no costs).  *See* **Exhibit C**.

   c.  Semanoff Ormsby Greenberg & Torchia, LLC (Pennsylvania Counsel) incurred fees and costs totaling $825.00 (including $825.00 in fees and no costs).  *See* **Exhibit D**.

---

a)  Illinois Counsel:  $276.49
b)  Pennsylvania Counsel:  $300.00
c)  Forensic Accountant:  $234.54
d)  Transactional Counsel:  $500.00

     d.  Kapila Mukamal. LLP (Forensic Accountant) incurred fees and costs totaling $347,557.98 (including $345,995.50 in fees and $1,562.48 in costs). *See* **Exhibit E**.

     e.  Maspons Advisory Services (Transactional Counsel) incurred fees and costs totaling $3,950.00 (including $3,950.00 in fees and no costs). *See* **Exhibit F**.

## VII.   CERTIFICATION OF CONFERENCE

Undersigned counsel for the Receiver hereby certifies that he provided the attached invoices to counsel for the SEC and to Defendant Courtright prior to filing this Fee Application. Counsel for the SEC informed the undersigned that the SEC objects to the Receiver's Fee Application to the extent that the Receiver asks to have her fees paid from the net proceeds of the third-party contingency fee actions, when the Receiver agreed to a separate fee structure for those actions and has already been paid in accordance with the agreed-to structure for those actions. The SEC further objects to the Receiver's request for authority to pay the requested fees and costs in amounts that exceed the Receivership Estate's current assets, without returning to the Court. Defendant Courtright does not object to the Receiver's requested relief.

## VIII.   CERTIFICATION OF RECEIVER

The undersigned certifies that:

(a)   I have read this Application;

(b)   to the best of my knowledge, information and belief formed after reasonable inquiry, the Application and all fees and expenses therein are true and accurate;

(c)     all fees contained in the Application are based on the rates listed in the Exhibits attached hereto and such fees are reasonable, necessary and commensurate with the skill and experience required for the activity performed;

(d)     I have not included in the amount for which reimbursement is sought the amortization of the cost of any investment, equipment, or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth herein for photocopies and facsimile transmission);

(e)     in seeking reimbursement for a service which I justifiably purchased or contracted for from a third party (such as copying, imaging, bulk mail, messenger service, overnight courier, computerized research, or title and lien searches), I require reimbursement only for the amount billed to me by the third-party vendor and paid by me to such vendor.  To the extent that such services were performed by me as Receiver, I certify that I am not making a profit as Receiver on such reimbursable service; and

(f)     I have not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

Respectfully submitted and certified,

 /s/ Melanie E. Damian
MELANIE E. DAMIAN, RECEIVER


WHEREFORE, Melanie E. Damian, as Receiver, respectfully requests that the Court enter an Order:[10]

---

[10] A copy of a proposed order granting the Receiver's Fourth Application for Order Authorizing Payment of Fees and Expenses is attached hereto as **Exhibit F**.

(a)    approving the total amount of fees and costs for the Application Period of: the Receiver and Lead Counsel, Damian & Valori LLP, in the amount of $453,884.85 Illinois Counsel, Rachlis Duff & Peel, LLC, in the amount of $9,069.00; Pennsylvania Counsel, Semanoff Ormsby Greenberg & Torchia, LLC, in the amount of $825; Forensic Accountant, Kapila Mukamal, LLP, in the amount of $347,557.98; and Transactional Counsel, Maspons Advisory Services, in the amount of $3,950.00;

(b)    authorizing payment of 80% of the fees and 100% of the costs to: Damian & Valori LLP in the amount of $364,051.75 (comprising $359,332.40 in fees (80% of $449,165.50) and $4,719.35 in costs); Rachlis Duff & Peel, LLC in the amount of $7,255.20 (comprising $7,255.20 in fees (80% of $9,069.00) and no costs); Semanoff Ormsby Greenberg & Torchia, LLC in the amount of $660.00 (comprising $660.00 in fees (80% of $825.00) and no costs); Kapila Mukamal, LLP in the amount of $278,358.88 (comprising $276,796.40 in fees (80% of $345,995.50) and $1,562.48 in costs); and Maspons Advisory Services in the amount of $3,160.00 (comprising $3,160.00 in fees (80% of $3950.00) and no costs).

(c)    authorizing payment of such fees and costs upon the Receivership Estate's receipt of sufficient funds without further Court order.


Respectfully submitted this 1st day of November, 2021.

**DAMIAN & VALORI, LLP**
*Counsel for Melanie E. Damian, Receiver*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

*/s/ Kenneth Dante Murena*

Kenneth Dante Murena, Esq.
Florida Bar No. 147486
E-mail: kmurena@dvllp.com

*Admitted Pro Hac Vice and*
*General Admission to N.D. Ill.*

## CERTIFICATE OF SERVICE

I HEARBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on November 1, 2021 on all counsel or parties who have appeared in the above-styled action.

*/s/ Kenneth Dante Murena*
Kenneth Dante Murena, Esq.
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*
(*Admitted Pro Hac Vice and*
*General Admission to N.D. Ill.)*