## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil Action No. 1:19-CV-08454 |
| : | |
| TODAY'S GROWTH CONSULTANT, INC. : | |
| (dba THE INCOME STORE) : | |
| : | |
| and : | |
| : | |
| KENNETH D. COURTRIGHT, III, : | |
| : | |
| Defendants. : | |
| : | |

## <u>RECEIVER'S EIGHTH STATUS REPORT</u>

Melanie E. Damian, the court-appointed receiver ("Receiver") in the above-captioned enforcement action ("SEC Enforcement Action"), submits her eighth status report concerning the status of the Receivership, established pursuant to the Court's Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief [ECF No. 20] ("TRO") and Order Appointing Receiver ("Appointment Order") [ECF No. 19]. This interim report sets forth the Receiver's activities and efforts to fulfill her duties under the Appointment Order for the period from October 1, 2021 through December 31, 2021 (the "Reporting Period").

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................3

II.  PROCEDURAL BACKGROUND.........................................................................5

III.  STATUS AND ACTIVITIES OF THE RECEIVERSHIP AND SUMMARY
OF TGC'S OPERATIONS .....................................................................................7

      A.  *Maintaining TGC's Operations and Websites
and Otherwise Preserving Assets of the Estate*.......................................9
      B.  *Court-Approved Claims Process*............................................................10
      C.  *Communicating with Investors* ...............................................................11
      D.  *Online Auction Sale for Assets of the Estate*..........................................12
      E.  *Receiver's Financial Advisor and Forensic Accountants*......................13
      F.  *Pursuing and Preserving Claims Against Third Parties,
Affiliates, and Insiders* ...........................................................................14

IV.  CASH ON HAND AND ACCRUED EXPENSES OF ESTATE ....................15

V.  DISBURSEMENTS OF ESTATE........................................................................16

VI.  KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE.........................17

VII.  KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE ......................19

VIII.  RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP AND
CONCLUSION.......................................................................................................19

## I.   INTRODUCTION

Since her appointment on December 30, 2019, the Receiver, with the assistance of her retained professionals, including her lead counsel, local counsel, and forensic accountants, has worked diligently to continue to fulfill her duties and obligations as set forth in the Appointment Order and to preserve the assets and records of the Receivership Estate ("Receivership Estate" or "Estate").   In particular, the Receiver took control of all known assets of Defendant Today's Growth Consultant d/b/a The Income Store ("TGC"), including but not limited to the many websites and domains owned by TGC, its business operations, and all other known assets.  And the Receiver worked on identifying and marshaling all other assets of TGC, including without limitation funds held in bank accounts, funds transferred to or in the possession of third parties, and other personal property of TGC.  The Receiver and her counsel also communicated with investors and answered inquiries regarding, among other things, the status of the SEC Enforcement Action, the claims process and timing of investor distributions, the status and condition of TGC's websites and revenue generated therefrom, the results of the sales of TGC's digital assets, and the Receiver's efforts to recover assets from third parties, affiliates and insiders for the benefit of the Estate.

During the Reporting Period, the Receiver continued to work with her Court-approved digital asset broker, Right of the Dot, LLC ("Broker"), to organize and facilitate the final online auction sale to be held on October 27, 2021 for the Estate's assets comprised of the Estate's remaining digital assets (the "Assets") separated into individual lots.  The Receiver communicated with bidders, granted access the secure data room which housed confidential asset information, and worked with her Broker to market the final auction sale to generate interest in the Assets to maximize recovery for the Estate.  Following the conclusion of the final auction sale, the Receiver

worked with her Broker to further negotiate the sale of the Estate's domains to third parties with the goal of liquidating all remaining digital Assets of the Estate to generate additional funds cover the administrative expenses of the Estate while the Receiver pursues her claims against third parties, affiliates and insiders to recover significant funds for the benefit the investors with allowed claims. The Receiver continued to work with her IT professionals to complete the transfer of all domains and websites to buyers as well as finalizing the transfer of any domains and websites to investors with content yet to be fully transferred as part of the Court-approved claims process.

