**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> TODAY'S GROWTH CONSULTANT, INC. : <br> (dba THE INCOME STORE) : <br> : <br> and : <br> : <br> KENNETH D. COURTRIGHT, III, : <br> : <br> Defendants. : <br> : | Civil Action No. 1:19-CV-08454 |

## RECEIVER'S NINTH STATUS REPORT

Melanie E. Damian, the court-appointed receiver ("Receiver") in the above-captioned enforcement action ("SEC Enforcement Action"), submits her ninth status report concerning the status of the Receivership, established pursuant to the Court's Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief [ECF No. 20] ("TRO") and Order Appointing Receiver ("Appointment Order") [ECF No. 19]. This interim report sets forth the Receiver's activities and efforts to fulfill her duties under the Appointment Order for the period from January 1, 2022 through March 31, 2022 (the "Reporting Period").

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................3

II. PROCEDURAL BACKGROUND ......................................................................................4

III. STATUS AND ACTIVITIES OF THE RECEIVERSHIP AND SUMMARY
OF TGC'S OPERATIONS ..................................................................................................6

    A. *Maintaining TGC's Operations, Reducing Operational
Expenses, and Preserving Assets of the Estate* .......................................................7
    B. *Results of Digital Asset Sales* ..................................................................................9
    C. *Court-Approved Claims Process* ............................................................................9
    D. *Communicating with Investors* .............................................................................10
    E. *Receiver's Financial Advisor and Forensic Accountants* ....................................11
    F. *Pursuing and Preserving Claims Against Third Parties,
Affiliates, and Insiders* ..........................................................................................12

IV. CASH ON HAND AND ACCRUED EXPENSES OF ESTATE .....................................13

V. DISBURSEMENTS OF ESTATE ....................................................................................14

VI. KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE ..........................................14

VII. KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE ........................................16

VIII. RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP AND
CONCLUSION ..................................................................................................................16

I.  **INTRODUCTION**

Since her appointment on December 30, 2019, the Receiver, with the assistance of her retained professionals, including her lead counsel, local counsel, and forensic accountants, has worked diligently to continue to fulfill her duties and obligations as set forth in the Appointment Order and to preserve the assets and records of the Receivership Estate ("Receivership Estate" or "Estate"). In particular, the Receiver took control of all known assets of Defendant Today's Growth Consultant d/b/a The Income Store ("TGC"), including but not limited to the many websites and domains owned by TGC, its business operations, and all other known assets. And the Receiver worked on identifying and marshaling all other assets of TGC, including without limitation funds held in bank accounts, funds transferred to or in the possession of third parties, and other personal property of TGC. The Receiver and her counsel also communicated with investors and answered inquiries regarding, among other things, the status of the SEC Enforcement Action, the claims process and timing of investor distributions, the status and condition of TGC's websites and revenue generated therefrom, the results of the sales of TGC's websites and domains and related digital assets, and the Receiver's efforts to recover assets from third parties, affiliates and insiders for the benefit of the Estate.

During the Reporting Period, the Receiver worked to reduce the Estate's significant monthly operating expenses to more efficiently preserve the value of the Estate. To achieve this, the Receiver, among other things, reduced and eliminated unnecessary data storage costs and third-party subscription services associated with data hosting and domain renewal as well as transferring the day-to-day IT operations and control of TGC's email accounts, cloud storage, and domain management to the Receiver's team to streamline and finalize the transfer of websites and domains to buyers. By assuming the day-to-day operations, the Receiver was able to eliminate the

significant monthly costs associate with retaining the IT consultants which were no longer necessary. The Receiver continued to complete the transfer of all domains and websites to buyers and anticipates the completion of this process and the receipt of all asset sale proceeds in the early second quarter of 2022.

As detailed in her prior status reports, the Receiver continued to litigate the Estate's claims against third parties, affiliates and insiders of the Defendants who improperly received significant recoverable transfers from TGC without providing reasonably equivalent value in exchange therefor and/or facilitated and assisted TGC and its principal Defendant Kenneth D. Courtright, III ("Courtright") to perpetrate the fraud that is the subject of this enforcement action and receivership. During the Reporting Period, the Receiver continued to advance the recovery actions and pursue expeditious resolutions of the Receiver's claims through judicial settlement conferences and settlement negotiations. During the Reporting Period, the Receiver reached a settlement with one of the Defendants which this Court approved. *See* ECF Nos. 180, 190. Further, the Receiver collected additional settlement amounts from third parties with whom she previously settled claims.