Immediately after the final auction sale of the Estate's digital Assets, the Receiver worked with her IT professionals to preserve and archive any remaining website files and content on the Estate's servers. Further, the Receiver continued to formulate, monitor, and institute practices that reduce operational costs including, among other things, transferring the day-to-day IT operations and control of TGC's email accounts, cloud storage, and domain management to the Receiver's counsel team to streamline and finalize the transfer of websites and domains to buyers and to preserve the value of the remaining Assets until they are sold. Transferring all remaining operations to the Receiver's counsel team helped to reduce the significant monthly costs associated with maintaining the Assets of the Estate.

Also during the Reporting Period, the Receiver and her counsel continued to receive and process late-filed claims from investors who may not have received notice of the Court-approved claims process and amended claims from investors who had submitted timely claims. The Receiver analyzed and determined whether, and the extent to which, to allow each such claim.

As detailed in her prior status reports, the Receiver continued to litigate the Estate's claims against third parties, affiliates and insiders of the Defendants who improperly received significant recoverable transfers from TGC without providing reasonably equivalent value in exchange

4

therefor and/or facilitated and assisted TGC and its principal Defendant Kenneth D. Courtright, III ("Courtright") to perpetrate the fraud that is the subject of this enforcement action and receivership. During the Reporting Period, the Receiver continued to advance the recovery actions and pursue expeditious resolutions of the Receiver's claims through judicial settlement conferences and settlement negotiations. During the Reporting Period, the Receiver reached a settlement with one of the Defendants which this Court approved. *See* ECF Nos. 173, 176. Additionally, the Receiver collected additional settlement amounts from third parties with whom she previously settled claims.

## II.    PROCEDURAL BACKGROUND

The Appointment Order entered on December 30, 2019, among other things, directs the Receiver to file with the Court within thirty (30) days after the end of each calendar quarter her report and recommendations regarding the status and activities of the Receivership Estate and TGC's business operations during the prior calendar quarter. *See* ECF No. 19. In particular, the Receiver's quarterly status reports are required to include: (1) a summary of the operations of the Receiver; (2) a summary of cash on hand, accrued administrative expenses, and the amount of unencumbered funds in the Estate; (3) a schedule of the Estate's receipts and disbursements; (4) a description of all known Assets of the Estate; (5) a description of liquidated and unliquidated claims held by the Estate; (6) a list of all known creditors of the Estate; (7) a status of Creditor Claims Proceedings (once commenced); and (8) the Receiver's recommendations for a continuation or discontinuation of the receivership. *See* ECF No. 19 at pp. 21-22.

On January 30, 2020, as required under the Appointment Order, the Receiver filed her Initial Status Report, which described, among other things, the Receiver's activities and efforts to fulfill her obligations under the Appointment Order during the first thirty (30) days of the

receivership. *See* ECF No. 45. Importantly, in her Initial Status Report, the Receiver concluded that TGC's business records confirm the allegations as set forth in the SEC's Complaint [ECF No. 1]. *See* EFC No. 45. Specifically, because TGC's revenue that was generated from all of the websites each month was significantly less than the monthly payment obligations to the investors and are thus not sufficient to cover both monthly payments to investors as well as TGC's monthly overhead expenses, the Receiver concluded that the long-term costs associated with maintaining and preserving the digital assets of TGC is not in the best interest of the Receivership Estate.[1] *See id*. Based on this conclusion and the Receiver's analysis of the equities of all interested parties, including the investors, the receipts and expenses of TGC's operations and of the Receivership Estate, and likely recoveries of the Estate, the Receiver outlined her proposal to promptly seek Court approval for a claims process and partial distribution plan which provided for, among other things, the transfer of websites to investors electing to receive them in lieu of monetary distributions. *See id*. On February 28, 2020, the Receiver filed her Claims Process Motion. *See* ECF No. 53. The Court granted the Receiver's Claims Process Motion on November 30, 2020 [ECF No. 109] and the Receiver implemented the plan as set forth below in Section III(B) *infra*.