## II.     PROCEDURAL BACKGROUND

The Appointment Order entered on December 30, 2019, among other things, directs the Receiver to file with the Court within thirty (30) days after the end of each calendar quarter her report and recommendations regarding the status and activities of the Receivership Estate and TGC's business operations during the prior calendar quarter. *See* ECF No. 19. In particular, the Receiver's quarterly status reports are required to include: (1) a summary of the operations of the Receiver; (2) a summary of cash on hand, accrued administrative expenses, and the amount of unencumbered funds in the Estate; (3) a schedule of the Estate's receipts and disbursements; (4) a

description of all known assets of the Estate; (5) a description of liquidated and unliquidated claims held by the Estate; (6) a list of all known creditors of the Estate; (7) a status of Creditor Claims Proceedings (once commenced); and (8) the Receiver's recommendations for a continuation or discontinuation of the receivership. *See* ECF No. 19 at pp. 21-22.

On January 30, 2020, as required under the Appointment Order, the Receiver filed her Initial Status Report, which described, among other things, the Receiver's activities and efforts to fulfill her obligations under the Appointment Order during the first thirty (30) days of the receivership. *See* ECF No. 45. Importantly, in her Initial Status Report, the Receiver concluded that TGC's business records confirm the allegations as set forth in the SEC's Complaint [ECF No. 1]. *See* EFC No. 45. Specifically, because TGC's revenue that was generated from all of the websites each month was significantly less than the monthly payment obligations to the investors and are thus not sufficient to cover both monthly payments to investors as well as TGC's monthly overhead expenses, the Receiver concluded that the long-term costs associated with maintaining and preserving the digital assets of TGC is not in the best interest of the Receivership Estate.[1] *See id*. Based on this conclusion and the Receiver's analysis of the equities of all interested parties, including the investors, the receipts and expenses of TGC's operations and of the Receivership Estate, and likely recoveries of the Estate, the Receiver outlined her proposal to promptly seek Court approval for a claims process and partial distribution plan which provided for, among other things, the transfer of websites to investors electing to receive them in lieu of monetary distributions. *See id*. On February 28, 2020, the Receiver filed her Claims Process Motion. *See*

---

[1] Indeed, since her appointment, the Receiver has detailed in her quarterly status reports the significant expenses associated with merely maintaining the assets including retaining a skeletal group of IT professionals and the ongoing carrying costs of the domains and websites. *See* ECF Nos. 45, 81, 101, 115, 127, 160, 172, 184.

ECF No. 53. The Court granted the Receiver's Claims Process Motion on November 30, 2020 [ECF No. 109] and the Receiver implemented the plan as set forth below in Section III(B) *infra*.

The Receiver's subsequent status reports detailed, among other things, the Receiver's continued efforts to carry out her duties and obligations as set forth in the Appointment Order including, without limitation, her efforts to preserve, maintain, and recover the Assets of the Estate. *See* ECF Nos. 81, 101, 115, 127, 160, 172, 184.

### III. STATUS AND ACTIVITIES OF THE RECEIVERSHIP AND SUMMARY OF TGC'S OPERATIONS

The Receiver, with the assistance of her professionals, continues to perform all duties and obligations as set forth in the Appointment Order. During the Reporting Period, the Receiver focused her attention and resources on: (A) maintaining and preserving the assets of the Receivership Estate, including the remaining digital assets; (B) working to transfer any remaining website files, domains, and associated content including social media accounts to buyers while sparingly utilizing TGC's former IT team on an hourly basis to assist with the final transfers; (C) reducing monthly operational costs including but not limited to server costs and third-party subscription based services formerly associated with operational websites and transferring the control of managing the Estate's remaining digital assets to the Receiver's team to significantly reduce monthly operational costs; (D) continuing to implement and monitor the Court-approved claims process while working closely with investors and creditors to answer questions; (E) further communicating with investors to address their questions and concerns regarding the SEC Enforcement Action and the Receivership; (F) continuing to identify, locate, and marshal assets of the Receivership Estate; (G) investigating claims against professionals including counsel and accountants, insiders, affiliates and third parties by obtaining and analyzing said professionals' files and documents related to work performed for TGC to formulate and pursue the Estate's