The Receiver's subsequent status reports detailed, among other things, the Receiver's continued efforts to carry out her duties and obligations as set forth in the Appointment Order including, without limitation, her efforts to preserve and maintain the Assets of the Estate. *See* ECF Nos. 81, 101, 115, 127, 160, 172. The Receiver's status reports further detailed the Receiver's and her professionals' efforts to locate and marshal assets for the Estate while minimizing

---

[1] Indeed, since her appointment, the Receiver has detailed in her quarterly status reports the significant expenses associated with merely maintaining the Assets including retaining a skeletal group of IT professionals and the ongoing carrying costs of the domains and websites. *See* ECF Nos. 45, 81, 101, 115, 127, 160, 172.

liabilities, liquidate the Estate's Assets pursuant to this Court's Orders to maximize recovery for the benefit of the Estate, research and bring claims against third parties, affiliates and insiders that received transfers from TGC, implement the Court-approved claims process, and continuously communicate with investors by telephone and email and through the Receivership website to, among other things, assist and answer questions with respect to their participation in the claims process, oversee the transfer of websites to eligible claimants that elected to receive a website as part of the Court-approved claims process, and provide status updates on the Receivership and the SEC Enforcement Action. *See id.*

### III. STATUS AND ACTIVITIES OF THE RECEIVERSHIP AND SUMMARY OF TGC'S OPERATIONS

The Receiver, with the assistance of her professionals, continues to perform all duties and obligations as set forth in the Appointment Order. During the Reporting Period, the Receiver focused her attention and resources on: (A) working with TGC's IT team to maintain and preserve the Assets of the Receivership Estate, including the operating websites and associated domains to preserve the value of the websites prior to sale and transfer; (B) working with TGC's IT team to transfer websites to investors who chose to receive the websites in the claims process; (C) working with her IT team to reduce monthly operational costs including but not limited to server costs and third-party services associated with operational websites while preserving and archiving websites and website content and transferring the control of managing the Estate's domains to the Receiver's counsel team to significantly reduce monthly operational costs; (D) continuing to implement and monitor the Court-approved claims process, receiving, organizing and analyzing completed and amended claims packages while working closely with investors and creditors to answer questions, gathering documentation necessary to properly consider each claim, and approve and deny claims through issuance of Final Determination letters; (E) further

7

communicating with investors to address their questions and concerns regarding the SEC Enforcement Action and the Receivership and to obtain information necessary to effectively manage TGC's digital Assets; (F) continuing to identify, locate, and marshal Assets of the Receivership Estate; (G) working with the Receiver's digital asset Broker to plan for and hold the final online auction sale of the remaining Assets of the Estate and further negotiating sales directly with third parties as authorized by this Court [ECF No. 162]; (H) communicating with and registering bidders for the final online auction sale, exchanging correspondence with potential buyers to answer questions about the digital assets, and providing buyers access to the data room to conduct their due diligence on the Assets; (I) working with her forensic accountant to analyze the books and records of TGC for purposes of determining the amounts transferred between investors or creditors and TGC to assist in processing amended and late-filed claims submitted in the claims process, tracing funds transferred from TGC to insiders, affiliates and third parties, and providing transferee reports to the Receiver and her counsel for purposes of investigating and formulating claims against such transferees; and (J) pursuing the claims of TGC and the Estate by continuing to litigate pending recovery actions against insiders, affiliates and third parties who received significant transfers from TGC without providing reasonably equivalent value, and/or facilitated and assisted TGC and Courtright to commit the fraud that is the subject of the SEC Enforcement Action, investigating additional claims against professionals including counsel and accountants, insiders, affiliates and third parties, and settling claims.[2]

---

[2] As authorized by this Court, the Receiver's counsel are pursuing such recovery claims on a contingency fee basis to preserve the limited resources of the Estate. *See* ECF No. 103.