claims; (H) working with the parties to propose and draft modifications to the parties' Joint Stipulation and Protective Order Prohibiting Use of Documents and Information Outside of This Litigation [ECF No. 100] to permit the Receiver to meaningfully engage in discovery in the Estate's claims against insiders, affiliates and third parties; (I) responding to Defendant Courtright's formal motions for turnover of documents and information, specifically, his personal computer in the possession of his prior counsel; (J) working with her forensic accountant to analyze the books and records of TGC for purposes of tracing funds transferred from TGC to insiders, affiliates and third parties, and providing transferee reports to the Receiver and her counsel for purposes of litigating claims against such transferees as well as further investigating and formulating claims against such transferees; and (K) pursuing the claims of TGC and the Estate by continuing to litigate pending recovery actions against insiders, affiliates and third parties who received significant transfers from TGC without providing reasonably equivalent value, and/or facilitated and assisted TGC and Courtright to commit the fraud that is the subject of the SEC Enforcement Action.[2]

### A. Maintaining TGC's Operations, Reducing Operational Expenses, and Preserving Assets of the Estate

During the Reporting Period, in an effort to reduce monthly operating expenses, the Receiver and her counsel took control of TGC's day-to-day operations including maintaining the Estate's remaining digital assets and finalizing the transfer of website files, domains, and related content including social media accounts to buyers. The Receiver continued to work with buyers to transfer any remaining digital assets while prudently utilizing the services of TGC's former IT team to assist with any of the buyers' technical issues.

---

[2] As authorized by this Court, the Receiver's counsel are pursuing such recovery claims on a contingency fee basis to preserve the limited resources of the Estate. *See* ECF No. 103.

The Receiver further reduced monthly operational costs by discontinuing payment for ownership renewal fees associated with the Estate's numerous domains as the value of the remaining domains no longer supported payment of these significant fees. The Receiver consulted several digital asset experts including experts specializing in domains specifically to obtain opinions on whether the remaining domains held value such that the Estate should continue to pay the significant monthly ownership renewal fees. The experts that the Receiver consulted were unanimous in their opinions that the value of the remaining domains would not offset the monthly costs required to keep the domains in the Estate's portfolio. As such, to maximize the value of the remaining digital assets, the Receiver worked with a third-party broker service, Afternic, to passively list for sale all remaining domains while discontinuing further monthly payments.

During the Reporting Period, the Receiver received numerous price inquiries for the domains listed for sale through Afternic, and the Receiver strategically set individual prices for each domain utilizing valuation resources provided by digital asset experts and was successful in selling additional domains for the benefit of the Estate.

The Receiver and her professionals will work to finalize the transfer of any remaining website files, domains and related content to buyers, address any issues that may arise with the buyers and the Estate's remaining domains and content, continue to negotiate and sell additional domains through the Afternic service, collect all proceeds related to the sale of the assets, and further reduce costs by discontinuing any remaining IT services including data preservation and storage once they are no longer necessary so as to preserve the value of the Estate in accordance with her duties and obligations under the Court's Orders.

### B. Results of Digital Asset Sales

As previously reported, the final auction sale that was held on October 27, 2021 resulted in the sale of 103 websites/domains, generating gross proceeds totaling $89,150.00 for the Estate. While a number of websites/domains did not sell at the auction, the Receiver with the assistance of GoDaddy premiere services marketed the remaining domains for sale using the Afernic service, as outlined above, and negotiated and sold additional domains during the Reporting Period. The domain sales through Afternic resulted in an additional $1,800 for the Estate with numerous inquiries from potential buyers still pending.

As outlined in her prior status reports, the Receiver's previous sales with the assistance of her retained digital asset broker, Right of the Dot, LLC, resulted in the sale of approximately 890 websites/domains, which generated gross sales proceeds totaling $565,733.66 for the Estate.[3] The Receiver is finalizing the transfer of the purchased websites, domains and associated content including social media accounts to their respective buyers and expects to collect the net sale proceeds (after deducting the Broker's fees and costs) from the third-party escrow account early in the second quarter of 2022.

### C. Court-Approved Claims Process

As previously reported, in accordance with this Court's Memorandum and Opinion Order granting the Receiver's Claims Process Motion [ECF No. 109], on December 15, 2020, the Receiver sent Claims Packages to 832 potential claimants (including government taxing agencies) via email and another 24 Claims Packages via U.S. Mail or Federal Express. Shortly after sending out the Claims Packages, the Receiver and her professionals began receiving, organizing, and

---

[3] These amounts represent all sales of websites/domains to date, including through online auction sales and direct private sales to third parties. These amounts do not include sales through Afternic.