### A. Maintaining TGC's Operations and Websites and Otherwise Preserving Assets of the Estate

During the Reporting Period, the Receiver continued to work with her professionals and TGC's IT consultants to preserve, maintain and improve TGC's many actively-operating websites to maximize the proceeds of their sale to third parties and the ultimate recovery by the Receivership Estate. The Receiver and her professionals closely monitored the functionality and performance of the websites, identified and resolved issues necessary to maintain their value while reporting these important metrics to investors and potential buyers. The Receiver's IT team continued to be critically important in addressing these and other day-to-day issues that arose and required continual dialogue with the Receiver, her counsel, and her financial advisor and forensic accountant.

During the Reporting Period, the Receiver further worked with TGC's IT consultants to transfer remaining sold or claimed websites and began winding down the IT operations associated with maintaining the websites as the Receiver determined that the continued monthly cost associated with maintaining the websites and their content was not sustainable given that the revenue generated by the websites and the proceeds of their sale was not significant enough to offset the monthly cost associated with maintaining them. Moreover, at the end of the current Reporting Period, the Receiver and her counsel took control from TGC's IT consultants of managing the Estate's remaining digital Assets and continued to negotiate the sale of such Assets to third parties while also transferring domains and other related content to buyers. Going forward, the Receiver and her professionals will finalize transfers of websites, domains and related content to buyers, continue to address any issues that may arise with the Estate's remaining domains and related content, and continue to negotiate the sale of such remaining Assets in accordance with her

duties and obligations under the Court's Orders.  As of December 31, 2021, the Receivership Estate is no longer engaging the IT professionals who were former employees of TGC.

### B. Court-Approved Claims Process

As previously reported, in accordance with this Court's Memorandum and Opinion Order granting the Receiver's Claims Process Motion [ECF No. 109], on December 15, 2020, the Receiver sent Claims Packages to 832 potential claimants (including government taxing agencies) via email and another 24 Claims Packages via U.S. Mail or Federal Express.  Shortly after sending out the Claims Packages, the Receiver and her professionals began receiving, organizing, and processing completed claim forms that claimants had sent to the Receiver's email address established for the claims process (IncomeStoreClaims@dvllp.com).

During the Reporting Period, the Receiver continued to receive and process completed claim forms.[3]  The Receiver also received an amended claim form from a claimant electing to change his remedy from monetary recovery to website turnover. The Receiver and her professionals analyzed and processed this amended claim form and sent out an updated initial determination letter acknowledging the investor's change in remedy.  And, the Receiver continued to communicate with investors and creditors to answer questions regarding her Initial and Final Determination letters and, among other things, the eventual distribution process.

Pursuant to her Final Determinations, the Receiver approved claims for monetary distribution to investors totaling approximately $70,128,469.32, to former employees totaling

---

[3] While the claims bar date was January 15, 2021, the Receiver, to permit as many defrauded investors to submit a claim as possible, agreed to accept completed claims packages after that date from investors who claimed they were not aware of the claims bar date or had difficulty submitting their claims in a timely manner.  During the Reporting Period, the Receiver received two (2) new completed claims forms from investors, processed those claims, and issued determination letters.

approximately $12,780.60, and to creditors totaling approximately $1,118,248.04 ($760,552.17 of which is subordinated to the claims of investors pursuant to an agreed order). Of the 472 claims from investors, 33 investors elected to receive one or more of the websites that TGC had assigned to them and forfeit their right to monetary distributions from the Estate. Pursuant to the approval of these claims, the Receiver transferred 69 websites to the 33 investors and satisfied $7,890,102.70[4] in potential monetary claims against the Estate.

### C. Communicating with Investors

During the Reporting Period, the Receiver continued to regularly communicate with investors through the email accounts, telephone number, and Receivership website established to provide information to, and address the questions and concerns of, investors. In particular, through the email accounts established for the Receivership (IncomeStore@dvllp.com; IncomeStoreClaims@dvllp.com) and telephone number set up soon after the commencement of the Receivership, the Receiver's professionals responded to investors' inquiries regarding (i) the Court-approved claims process and forthcoming distribution plan, (ii) completing the proof of claim form, (iii) transferring websites and corresponding social media channels to the investors pursuant to their elections in the claims process, (iv) requests for reconsideration of the Receiver's Initial Determination of claims, (v) the Estate Assets being sold at the online auction sale and the results of the sale, and (vi) the SEC Enforcement Action and Receivership in general.