9

processing completed claim forms that claimants had sent to the Receiver's email address established for the claims process (IncomeStoreClaims@dvllp.com).

During the Reporting Period, the Receiver continued to receive and respond to email inquiries from investors regarding the claims process and the status and timing for an initial distribution.

As previously reported, pursuant to her Final Determinations, the Receiver approved claims for monetary distribution to investors totaling approximately $70,128,469.32, to former employees totaling approximately $12,780.60, and to creditors totaling approximately $1,118,248.04 ($760,552.17 of which is subordinated to the claims of investors pursuant to an agreed order). Of the 472 claims from investors, 33 investors elected to receive one or more of the websites that TGC had assigned to them and forfeit their right to monetary distributions from the Estate. Pursuant to the approval of these claims, the Receiver transferred 69 websites to the 33 investors and satisfied $7,890,102.70 in potential monetary claims against the Estate.

### D. Communicating with Investors

During the Reporting Period, the Receiver continued to regularly communicate with investors through the email accounts, telephone number, and Receivership website established to provide information to, and address the questions and concerns of, investors. In particular, through the email accounts established for the Receivership (IncomeStore@dvllp.com; IncomeStoreClaims@dvllp.com) and telephone number set up soon after the commencement of the Receivership, the Receiver's professionals responded to investors' inquiries regarding (i) the Court-approved claims process and eventual distribution plan, (ii) submitting untimely claim forms, (iii) transferring websites and corresponding social media channels to the investors pursuant to their elections in the claims process, (iv) the Estate Assets being sold at the online auction sale

and directly to third parties and the results of the sales, and (v) the SEC Enforcement Action and Receivership in general.

### E. Receiver's Financial Advisor and Forensic Accountants

During the initial reporting period, the Receiver retained Kapila Mukamal ("Kapila") as her forensic accountant and tax consultant to assist her to fulfill her duties under the Appointment Order. Kapila assisted the Receiver with an in-depth investigation of TGC's former business operations, accounting and banking records, and transactions involving investors, creditors, affiliates, insiders and third parties.

As previously reported, Kapila analyzed thousands of bank and accounting records of TGC and bank records of Courtright and prepared a forensic reconstruction of the bank accounts of TGC and Courtright. In the Receiver's prior Status Report, the Receiver reported that Kapila's forensic reconstruction comprised more than 126,000 line-items reflecting approximately $206 million of funds flowing through the various accounts. Since filing that Report, the Receiver has continued to seek to acquire additional records from financial institutions, including batch payment details, and provided them to Kapila to incorporate into the reconstruction.

During the Reporting Period, Kapila monitored and reviewed draft 1099 tax forms prepared for the year 2021, prepared an extension for the deadline to file federal tax forms, and continued to prepare transaction detail schedules and gather supporting documentation to address the Receiver's and claimants' inquiries regarding the claims process and other subjects, and for purposes of the Receiver's claims against third parties, affiliates and insiders who had received significant transfers from TGC and/or facilitated the fraud perpetrated by TGC and Courtright.

### F. Pursuing and Preserving Claims Against Third Parties, Affiliates, and Insiders

During the Reporting Period, the Receiver and her counsel continued to pursue the Estate's claims against third parties, affiliates and insiders, including gathering evidence to support those claims and litigating the actions brought against such parties during prior reporting periods.[4] During the Reporting Period, the Receiver and her counsel were able to resolve the Estate's fraudulent transfers claims against four transferees who were separate defendants in one of the Estate's recovery actions. On January 25, 2022, the Receiver filed her Motion to approve this settlement [*see* ECF No. 180], and, at the February 15, 2022 status conference, the Court granted the Receiver's Motion to Approve the Settlement with third parties Dave Conklin, Conklin Web Properties, LLC d/b/a Conklin Media, Conklin Media, LLC, and Conklin & Courtright, LLC. *See* ECF No. 190.

In the action the Receiver brought during a prior reporting period against the two banks through which TGC received funds from and disbursed funds to investors[5], the Receiver and her professionals further engaged in informal settlement discussions while exchanging written discovery and scheduling depositions.

Further, during the Report Period, the Receiver and her counsel continued to work with third parties, affiliates and insiders to investigate and discuss each of their involvements with TGC

---

[4] As detailed in the Receiver's prior Status Reports, to preserve the minimal funds in the Receivership Estate, the Receiver and her counsel did not bill the Estate for the formulation and litigation of these recovery claims. Rather, on September 16, 2020, the Receiver filed her Motion for Approval of Contingency Fee Arrangement for such claims. *See* ECF No. 99. And on November 5, 2020, the Court granted that Motion. *See* ECF No. 103.