The Receiver also continued to receive information from investors regarding website functionality that facilitated the Receiver's maintenance and operation of TGC's many websites.

---

[4] This amount includes the amended monetary claim pursuant to the amended claim form submitted by an investor who elected to modify his claim to receive a website previously assigned to him which resulted in a reduction of his monetary claim and an additional satisfied claim by the Estate in the amount of $16,653.

### D. *Online Auction Sale for Assets of the Estate*

During the Reporting Period, the Receiver continued to work with her Broker to determine the value of TGC's digital and physical Assets, to prepare for and oversee the final online auction sale as well as negotiate the sale of Assets directly to third parties to maximize the recovery for the Estate.

In her prior Status Reports, the Receiver detailed the process for planning and conducting the online auction sales with her Broker as well as private sales directly third parties.[5] During the current Reporting Period, the Receiver and her Broker determined that a final no-reserve online auction sale to be held on October 27, 2021 would be the best way to attempt to liquidate the remaining Assets, maximize the recovery by the Estate, and minimize the associated costs. In preparation for the final no-reserve online auction, the Receiver and her Broker re-organized the remaining Estate Assets into individual lots each requiring a minimum bid of $500.00. The Receiver's Broker marketed this final online auction to its worldwide list of potential buyers of digital assets. The Receiver also worked with her Broker to notify investors and third parties who previously expressed their interest in the Assets to be sold at the final online auction sale. The auction was held on October 27, 2021, and 103 websites/domains were sold, generating gross proceeds totaling $89,150.00 for the Estate. While a number of websites/domains did not sell at

---

[5] The Receiver determined that, in order to maximize the value of the remaining Assets and to streamline negotiations and sales, the best method to liquidate the remaining Assets would be to negotiate private sales directly with interested parties. Thus, on August 4, 2021, the Receiver filed her Motion to Modify this Court's Order Granting the Receiver's Motion to Approve Sale of Estate Assets [ECF No. 131] to Authorize the Receiver to Negotiate the Sale of Asset Groups to Third Parties [ECF No. 156]. On August 10, 2021, this Court granted the Receiver's Motion permitting the Receiver to directly negotiate the sale of the Estate's remaining Assets with third parties. *See* ECF No. 162.

the auction, the Receiver and her Broker continued to negotiate the sale of domains directly to third parties after the auction.

As previously reported, the Receiver has determined that the carrying cost of the websites exceed their value. As such, following the October 27, 2021 final auction sale, the Receiver worked with TGC's IT consultants to convert all remining websites to domains only and continued to negotiate the sale of those domains.

To date, the Receiver and her Broker have negotiated the sale of approximately 890 websites/domains which generated gross sales proceeds totaling $565,733.66 for the Estate.[6] The Receiver and her IT professionals are finalizing the transfer of the purchased websites and domains to their respective buyers and will collect the net sale proceeds (after deducting the Broker's fees and costs) from the third-party escrow account upon completion of the website/domain transfers.

### E. Receiver's Financial Advisor and Forensic Accountants

During the initial reporting period, the Receiver retained Kapila Mukamal ("Kapila") as her financial advisor and forensic accountant to assist her to fulfill her duties under the Appointment Order. Kapila assisted the Receiver with an in-depth investigation of TGC's former business operations, accounting and banking records, and transactions involving investors, creditors, affiliates, insiders and third parties.

As previously reported, Kapila analyzed thousands of bank and accounting records of TGC and bank records of Courtright and prepared a forensic reconstruction of the bank accounts of TGC and Courtright. In the Receiver's prior Status Report, the Receiver reported that Kapila's forensic reconstruction comprised more than 126,000 line-items reflecting approximately $206 million of

---

[6] These amounts represent all sales of websites/domains to date, including through online auction sales and direct private sales to third parties and after the current Reporting Period, during Q1 2022.

funds flowing through the various accounts. Since filing that Report, the Receiver has continued to seek to acquire additional records from financial institutions, including batch payment details, and provided them to Kapila to incorporate into the reconstruction.