[5] During a prior reporting period, the Court presiding over the action against the banks ruled on the banks' motions to dismiss, granting in part and denying in part the motions, resulting in several of the Receiver's claims surviving against one bank (Heartland Bank & Trust).

and/or Courtright and to evaluate their ability to assist the Receiver in her pursuit of claims against other third parties, affiliates and insiders who received significant transfers from TGC and/or facilitated the fraud perpetrated by TGC and Courtright.

Finally, during the Reporting Period, the Receiver continued to investigate and formulate the Estate's claims against TGC's former professionals. The Receiver obtained and analyzed documents and information from TGC's former counsel related to representation of TGC and further pursued additional documents and information from TGC's other former professionals in order to fully develop and pursue the Estate's claims within the time period set forth in the Tolling Agreements with those professionals.[6]

### IV. CASH ON HAND AND ACCRUED EXPENSES OF ESTATE

As of the end of the Reporting Period (March 31, 2022), the Estate held a total of $377,151.23 in cash on hand, comprising, among other things, funds generated from TGC's business operations (including website revenue deposited in TGC's operating accounts) and settlement funds received from third parties, affiliates and insiders against whom the Receiver pursued fraudulent transfer claims. *See* **Exhibit A**. The Receiver deposited such funds in her fiduciary account for the Receivership Estate at City National Bank in Miami, Florida.

During the Reporting Period, the Receivership Estate incurred administrative expenses in the form of fees and costs of the Receiver and her professionals for the work they performed in connection with fulfilling the Receiver's duties under the Court's Orders. On March 2, 2022, the Court entered the parties' Stipulation and Order Concerning Receiver's Interim Fee Applications that, among other things, set forth the timing and procedure for payment of the Receiver's and her professionals' outstanding administrative fees and further governing the protocol for application

---

[6] Pursuant to the Court's November 5, 2020 Order [ECF No. 103], the Receiver will pursue those claims on a contingency fee basis to minimize the expense to the Estate.

and payment of the Receiver's and her professionals' administrative fees set forth in all future fee applications. *See* ECF No. 191. The Receiver's future fee applications, including the application associated with the Receiver and her professionals' administrative fees and costs through the first quarter of 2022, will conform with the procedures set forth in the parties' Stipulation.

## V. DISBURSEMENTS OF ESTATE

During the Reporting Period, the Receiver made disbursements totaling $32,473.80 from TGC's operating accounts for expenses necessary to preserve the value of TGC's remaining digital assets and to facilitate and finalize the transfer of the remaining digital assets purchased by buyers. Such expenses included payments to the IT contractors who continued to assist the Receiver to transfer websites, domains and related content to buyers, and to operate the business in a limited capacity including reduced expenses associated with data preservation, domain hosting, and fees for bank account services and maintenance. *See* Exhibit A.

## VI. KNOWN PROPERTY OF THE RECEIVERSHIP ESTATE

As of the end of the Reporting Period (March 31, 2022), the Receiver was in possession, custody or control of the following assets of the Receivership Estate:

- $377,151.23 in cash on hand in the Receiver's fiduciary account and TGC's operating accounts.

- Approximately $565,733.66 in gross proceeds from the sale of the Estate's digital assets, currently held in escrow pending agreement as to broker's commission (the Receiver estimates that at least $450,000 in net sale proceeds will be transferred to the Estate).

- Approximately 2,000 domain names comprising the remaining digital assets of the Estate (precise value currently unknown).

- Trademarks (precise value currently unknown)

  Claims against third parties, affiliates, and insiders (precise value currently unknown, however, in total the Receiver seeks in excess of $35 million)

including fraudulent transfer and/or aiding and abetting actions filed by the Receiver against the following parties:

- Heartland Bank & Trust Company; Case No. 1:20-cv-07819; Venue in the United States District Court for the Northern District of Illinois

- William Courtright and Courtright Consulting, Inc.; Case No. 2:20-cv-01012; Venue in the United States District Court for the Northern District of Illinois

- Asher Milgrom, Danial Giordano, Daniel Meyer, and JDS Consulting, LLC; Case No. 5:20-cv-06546; Venue in the United States District Court for the Eastern District of Pennsylvania

- Don Shire Ministries, Joliet Catholic Academy, Legacy Families, and Messiah Lutheran Church; Case No. 1:20-cv-07817; Venue in the United States District Court for the Northern District of Illinois
    - On May 7, 2021, this Court entered an Order approving the Receiver's settlement with Don Shire Ministries in the amount of $50,000. *See* ECF No. 130.
    - On November 17, 2021, this Court entered an Order approving the Receiver's settlement with Joliet Catholic in the amount of $100,000. *See* ECF No. 176.