During the Reporting Period, Kapila continued to prepare transaction detail schedules and gather supporting documentation to address the Receiver's and claimants' inquiries regarding the claims process and other subjects, and for purposes of the Receiver's claims against third parties, affiliates and insiders who had received significant transfers from TGC and/or facilitated the fraud perpetrated by TGC and Courtright.

### F. Pursuing and Preserving Claims Against Third Parties, Affiliates, and Insiders

During the Reporting Period, the Receiver and her counsel continued to pursue the Estate's claims against third parties, affiliates and insiders, including gathering evidence to support those claims and litigating the actions brought against such parties during prior reporting periods.[7] During the Reporting Period and shortly thereafter, the Receiver and her counsel were able to resolve the Estate's fraudulent transfers claims against two transferees who were defendants in two separate recovery actions. On November 1, 2021 and January 25, 2022, the Receiver filed two separate Motions to approve these settlements [*see* ECF Nos. 173 and 180], and, at the November 17, 2021 status conference, the Court considered and granted the Receiver's Motion to Approve the Settlement with third party Joliet Catholic Academy. *See* ECF No. 176.

---

[7] As detailed in the Receiver's prior Status Report, to preserve the minimal funds in the Receivership Estate, the Receiver and her counsel did not bill the Estate for the formulation and litigation of these recovery claims. Rather, on September 16, 2020, the Receiver filed her Motion for Approval of Contingency Fee Arrangement for such claims. *See* ECF No. 99. And on November 5, 2020, the Court granted that Motion. *See* ECF No. 103.

In the action the Receiver brought during a prior reporting period against the two banks through which TGC received funds from and disbursed funds to investors, the Receiver and her professionals engaged in informal settlement discussions and prepared and exchanged damages calculations to advance those discussions during the current Reporting Period. Further, the Court presiding over that action ruled on the banks' motions to dismiss, granting in part and denying in part the motions, resulting in several of the Receiver's claims surviving against one bank (Heartland Bank & Trust). Accordingly, the Receiver's professionals updated the damages calculations, and Heartland Bank & Trust filed its Answers and Affirmative Defendants to the Receiver's remaining claims.

Further, during the Report Period, the Receiver and her counsel continued to work with third parties, affiliates and insiders to investigate and discuss each of their involvements with TGC and/or Courtright and to evaluate their ability to assist the Receiver in her pursuit of claims against other third parties, affiliates and insiders who received significant transfers from TGC and/or facilitated the fraud perpetrated by TGC and Courtright.

Finally, the Receiver identified potential claims against professionals and, during the Reporting Period, the Receiver entered into Tolling Agreements with those professionals to preserve such claims so the Receiver could pursue them on behalf of TGC.[8]

## IV.    CASH ON HAND AND ACCRUED EXPENSES OF ESTATE

As of the end of the Reporting Period (December 31, 2021), the Estate held a total of $237,9621.23 in cash on hand, comprising funds generated from TGC's business operations (including website revenue deposited in TGC's operating accounts) settlement funds received from third parties, affiliates and insiders against whom the Receiver pursued fraudulent transfer claims.

---

[8] Pursuant to the Court's November 5, 2020 Order [ECF No. 103], the Receiver will pursue those claims on a contingency fee basis to minimize the expense to the Estate.

*See* **Exhibit A**.  The Receiver deposited such funds in her fiduciary account for the Receivership Estate at City National Bank in Miami, Florida.