- Ronald Fossum; Case No. 2:20-cv-01868; Venue in the United States District Court for the Western District of Washington

- Pepperdine University; Case No. 1:21-cv-02371; Venue in the United States District Court for the Northern District of Illinois

- EIN Cap, Inc., Alpha Capital Source, Inc., BMF Capital, LLC, FundKite, LLC, AKF, Inc., World Global Capital, LLC, Fox Capital Group, Inc., High Five Group, LLC, and Sutton Funding NY, Inc.; Case No. 21-cv-01792; Venue in the United States District Court for the Northern District of Illinois
    - On September 9, 2021, this Court entered an Order approving the Receiver's settlement with Sutton Funding NY, Inc. in the amount of $55,000, the majority of which was subsequently paid. *See* ECF No. 170. During the Reporting Period, Sutton Funding made two payments totaling $10,000. *See* Exhibit A.

- Click Intelligence, Ltd.; Case No. 1:20-cv-11066; Venue in the United States District Court for the Southern District of New York
    - On February 11, 2022, the Court presiding over this matter

15

        entered an Order granting the Defendants Motion to Dismiss for Lack of Jurisdiction and for Forum Non Conveniens. ECF No. 40. The Receiver will re-file this action in the appropriate venue.

- Cody Neer; Case No. 1:21-cv-01999; Venue in the United States District Court for the Middle District of Florida, Tampa Division

- Claims against former counsel and accountant of TGC – not yet filed

## VII. KNOWN CREDITORS OF THE RECEIVERSHIP ESTATE

As detailed in the Receiver's prior status reports, 472 investors, 8 creditors, and 9 former employees submitted claims in the claims process, and the Receiver allowed $70,128,469.32 in investor claims, $1,118,248.04 in creditor claims, and $12,780.60 in employee claims. Of the 472 claims from investors, 33 investors elected to receive one or more of the websites that TGC had assigned to them and forfeit their right to monetary distributions from the Estate. Pursuant to the approval of these claims, the Receiver transferred 69 websites to the 33 investors and satisfied $7,890,102.70 in potential monetary claims against the Estate.

## VIII. RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP AND CONCLUSION

The Receiver recommends the Receivership continue so she may continue to preserve and maximize the value of the Estate's assets for the benefit of the investors and creditors of the Estate, finalize the transfer of the digital assets purchased by buyers, conclude the claims process, and propose a distribution plan and implement any plan the Court may approve. Until further order of the Court, the Receiver will continue to work with her team of professionals to locate, marshal, and preserve all known and potential assets of the Estate in accordance with the Appointment Order. Further, the Receiver will continue to investigate, pursue, and litigate existing and potential claims against third parties, affiliates, and insiders on behalf of the Estate. The Receiver will also continue to investigate and gather information regarding the Estate's assets, claims and potential

claims against third parties, affiliates and insiders through subpoenas, depositions, and other inquiries to financial institutions, and other entities and persons with any connection to the Defendants and other sources of recovery for the Estate.

The Receiver will continue to perform all other duties as mandated by the Appointment Order and will continue updating the Court on a quarterly basis as to the status and activities of the Receivership and business operations of TGC.

Respectfully submitted this 2nd day of May, 2022.

                                                Respectfully submitted,

                                                */s/ Kenneth Dante Murena*
                                                Kenneth Dante Murena, Esq.
                                                Florida Bar No. 147486
                                                DAMIAN & VALORI LLP
                                                1000 Brickell Avenue, Suite 1020
                                                Miami, Florida 33131
                                                Telephone: (305) 371-3960
                                                Facsimile: (305) 371-3965
                                                Email: kmurena@dvllp.com
                                                *Counsel for Melanie E. Damian,*
                                                *Court-Appointed Receiver*

                                                *Admitted Pro Hac and General Admission*
                                                *to Northern District of Illinois*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on May 2, 2022 on all counsel or parties who have appeared in the above-styled action.

                                                */s/Kenneth Dante Murena*
                                                Kenneth Dante Murena,
                                                *Counsel for Melanie E. Damian,*
                                                *Court-Appointed Receiver*