During the Reporting Period, the Receivership Estate incurred administrative expenses in the form of fees and costs of the Receiver and her professionals for the work they performed in connection with fulfilling the Receiver's duties under the Court's Orders.  Pursuant to the Appointment Order, and in accordance with the timeline set forth in this Court's Order as outlined during the status conference hearing held on September 7, 2021 [ECF No. 169], the Receiver filed her Fourth Quarter 2020, First Quarter 2021, and Second Quarter 2021 fee applications ("Omnibus Fee Application") on November 1, 2021 seeking approval and payment of the Estate's fees and costs from the funds the Receiver has marshalled and deposited into her fiduciary account since she was appointed.  Further, the Receiver's Seventh Fee Application covering the time period from July 1, 2021 through September 30, 2021 was due to be filed on November 15, 2021.  Due to the ongoing negotiations between the Receiver and the SEC regarding the SEC's objections to the Receiver's Omnibus Fee Application, on November 15, 2021, the Receiver filed a motion for extension of time to file her Seventh Fee Application which was granted by this Court making January 28, 2022 the new deadline for the Receiver to file her Seventh Fee Application.  *See* ECF Nos.  175, 176.  On January 28, 2022, the Receiver filed her Seventh Fee Application.  *See* ECF No. 182.

### V.    DISBURSEMENTS OF ESTATE

During the Reporting Period, the Receiver made disbursements totaling $188,606.27 from TGC's operating accounts for expenses necessary to operate and preserve the value of TGC's websites and domains.  Such expenses primarily included payments to the IT contractors who continued to assist the Receiver to preserve the assets, transfer websites, domains and related

content to purchaser and investors who elected website turnover, and operate the business in a limited capacity, utilities, data expense, domain hosting, maintenance fees, and fees for bank account services and maintenance. *See* Exhibit A.

## VI.    KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE

As of the end of the Reporting Period (December 31, 2021), the Receiver was in possession, custody or control of the following assets of the Receivership Estate:

- $237,961.23 in cash on hand in the Receiver's fiduciary account and TGC's operating accounts.

- Approximately 2,000 domain names comprising the remaining digital assets of the Estate.

- Trademarks (precise value currently unknown)

- Claims against third parties, affiliates, and insiders (precise value currently unknown, however, in total the Receiver seeks in excess of $70 million) including fraudulent transfer and/or aiding and abetting actions filed by the Receiver against the following parties[9]:

---

[9] The Receiver previously reported that the Estate had claims against the following parties but has since settled these claims and collected settlement proceeds:

  o  Empire Flippers, LLC and CMS United, Inc.; Case No. 1:20-cv-07811; Venue in the United States District Court for the Northern District of Illinois
    ▪  On May 7, 2021, this Court entered an Order approving the Receiver's settlement with CMS United, Inc. and Empire Flippers in the amount of $250,000, which those defendants subsequently paid. *See* ECF No. 130. Thereafter, the Receiver recovered additional settlement funds from Empire Flippers in the amount of $66,526.08 provided the Receiver's counsel agree not to apportion such proceeds for use in payment of the Receiver's counsel's fees.

  o  Mike Engstrom; Case No. 1:20-cv-07087; Venue in the United States District Court for the Northern District of Illinois
    ▪  On September 7, 2021, this Court entered an Order approving the Receiver's settlement with Michael Engstrom in the amount of $290,000, which Mr. Engstrom subsequently paid. *See* ECF No. 171.

o Heartland Bank & Trust Company; Case No. 1:20-cv-07819; Venue in the United States District Court for the Northern District of Illinois

o William Courtright and Courtright Consulting, Inc.; Case No. 2:20-cv-01012; Venue in the United States District Court for the Middle District of Florida

o Asher Milgrom, Danial Giordano, Daniel Meyer, and JDS Consulting, LLC; Case No. 5:20-cv-06546; Venue in the United States District Court for the Eastern District of Pennsylvania

o Don Shire Ministries, Joliet Catholic Academy, Legacy Families, and Messiah Lutheran Church; Case No. 1:20-cv-07817; Venue in the United States District Court for the Northern District of Illinois
  ▪ On May 7, 2021, this Court entered an Order approving the Receiver's settlement with Don Shire Ministries in the amount of $50,000. *See* ECF No. 130.
  ▪ On November 17, 2021, this Court entered an Order approving the Receiver's settlement with Joliet Catholic in the amount of $100,000. *See* ECF No. 176.

o Conklin Web Properties, LLC d/b/a Conklin Media, Conklin Media, LLC, Prospect MX, LLC, Dave Conklin, Jodi Conklin, Emily Lasko, and Haley Hirthler; Case No. 5:20-cv-06297; Venue in the United States District Court for the Eastern District of Pennsylvania
  ▪ On January 25, 2022, the Receiver filed her Motion to Approve the Settlement and Release Agreement with Dave Conklin, Conklin Web Properties, LLC d/b/a Conklin Media, Conklin Media LLC and Conklin & Courtright LLC in the amount of $170,000.

o Ronald Fossum; Case No. 2:20-cv-01868; Venue in the United States District Court for the Western District of Washington

o William Longcore; Case No. 5:20-cv-06538; Venue in the United States District Court for the Eastern District of Pennsylvania
  ▪ On May 7, 2021, this Court entered an Order approving the Receiver's settlement with William Longcore in the amount of $22,500, which Mr. Longcore subsequently paid. *See* ECF No. 130.

o Pepperdine University; Case No. 1:21-cv-02371; Venue in the United States District Court for the Northern District of Illinois

o EIN Cap, Inc., Alpha Capital Source, Inc., BMF Capital, LLC, FundKite, LLC, AKF, Inc., World Global Capital, LLC, Fox Capital Group, Inc., High Five Group, LLC, and Sutton Funding NY, Inc.; Case No. 21-cv-01792; Venue in the United States District Court for the Northern District of Illinois
  ▪ On September 9, 2021, this Court entered an Order approving the Receiver's settlement with Sutton Funding NY, Inc. in the amount of $55,000, the majority of which was subsequently paid. *See* ECF No. 170. Only the final two monthly installment payments, totaling $10,000, remain unpaid and the Receiver expects to collect that sum during 1Q 2022.

o Click Intelligence, Ltd.; Case No. 1:20-cv-11066; Venue in the United States District Court for the Southern District of New York

o Cody Neer; Case No. 1:21-cv-01999; Venue in the United States District Court for the Middle District of Florida, Tampa Division

o Claims against professionals – not yet filed

## VII. KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE

As explained above, 472 investors, 8 creditors, and 9 former employees submitted claims in the claims process, and the Receiver allowed $70,128,469.32 in investor claims, $1,118,248.04 in creditor claims, and $12,780.60 in employee claims. Of the 472 claims from investors, 33 investors elected to receive one or more of the websites that TGC had assigned to them and forfeit their right to monetary distributions from the Estate. Pursuant to the approval of these claims, the Receiver transferred 69 websites to the 33 investors and satisfied $7,890,102.70 in potential monetary claims against the Estate.

## VIII. RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP AND CONCLUSION

The Receiver recommends the Receivership continue so she may preserve and maximize the value of the Estate's Assets for the benefit of the investors and creditors of the Estate, finalize

the sale of the Estate's remaining assets, conclude the claims process, and propose a distribution plan and implement any plan the Court may approve. Until further order of the Court, the Receiver will continue to work with her team of professionals to locate, marshal, and preserve all known and potential assets of the Estate in accordance with the Appointment Order. Further, the Receiver will continue to investigate, pursue, and litigate existing and potential claims against third parties, affiliates, and insiders on behalf of the Estate. The Receiver will also continue to investigate and gather information regarding the Estate's Assets, claims and potential claims against third parties, affiliates and insiders through subpoenas, depositions, and other inquiries to financial institutions, and other entities and persons with any connection to the Defendants and other sources of recovery for the Estate.

The Receiver will continue to perform all other duties as mandated by the Appointment Order and will continue updating the Court on a quarterly basis as to the status and activities of the Receivership and business operations of TGC.

Respectfully submitted this 31st day of January, 2022.

Respectfully submitted,

/s/ Kenneth Dante Murena
Kenneth Dante Murena, Esq.
Florida Bar No. 147486
DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
Email: kmurena@dvllp.com
Counsel for Melanie E. Damian,
Court-Appointed Receiver

Admitted Pro Hac and General Admission
to Northern District of Illinois

20

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on January 31, 2022 on all counsel or parties who have appeared in the above-styled action.

*/s/Kenneth Dante Murena*
Kenneth Dante Murena,
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*
